UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VLADIMIR VEDENEEV and GLOBAL NETWORK MANAGEMENT INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> JOURNALISM DEVELOPMENT NETWORK INC. d/b/a THE ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT, <br><br> *Defendant*. | CIVIL ACTION NO. _____ <br><br><br> JURY TRIAL DEMANDED |

## **COMPLAINT**

1.      This defamation action arises from the publication by Defendant Journalism Development Network Inc. d/b/a the Organized Crime and Corruption Reporting Project ("OCCRP") of a sensational story accusing Plaintiffs Vladimir Vedeneev and Global Network Management Inc. ("GNM") of spying on Telegram users for the Russian Federal Security Service ("FSB").  Specifically, in an article headlined "Telegram, the FSB, and the Man in the Middle," (the "Article") OCCRP told the world that Mr. Vedeneev and GNM controlled and monitored Telegram data and information and provided it to the Kremlin.

2.      OCCRP's accusations are categorically false.  And OCCRP knew they were false before it published them.  But OCCRP did not care, because it wanted to publish a sensational, fear-mongering story.

3.      Mr. Vedeneev and GNM have built their businesses and reputations by providing legitimate telecom services to commercial clients.  Mr. Vedeneev is a network engineer and entrepreneur.  He is the founder of GNM, an Antigua-and-Barbuda-based telecommunications

company that is a recognized Local Internet Registry and provides infrastructure-related services that facilitate high-capacity connectivity services across Europe, Asia, and beyond in accordance with international standards and regulations.

4.    As relevant here, although GNM provides limited telecom services to Telegram (as it does for numerous clients around the world), GNM and Mr. Vedeneev have *never* had authority over Telegram's internal systems, infrastructure, or data; have *never* controlled Telegram's routing; have *never* had access to Telegram message content or encryption keys; have *never* monitored Telegram users; and have *never* worked for or engaged in espionage for the Russian FSB (or anyone else).

5.    But OCCRP—determined to publish a sensational, attention-grabbing narrative—ignored those facts and the voluminous evidence confirming their truth and instead cast Mr. Vedeneev and GNM as covert agents of Russian surveillance.  It did so both directly and indirectly—through a series of implications of false connections between Mr. Vedeneev and the Russian FSB and through false accusations about Mr. Vedeneev's access to Telegram data. OCCRP's message was simple and sensational: Mr. Vedeneev and GNM are "man in the middle" agents helping the Russian government surveil Telegram users.

6.    OCCRP's spy-novel narrative has no basis in fact.  Mr. Vedeneev and GNM have *not* provided Telegram data or information to the Russian FSB (or anyone else), have *not* intercepted or accessed Telegram communications, have *not* controlled Telegram's internal systems or routing, and have *not* engaged in espionage or any other criminal conduct.  Rather, the services GNM provided Telegram were limited and lawful:  GNM allocated IP address blocks to Telegram in its capacity as a Local Internet Registry and performed routine physical maintenance on equipment, just as it does for countless customers.  Telegram—*not* Mr. Vedeneev or GNM—

assigned specific IP addresses to its servers and devices and managed its own routing and operational control. Public technical records and Telegram's own statements confirm exactly that.

7. OCCRP knew all of this before it published the Article. Before the Article ran, Mr. Vedeneev participated in a lengthy interview with OCCRP reporter Roman Anin. And even though Mr. Anin misrepresented to Mr. Vedeneev the substance of the Article that he and OCCRP were preparing to publish—no doubt an attempt to avoid receiving from Mr. Vedeneev evidence and information that would disprove the sensational accusations they intended to publish and dupe Mr. Vedeneev into an interview he would have otherwise rejected—Mr. Vedeneev explained in detail that IP address allocation does not amount to routing control; that GNM did not carry or route Telegram traffic; that neither he nor GNM had access to Telegram message content, internal systems, or encryption keys; and that GNM does not operate in Russia or provide information to Russian authorities. The facts Mr. Vedeneev explained are supported by publicly available technical records and by Telegram's own public statements. OCCRP ignored them and published its accusations anyway.

8. By willfully ignoring the truth and knowingly publishing its false accusations against Mr. Vedeneev and GNM, OCCRP acted with actual malice. Even still, Mr. Vedeneev and GNM tried to avoid bringing this lawsuit. Since OCCRP published its Article, Mr. Vedeneev and GNM repeatedly engaged with OCCRP and explained to it the falsity of its defamatory accusations, citing extensive public records, official documents, technical facts, and other documentary evidence. And Mr. Vedeneev and GNM demanded—repeatedly—that OCCRP retract its false and defamatory accusations. But OCCRP has steadfastly refused to do so and has instead doubled down on them.

9. Enough is enough. Mr. Vedeneev and GNM cannot continue to sit idly by while OCCRP falsely brands them agents of Russian espionage, destroys their reputations, and costs them substantial business. Mr. Vedeneev and GNM bring this action to hold OCCRP accountable for its false and defamatory accusations, to recover for the substantial and irreparable harm OCCRP has caused, and to vindicate their rights, their business, and their reputations.

## PARTIES AND RELEVANT NON-PARTIES

10. Plaintiff Vladimir Vedeneev is an Antiguan and Barbudan citizen, and a Russian citizen by birth, who resides and is domiciled in Switzerland. He is an entrepreneur and telecommunications executive and is the CEO of Plaintiff Global Network Management, Inc.

11. Plaintiff Global Network Management Inc. ("GNM") is a corporation incorporated under the laws of Antigua and Barbuda that maintains its headquarters and principal place of business in Antigua and Barbuda. It is a global telecommunications operator focused on providing infrastructure support between data centers. GNM has never been incorporated in Russia and has never been affiliated with any Russian legal or corporate authorities.

12. Defendant Journalism Development Network Inc. d/b/a the Organized Crime and Corruption Reporting Project ("OCCRP") is a corporation incorporated under the laws of the State of Maryland that maintains its headquarters and principal place of business in the District of Columbia.[1] OCCRP touts itself as one of the largest investigative journalism organizations in the world and boasts that it is "mission-driven ... to publish stories that lead to real-world action." OCCRP published the Article headlined "Telegram, the FSB, and the Man in the Middle," that makes numerous false and defamatory accusations against Mr. Vedeneev and GNM.

---

[1] *See, e.g.*, Journalism Development Network Inc., Return of Organization Exempt From Income Tax (Form 990) (Nov. 5, 2025), *available at* https://apps.irs.gov/pub/epostcard/cor/260898750_202412_990_2026020923906160.pdf.

13. Non-Party Important Stories is an online news outlet focused on covering the Russian government. It was founded by Roman Anin and is a co-publisher of the Article. OCCRP refers to Important Stories as its "partner."

14. Non-Party Roman Anin is a Russian journalist. Mr. Anin co-founded Important Stories and works for and is a partner of OCCRP. He is one of the co-authors of the Article, which he reported, investigated, and authored for OCCRP and Important Stories.

**<u>JURISDICTION</u>**

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between Plaintiffs and Defendant and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, Mr. Vedeneev is a citizen of Antigua and Barbuda (and Russia by birth) and resides and is domiciled in Switzerland; Global Network Management Inc. is a citizen and domiciliary of Antigua and Barbuda; and Journalism Development Network Inc. d/b/a the Organized Crime and Corruption Reporting Project ("OCCRP") is a citizen of the State of Maryland and the District of Columbia (and is not a citizen or domiciliary of any foreign state).

16. This Court has personal jurisdiction over Defendant OCCRP because it maintains its headquarters and principal place of business in the District of Columbia and is a citizen and domiciliary of the District of Columbia.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant OCCRP resides in and is subject to personal jurisdiction in the District of Columbia.

**FACTS**

**Vladimir Vedeneev Works Tirelessly to Become a
Successful Businessman in the Telecommunications Industry and
Founds and Grows Global Network Management ("GNM")—
While Scrupulously Maintaining His Privacy**

18.     Mr. Vedeneev has worked tirelessly his entire professional career to succeed in the telecommunications industry while supporting humanitarian philanthropic causes and scrupulously maintaining his privacy.

*Mr. Vedeneev Receives Engineering and Business Degrees
and Enters the Telecommunications Industry*

19.     Mr. Vedeneev was born in Tolyatti, Russia.  In the late 1990s he moved to St. Petersburg,  where he enrolled at St. Petersburg State Technical University, from which he graduated in 2003 with a degree in Information Technology and Telecommunications Infrastructure Engineering.  After receiving his engineering degree, Mr. Vedeneev continued his education at St. Petersburg State University, where he received his Master of Business Administration (MBA) degree.

20.     After receiving his engineering degree, and while pursuing his MBA, Mr. Vedeneev joined the LenSpecSMU Group (now known as Etalon Group), a real estate development company, where he served as Deputy General Director of one of its subsidiaries and oversaw internet connectivity for residential projects.

21.     As Mr. Vedeneev acquired hands-on experience and expanded his technical and managerial expertise, he embarked on an entrepreneurial journey.  He founded two Russian telecommunications companies—Electron Telecom Company ("ElectronTelecom") and GlobalNet LLC ("GlobalNet")—that specialized in providing broadband services and backbone network infrastructure.  ElectronTelecom was established on the foundation of LenSpecSMU Group, which acted as its primary partner during its founding stage.  Neither ElectronTelecom nor

GlobalNet had or would have any relation to the company Mr. Vedeneev would soon found, Global

Network Management Ltd. (BVI), which would later become Global Network Management Inc.

*Mr. Vedeneev Founds and Grows*
*Global Network Management Inc. ("GNM")*

22.    In 2011, Mr. Vedeneev founded Global Network Management Ltd. (BVI) with the

goal of establishing a company to facilitate the burgeoning internet communications and traffic

across the world.  Mr. Vedeneev deliberately chose to incorporate the company in the British

Virgin Islands rather than in Russia to ensure that it would operate entirely outside Russia's

jurisdiction and be free from control or influence by Russian authorities as it served a global client

base.

23.    In 2017, Mr. Vedeneev moved out of Russia, and in 2018, he restructured Global

Network Management Ltd. (BVI) into Global Network Management Inc. ("GNM") in Antigua

and Barbuda, under whose laws it was incorporated and where it established its headquarters and

principal place of business.  All clients of Global Network Management Ltd. (BVI) were

transferred to GNM, and the BVI entity was dissolved.

24.    GNM is an international telecommunications infrastructure provider that provides

backbone and Internet Exchange infrastructure—all in accordance with international standards—

to facilitate high-capacity connectivity services across Europe, Asia, and beyond.  GNM provides

infrastructure at the physical (Layer 1) and data link (Layer 2) levels, such as fiber connectivity

and ethernet transport.

25.    In that capacity, GNM works closely with the Réseaux IP Européens Network

Coordination Centre ("RIPE NCC").  RIPE NCC, which is headquartered in the Netherlands, is an

independent, not-for-profit organization that functions as the Regional Internet Registry (RIR) for

Europe, the Middle East, and parts of Central Asia, allocating and administering internet number resources (including IP addresses and Autonomous System Numbers) for those regions.

26.   GNM, for its part, is a recognized Local Internet Registry (LIR) within the RIPE NCC system.  As a LIR, GNM receives internet number resources (like IP addresses) from RIPE NCC and assigns them to customers.  (RIPE NCC does not deal directly with most end users.)

27.   GNM's role is purely administrative:  It pays registry fees, maintains contact records, and may sponsor sub-allocations under RIPE NCC policies.  GNM does *not* have operational authority, such as making routing decisions or prefix announcements, and does *not* have access to its customers' systems.

28.   GNM's client base includes such internationally recognized companies as Google Ireland Limited (and its infrastructure subsidiary Raiden Unlimited), Cloudflare Inc., Vodafone, and Telecom Italia—all of which conducted independent due diligence on GNM before engaging its services.  GNM is also certified by Google as a Gold Level Verified Peering Provider, the highest verification level within Google's VPP program that confirms that GNM provides highly reliable, redundant, and secure connectivity to Google's network across multiple metropolitan areas.

29.   Global Network Management Ltd (BVI) and GNM have *never* been active in Russia, have *never* had or maintained any ties with the Russian government, and have *never* had clients or offices in Russia.  In fact, their only "connection" with Russia is the fact that GNM formerly occasionally contracted directly with individual employees from ElectronTelecom or GlobalNet to perform work in Russia because of their relevant market knowledge, technical expertise, and prior experience on specific types of projects.  But because GNM contracted directly

8

with those individuals (not ElectronTelecom or GlobalNet), GNM had *no* contracts with either ElectronTelecom or GlobalNet, and ElectronTelecom and GlobalNet had *no* operational control over Global Network Management Ltd (BVI) or GNM.

30.    Likewise, Global Network Management Ltd (BVI) and GNM have *never* had any corporate, operational, financial, managerial, or technical control over either ElectronTelecom or GlobalNet—and ElectronTelecom and GlobalNet have *never* had any corporate, operational, financial, managerial, or technical control over Global Network Management Ltd (BVI) or GNM. Indeed, the companies own and operate physically separate segments of fiber optic infrastructure: GNM (like Global Network Management Ltd (BVI) before it) owns and manages the segment in Europe up to the Russian border, while GlobalNet owns and manages the segment inside Russia. Although the fiber cable between Europe and Russia is physically continuous, operational control is strictly divided at the border.

31.    Mr. Vedeneev has long focused his professional efforts on GNM; from 2017-2024, ElectronTelecom and GlobalNet were managed by hired directors and Mr. Vedeneev's involvement with them was limited to attending board meetings.

32.    In 2024, Mr. Vedeneev sold his ownership interests in ElectronTelecom and GlobalNet in a commercial sale and since then he has had no interest in or involvement with either company.

*Mr. Vedeneev Dedicates His Non-Business Efforts*
*to Supporting Various Humanitarian Causes*

33.    Throughout his career, Mr. Vedeneev has dedicated himself to not just his work but also to the support of humanitarian philanthropic causes. Before moving out of Russia in 2017, Mr. Vedeneev volunteered his time teaching computer literacy and technology education at a

9

children's orphanage and provided financial and organizational support for a pediatric hospice in St. Petersburg.

34.    And Mr. Vedeneev remained committed to supporting humanitarian causes after leaving Russia.  Most recently, Mr. Vedeneev has provided assistance to Ukrainian children and to families displaced by Russia's war on Ukraine and has provided financial support to the parish led by Grigory Mikhnov-Vaitenko, an outspoken Russian Orthodox priest and human rights defender known for his opposition to Russia's war on Ukraine and staunch criticism of the Kremlin.

### *Mr. Vedeneev Has Always Maintained and Scrupulously Guarded His Privacy*

35.    Although Mr. Vedeneev has achieved business success, he has jealously maintained and guarded his privacy.  He has not sought out publicity for himself, does not speak out on public issues, and does not have (or cultivate) a public persona.  To the contrary, Mr. Vedeneev is an intensely private person with no desire for any spotlight.

36.    OCCRP acknowledged as much in its defamatory article, admitting that Mr. Vedeneev is "a man with no public profile."  Indeed, the only public profile Mr. Vedeneev now has is the one created by OCCRP with its defamatory article; Mr. Vedeneev's only so-to-speak public outreach has been his efforts to push back against OCCRP's defamatory falsehoods to attempt to mitigate the massive harm they have caused—and are continuing to cause—him.

### **Mr. Vedeneev and GNM Provide Limited Services for Telegram**

37.    Mr. Vedeneev began working with Telegram in 2015 when it was a startup company.  Telegram is a popular messaging platform that lets people send texts, photos, videos, files, and voice messages quickly across phones, tablets, and computers.  It is known for fast delivery, cloud-based syncing across devices, large group and channel features, and options for

10

private communication such as end-to-end encrypted Secret Chats.  And it is widely used for community building, broadcasting updates, and sharing media and documents at scale.

38.    At that time—in 2015—Telegram Founder and CEO Pavel Durov asked Mr. Vedeneev to assist solely with Telegram's selection of telecommunications and data-center providers, and for that purpose Telegram granted Mr. Vedeneev a narrowly tailored power of attorney to sign provider and provider-related contracts on Telegram's behalf.  Those limited rights did *not* include or grant Mr. Vedeneev any authority over Telegram's internal systems, infrastructure operations, routing, message content, encryption keys, or data.  Mr. Vedeneev's role was limited to vendor coordination, contract execution, and physical "smart hands" support.

39.    At the same time, Global Network Management Ltd. (BVI) acted as a contractor providing Telegram limited technical and colocation support services in selected data centers.  The work performed by Global Network Management Ltd. (BVI) did *not* include or provide any authority over Telegram's internal systems, infrastructure operations, routing, message content, encryption keys, or data.

40.    In 2018, GNM took over Telegram's telecom-related services because it was already handling much of Telegram's work with service providers.

41.    Critically, GNM (and Global Network Management Ltd. (BVI) before it) and Mr. Vedeneev have *never* had any operational authority relating to Telegram, such that they have *never* made Telegram routing decisions, *never* made prefix announcements, and *never* had access to Telegram's systems.  Likewise, Mr. Vedeneev *never* held a formal position at Telegram and was *never* paid by Telegram for any services (GNM was compensated for services it contractually

11

provided).  Mr. Vedeneev was **never** an officer or director of Telegram, was **never** its CFO,[2] and **never** had responsibility for Telegram's finances.  And ElectronTelecom and GlobalNet **never** operated internationally and **never** contracted with Telegram.

**OCCRP Reaches Out to Mr. Vedeneev and
Speaks to Him Under False Pretenses—
And Illegally Records Their Conversation,
as a Court Has Already Found**

42.     On June 4, 2025, OCCRP reporter Roman Anin emailed Mr. Vedeneev, telling him that he was working on an article about Telegram, asking Mr. Vedeneev various questions about Telegram, and asking Mr. Vedeneev if he would speak with him (Mr. Anin) about Telegram via videoconference for an article on which he was working.  Mr. Anin did not indicate that the article would have anything to do with Mr. Vedeneev or GNM or that it would mention either of them.

43.     Mr. Vedeneev responded to Mr. Anin and agreed to speak with him about Telegram on the conditions that the conversation would be private and entirely off-the-record and that Mr. Anin's article would not mention him or GNM.

44.     Mr. Anin agreed to those conditions, and he and Mr. Vedeneev spoke via videoconference for three-and-a-half hours.  Mr. Vedeneev understood from Mr. Anin that their conversation would be private and off-the-record and that the article on which Mr. Anin was working would not mention either Mr. Vedeneev or GNM.

45.     Upon information and belief—and as indicated by the fact that OCCRP and Mr. Anin published their defamatory article shortly after speaking with Mr. Vedeneev—Mr. Anin (and thus OCCRP) knowingly lied to Mr. Vedeneev about the subject and substance of OCCRP's

---

[2] Although OCCRP's defamatory article includes an image from a contract purporting to identify Mr. Vedeneev as Telegram's CFO, he was no such thing:  The "CFO" title under Mr. Vedeneev's name in the contract was an administrative requirement of the document template used by the counterparty.

and his forthcoming article, which was already substantially completed and was focused on Mr. Vedeneev and GNM and included the accusations that they would ultimately publish in their defamatory article.

46.     Contrary to Mr. Anin's representations to Mr. Vedeneev, Mr. Anin recorded his videoconference with Mr. Vedeneev.  And, showing Mr. Anin's (and OCCRP's) intent to publish and use the recording, Mr. Anin had—unbeknownst to Mr. Vedeneev—set up multiple cameras to record the conversation from multiple angles—and may have even had a camera crew in the room with him during his videoconference with Mr. Vedeneev.

47.     During the recorded conversation, Mr. Vedeneev was in Switzerland and Mr. Anin was evidently in California.  Recording without the permission of all parties is illegal in both jurisdictions.[3]  And as explained below, a Swiss court has found Mr. Anin's recording of the videoconference to be illegal.  (*See infra* Paragraphs 83-86.)

48.     During their videoconference, Mr. Vedeneev explained GNM's and his business— including GNM's role as an LIR within the RIPE NCC system, and the limited work that GNM and he provided for Telegram—as described above.  (*See supra* Paragraphs 22-32 & 37-41.) Among other things, Mr. Vedeneev explained to Mr. Anin that (and how):

(a)     Mr. Vedeneev and GNM have *never* had access to Telegram's data, message content, encryption keys, or internal systems;

(b)     GNM does *not* have (and has *not* had) operational authority over or control of the systems of its customers, including Telegram;

(c)     GNM has *never* had any involvement in routing Telegram traffic:  GNM has *never* originated or announced Telegram prefixes, which originate exclusively from Telegram-controlled Autonomous System Number (ASNs), and ***Telegram maintains exclusive control of its routing***

---

[3] Cal. Penal Code § 632(a); Swiss Civil Code art. 28(1); *see also* Swiss Criminal Code arts. 179bis & 179ter.

*decisions*—all of which is publicly verifiable through Border Gateway Protocol (BGP) data;

(d)     GNM has **never** provided IP transit services to Telegram: GNM simply operates Internet Exchange infrastructure within which Telegram (like GNM's other customers, including Google) may exchange traffic with third parties, whereas Telegram uses Tier-1 providers including Cogent Communications, Lumen, Telxius, Vodafone, and Arelion (among other companies) for IP transit and routing traffic at the network layer (which is publicly verifiable)—in other words, GNM does **not** act as a transit provider, does **not** control Telegram routing decisions, and does **not** have visibility into or control over that traffic;

(e)     Physical access to equipment does **not** mean access to data, such that even though contractors may have physical access to data center environments for specific tasks, all systems remain protected by credentials controlled exclusively by the client (*e.g.*, Telegram);

(f)     Numerous safeguards exist to prevent unauthorized access to Telegram's data, including access controls, logging, contractual obligations, and encryption—not to mention the devastating commercial consequences that would befall a company or person who obtains unauthorized access to a customer's data—such that physical proximity to a data center does **not** provide actual access to data;

(g)     Although Mr. Vedeneev was an authorized external contractor with physical access to Telegram's Miami data center, his access was controlled and logged, and it did **not** provide access to Telegram's systems or data;

(h)     Mr. Vedeneev did **not** have "exclusive access to some of Telegram's servers" in its Miami data center (as Mr. Anin and OCCRP would later claim in the Article); rather, he was the only person *from the customer/provider side* with authorized physical access for installation—which did **not** provide Mr. Vedeneev access to data on servers—and data center personnel and staff also had physical access; and

(i)     Mr. Vedeneev's work for Telegram was limited to vendor coordination, contract execution, and support with **no** operational control over Telegram infrastructure, routing, or data.

49.     At no point during the videoconference did Mr. Anin ever mention the true substance of OCCRP's and his forthcoming article or that they intended in the article to accuse Mr. Vedeneev and GNM of acting as a "man in the middle" and engaging in espionage for the Russian FSB. In fact, the only questions Mr. Anin asked Mr. Vedeneev about GNM were about

whether Mr. Vedeneev has "authorized access to Telegram's infrastructure in Miami" and whether GNM "has contractual obligations regarding this infrastructure." And Mr. Vedeneev provided him the explanations and information detailed above.

50.    At no time during the videoconference did Mr. Anin inform Mr. Vedeneev that their conversation would be anything other than private and off-the-record, and at no time during the videoconference did Mr. Anin inform Mr. Vedeneev that he was recording the videoconference. And Mr. Vedeneev never consented to his conversation with Mr. Anin being recorded.

**OCCRP Publishes an Article Falsely Claiming that
Mr. Vedeneev and GNM Spied on Telegram
Users for the Russian Government**

51.    On June 10, 2025, OCCRP published an article authored by Roman Anin, Nikita Kondratyev, and Ilya Lozovsky headlined "Telegram, the FSB, and the Man in the Middle" (the **"Article"**) on OCCRP's website and the website of its partner, Important Stories, to ensure a maximum global audience for it.[4] A true and correct copy of the Article is attached hereto as **Exhibit A.**

52.    The Article purports to be an investigative report that, as OCCRP's partner Important Stories bragged in promoting the reporting, "uncovered how Telegram is connected to the FSB"—through Mr. Vedeneev and GNM.[5]

53.    To that end, in the Article, OCCRP repeatedly accuses Mr. Vedeneev and GNM of engaging in espionage for the Russian FSB by providing Telegram user data to it.

---

[4] *See* Roman Anin, Nikita Kondratyev & Ilya Lozovsky, *Telegram, the FSB, and the Man in the Middle*, OCCRP (June 10, 2025), https://www.occrp.org/en/investigation/telegram-the-fsb-and-the-man-in-the-middle, and https://istories.media/en/stories/2025/06/10/telegram-fsb.

[5] *How Is Telegram Connected to the FSB? And What Does This Mean for You? Investigation*, YouTube (June 10, 2025), https://www.youtube.com/watch?v=s7pnANMPigg.

54.    *First*, OCCRP makes this false and defamatory accusation clear from the very beginning of the Article—in its headline, sub-headline, and specially highlighted "Key Findings." Specifically, the Article states (emphases added):

(a)    "Telegram, the FSB, and *the Man in the Middle*";

(b)    "The technical infrastructure that underpins Telegram is *controlled by a man whose companies have collaborated with Russian intelligence services*";

(c)    "*Key Findings*":

(i)    "A company owned by a Russian network engineer named *Vladimir Vedeneev controls thousands of Telegram IP addresses* and maintains its servers";

(ii)    "*Vedeneev's other companies have a history of collaborating with* Russia's defense sector, *the FSB security service*, and other highly sensitive agencies"; and

(iii)    "Because of the way Telegram's encryption protocols work, even users who use its 'end-to-end' encryption features are vulnerable to being tracked by anyone who can monitor its network traffic."

55.    *Second*, OCCRP repeats the false and defamatory accusation throughout the body of the Article through the following statements (emphases added) and the implications reasonably and, indeed, inescapably drawn therefrom:

(a)    "[A] new investigation by OCCRP's Russian partner, Important Stories, reveals a critical vulnerability. *When reporters investigated who controls the infrastructure that keeps Telegram's billions of messages flowing, they found a man with no public profile but unparalleled access: Vladimir Vedeneev, a 45-year-old network engineer.*"

(b)    "*Vedeneev owns the company that maintains Telegram's networking equipment and assigns thousands of its IP addresses.*"

(c)    "*[T]wo other closely linked Vedeneev companies—one of which also assigns Telegram IP addresses, and another which did so until 2020—have had multiple highly sensitive clients tied to the security services.*"

(d)    "A Ukrainian IT specialist who spoke with reporters on condition of anonymity said that *the Russian military has used 'man-in-the-middle' type surveillance* in his country after capturing network infrastructure."

16

(e)    *"The Man in the Middle"*

(f)    "To learn how Telegram messages travel, reporters messaged each other through the service and recorded the traffic using Wireshark, a network traffic analyzer. The results showed that *the IP addresses were controlled by a company registered in Antigua and Barbuda called Global Network Management (GNM).*"

(g)    "*GNM's owner ... is a Russian network engineer named Vladimir Vedeneev.*"

(h)    "*Vedeneev was the only person authorized to access Telegram servers in a Miami data center. ... [H]is company owns a router in the Telegram server room.* 'If a company controls the routers that distribute traffic passing through Telegram servers, *this means that it, or anyone to whom it grants such access, can see the identifiers of messenger users,'* says Wozniak, the security specialist.*"

(i)    "*Vedeneev ... is the founder of GlobalNet*, a St. Petersburg backbone telecom operator that controls 18,000 kilometers of backbone infrastructure from Siberia to Western Europe in two dozen countries. (Last year, Vedeneev handed over his majority share in the company to relatives.) *Until 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet.*"

(j)    "*But GlobalNet is not just any network provider. Among its clients is the Main Research Computing Center of the Presidential Property Management Department of Russia (GlavNIVTS).* Officially, this organization provides technical support for President Putin's public 'direct line' question-and-answer events, summits, and other high-level meetings. But GlavNIVTS is also perhaps *the most secret and little-studied special service in Russia.* The agency helped plan the invasion of Ukraine, upgraded a major bot network, developed a centralized video surveillance system, and built tools to track and deanonymize internet users.*"

(k)    "More About GlavNIVTS[.] In 2019, former GlavNIVTS employees told reporters from Meduza that *the center* has access to secret materials and *works in the interests of a litany of security agencies, including the FSB,* the FSO, the Interior Ministry, the Defense Ministry, and the GRU military intelligence service. *GlavNIVTS specialists have also 'cleaned up' the digital traces of Russian military personnel* in Syria and eastern Ukraine, developed tools to predict the results of strikes on Ukrainian infrastructure, helped upgrade a major network of pro-Kremlin bots, and developed a centralized video surveillance system with facial recognition technology. In addition, G*lavNIVTS helped develop a Russian analogue to Palantir, the American mass data analysis system used by the military and CIA.* Elements of the 'Russian Palantir'—which used names like "Media Monitor,"

17

'Sherlock,' and 'PSKOV'—*help the government track and deanonymize internet users*, as reported by Meduza in 2019."

(l)    "According to data from Russia's official state procurement portal, GlobalNet also provides communications infrastructure to the Kurchatov Institute, a flagship state-owned nuclear research laboratory led by Putin ally Mikhail Kovalchuk and sanctioned by the United States.  Shortly after Russia's full-scale invasion of Ukraine in 2022, *GlobalNet said it was the first Russian operator to implement a system for monitoring user traffic called Deep Packet Inspection (DPI)* 'according to [Russian internet regulator] Roskomnadzor rules.'  It also has a notable minority co-owner: Roman Venediktov, a Russian space forces officer." (brackets in original)

(m)    "At the same time [last year], *he [Vedeneev] also transferred his share of another company called Electrontelecom*—a telecom operator that is also related to Telegram's infrastructure: the company assigned more than five thousand of the messenger's IP addresses.  Reporters obtained the company's internal accounting documents for 2024 which show that *one of its most important government clients is the FSB*.  The documents show that *Electro[n]telecom installs and manages equipment for a system that is being used by the FSB* offices in St. Petersburg and the Leningrad region for surveillance."

(n)    "'If *someone has access to Telegram traffic and cooperates with Russian intelligence services*, this means that the device identifier becomes a really big problem—a tool for global surveillance of messenger users, regardless of where they are and what server they connect to.'"

56.    "Man in the middle" cybersurveillance and attacks are "common cybersecurity threat[s] where an attacker secretly intercepts and manipulates communication between two parties who believe they are directly communicating with each other."[6]  They generally consist of two phases: interception and decryption.[7]  In the first phase (interception), the cybercriminal intervenes

---

[6] Muhammad Raza, *What Is a MITM Attack? Man in the Middle Attacks, Explained*, Splunk by Cisco (Feb. 10, 2025), https://www.splunk.com/en_us/blog/learn/man-in-the-middle-attacks.html; *see also* Akos Molnar, *Most Common Account Takeover Attacks – Man-in-the-Middle Attacks*, Cursor Insight (Jan. 6, 2022), https://www.cursorinsight.com/post/178/most-common-account-takeover-techniques-man-in-the-middle-attacks.

[7] Molnar, *supra* n.6; *Man in the Middle (MITM) Attack*, Imperva (Thales Cybersecurity), https://www.imperva.com/learn/application-security/man-in-the-middle-attack-mitm;    Kurt Baker, *What Is a Man in the Middle (MITM) Attack*, CrowdStrike (Jan. 17, 2025),

(Continued…)

in data transmission between two parties engaged in electronic communication to obtain that information.[8]  In the second phase (decryption), the cybercriminal decrypts the stolen data to make it intelligible and useable to the cybercriminal.  The attack can be visualized as follows:[9]



57.    OCCRP's plan was unmistakable:  Both directly accuse Mr. Vedeneev of engaging in espionage for the Russian FSB by providing it Telegram data, and imply numerous (false) connections between Mr. Vedeneev and the Russian FSB together with (false) accusations about Mr. Vedeneev's access to Telegram data to paint him as the "man in the middle" connecting the two by providing Telegram data to the FSB.

### OCCRP's Defamatory Accusations
### Against Mr. Vedeneev and GNM Are Categorically False

58.    OCCRP's defamatory accusations against Mr. Vedeneev and GNM—its claims that they served as a "man in the middle" and provided Telegram data and information to the Russian FSB and that they committed espionage and other criminal acts—are categorically false. Mr. Vedeneev and GNM did ***not*** act as a "man in the middle" between Telegram and Telegram

---

https://www.crowdstrike.com/en-us/cybersecurity-101/cyberattacks/man-in-the-middle-mitm-attack.

[8] Molnar, *supra* n.6; Imperva, *supra* n.7; Baker, *supra* n.7.

[9] Molnar, *supra* n.6.

users (or Telegram and the Russian FSB), they did **not** provide Telegram data or information to the Russian FSB (or anyone else), they did **not** engage in espionage for the Russian FSB (or anyone else), and they have **not** engaged in criminal conduct.

*Mr. Vedeneev and GNM Do Not Assign or Control—*
*And Have Never Assigned or Controlled—*
*Telegram IP Addresses*

59.     ***First***, Mr. Vedeneev and GNM do **not** assign or control—and have **never** assigned or controlled—Telegram IP addresses.  Indeed, Mr. Vedeneev expressly explained exactly that to Mr. Anin before OCCRP published the Article.  As Mr. Vedeneev explained to Mr. Anin, GNM simply allocated IP address blocks to Telegram in its role as a Local Internet Registry ("LIR") and performed routine physical maintenance on server equipment.  Telegram—not GNM or Mr. Vedeneev—would then assign particular IP addresses to particular servers or devices.  And as Mr. Vedeneev further explained, allocating IP addresses does *not* require or amount to having routing authority or network control; that routing was exclusively managed by Telegram (not Mr. Vedeneev or GNM), and it is the routing (over which Telegram had exclusive control) that determines operational control over network traffic.

60.     Likewise, just as Mr. Vedeneev and GNM do not control Telegram's IP addresses, they do not monitor or analyze Telegram's network traffic.  Mr. Vedeneev and GNM never provided Telegram with global IP transit services.  And Mr. Vedeneev and GNM do not have access to Telegram's message content, encryption keys, or internal systems.

61.     Indeed, as explained above, as an LIR, GNM simply receives IP addresses from RIPE NCC and allocates them to its clients—including Telegram—on a wholesale basis.  GNM's role is limited to providing infrastructure at the physical (Layer 1) and data link (Layer 2) levels, such as fiber connectivity and ethernet transport; that is, the provision of a physical transmission medium.  GNM does not decide, control, or participate in how data is routed, interpreted, or

20

processed.  Once allocated, Telegram (like GNM's other clients) independently configures and routes the IP addresses within its infrastructure.  Telegram's routing process is entirely managed and controlled by Telegram, not Mr. Vedeneev or GNM.

62.     Thus, while GNM allocated thousands of IP addresses to Telegram over time, Telegram has had exclusive authority and ability to make its routing decisions, determine and enforce usage policies, and assert operational control over those IP addresses.  Indeed, these facts are verifiable through public records, including the RIPE WHOIS database and global BGP routing tables, which show that Telegram's prefixes are not originated, announced, or routed through GNM.

63.     Moreover, while GNM provides colocation, installation, and maintenance services for its clients, including Telegram—such as replacing faulty hardware components, rebooting servers, installing or removing hardware, and connecting client equipment to switches or routers—GNM's physical access is limited to performing those agreed-upon maintenance tasks and does not include access to client systems or data.  That is standard industry practice:  It would not be practical for every company to install and maintain its own equipment worldwide without utilizing local providers.

*Mr. Vedeneev and GNM Do Not Access—*
*And Have Never Accessed—*
*Telegram Communications*

64.     ***Second***, Mr. Vedeneev and GNM do ***not*** directly or indirectly access, intercept, alter, or observe—and have ***never*** directly or indirectly accessed, intercepted, altered, or observed—Telegram communications.

65.     In fact, ***Mr. Vedeneev and GNM <u>cannot</u> access or decrypt Telegram traffic***. Telegram's official data center documentation explains that its data centers operate independently with end-to-end encryption, thus rendering external interception infeasible without access to

21

internal keys.   Mr. Vedeneev and GNM have never possessed those internal keys.   Indeed, Telegram has publicly stated that it operates all servers internally, that "no unauthorized access is possible," and that it has "never shared personal messages" or "encryption keys" with any third party.

66.     Moreover, GNM does not provide IP transit, routing, or traffic management services for Telegram—only physical capacity (leased wavelengths and fiber channels) for its backbone interconnections.   Telegram exclusively controls all of its routing decisions and IP-level operations.   GNM's role is limited to physical transport infrastructure, without access to or inspection of the data transmitted.

67.     Moreover, Telegram's data is transmitted exclusively via direct connections to globally recognized Tier 1 providers, including Orange, Cogent, Lumen, Telxius and Vodafone. Even though Telegram's encrypted traffic may traverse GNM-provided backbone channels as part of international connectivity, GNM and Mr. Vedeneev have no operational control, routing authority, or access to Telegram's internal infrastructure.   GNM only provides physical transport capacity without involvement in IP-level operations or data handling.

68.     Public BGP records confirm that Telegram's IP prefixes are not originated, announced, or routed through GNM, meaning Mr. Vedeneev and GNM do not control them.

*Mr. Vedeneev and GNM Do Not Spy—*
*And Have Never Spied—*
*For the Russian FSB (or Anyone Else)*

69.     ***Third***, Mr. Vedeneev and GNM do ***not*** spy—and have ***never*** spied—on Telegram or Telegram users for the Russian FSB or anyone else; they do ***not*** and have ***never*** engaged in espionage or other criminal activities.

70.     Indeed, Mr. Vedeneev and GNM do not have any connections to the Russian FSB or the Russian Government.

22

71.    Mr. Vedeneev emigrated from Russia years ago.  And when he founded Global Network Management Ltd. (BVI) in 2011, he deliberately incorporated it in the British Virgin Islands rather than in Russia to ensure that it would operate entirely outside Russia's jurisdiction and be free from control or influence by Russian authorities as it served a global client base.

72.    Likewise, GNM is an Antiguan and Barbudan entity that has never been registered as a legal entity in Russia, has no Russian tax identification number, holds no Russian telecommunication licenses, and has no branches or offices in Russia.  GNM owns no physical assets, network nodes, or data center space in Russia, and its entire global network is located in international Tier-1 hubs in Europe, the United States, and Asia (not Russia).  And although GNM utilized remote contractors globally prior to 2022, it has since fully transitioned its workforce to non-Russian jurisdictions.  And because GNM does not operate inside Russia, it is *not* subject to Russian System for Operative Investigative Activities ("SORM") laws or any FSB administrative directives.

73.    Moreover, as explained above, neither ElectronTelecom nor GlobalNet has ever had any corporate, operational, financial, managerial, or technical control over GNM (or Global Network Management Ltd (BVI) before it), nor vice versa.  And Mr. Vedeneev fully divested his interests in GlobalNet and ElectronTelecom by June 2024.

74.    And again, as explained above, Mr. Vedeneev and GNM do not access Telegram data or track its users.

*Mr. Vedeneev and GNM Do Not Have a History*
*of Collaborating with the Russian FSB or Similar Authorities*

75.    ***Fourth***, Mr. Vedeneev and GNM do not have "a history of collaborating with Russia's defense sector, the FSB security service, and other highly sensitive agencies" as OCCRP claims.

23

76.     As explained in Paragraphs 21 and 29-32, while Mr. Vedeneev previously owned two companies that operated in Russia—ElectronTelecom and GlobalNet—those companies did *not* "collaborat[e] with Russia's defense sector, the FSB security service, and other highly sensitive agencies," and they did *not* have "multiple highly sensitive clients tied to the security services."

77.     ElectronTelecom simply performed construction work for government clients, such as cable laying, network design, and resale of non-restricted equipment.  And GlobalNet was a backbone operator that served many clients, including some government entities.  Neither was involved in surveillance or intelligence on behalf of the Russian government.

78.     Indeed, to perform any work involving SORM (the Russian lawful interception system) or similar surveillance systems, an operator must obtain special government licenses issued by the FSB and the Ministry of Digital Development.  Those licenses are listed in public registries, and those public licensing registries confirm that ElectronTelecom and GlobalNet have *never* held such licenses.

79.     Moreover, as explained above, ElectronTelecom and GlobalNet have *never* been involved in allocating IP addresses to Telegram, have *never* been recognized LIRs, and have *never* allocated IP addresses to Telegram or anyone else.  Public registry data and routing records confirm that ElectronTelecom and GlobalNet *never* allocated or controlled Telegram's IP addresses.

80.     Simply put, Mr. Vedeneev is *not* involved in Russian telecommunications at all. He sold his interests in both ElectronTelecom and GlobalNet in 2024, and even before then he had not been involved in either company's daily operations since 2017.

**Mr. Vedeneev and GNM Defend Themselves Against
OCCRP's False and Defamatory Accusations—
And OCCRP and Mr. Anin Double Down on Their Defamation
by Publishing Misleading Portions of Their
Unlawfully Recorded Videoconference with Mr. Vedeneev**

81.     Shortly after OCCRP published its defamatory Article to its global audience, Mr. Vedeneev and GNM issued a detailed statement explaining the falsity of OCCRP's accusations against them in its Article.  A copy of the statement is attached hereto as **Exhibit B**.

82.     Rather than retracting the Article in light of those further explanations of the falsity of its claims against Mr. Vedeneev and GNM, OCCRP and Mr. Anin doubled down on their defamation.  To that end, Mr. Anin published on YouTube two videos with cherry-picked portions of his videoconference with Mr. Vedeneev that he unlawfully recorded in such a way as to misrepresent the substance of that videoconference and to make Mr. Vedeneev and GNM appear guilty of the misconduct that OCCRP alleged in the Article.[10]

**A Swiss Court (Where Mr. Vedeneev Resides) Finds OCCRP's
and Mr. Anin's Recording of Mr. Vedeneev to Be Unlawful—
And OCCRP and Mr. Anin Ignore the Court's Order to Remove It**

83.     When Mr. Vedeneev learned of the video—which was the first time he learned that Mr. Anin had recorded their videoconference—he filed a legal action in Switzerland (where he resides) seeking a court order compelling Mr. Anin and YouTube to remove the June video.[11]

84.     The Swiss court held that Mr. Anin violated Mr. Vedeneev's personality rights under Article 28(1) of the Swiss Civil Code, noting that during the videoconference (between

---

[10] iStories, *How Is Telegram Connected to the FSB? And What Does This Mean for You? Investigation*, YouTube (June 10, 2025), https://www.youtube.com/watch?v=s7pnANMPigg; iStories, *"If We Don't Give Out Users, We'll Be Shut Down." A Conversation About Telegram and FSB*, YouTube (July 10, 2025), https://www.youtube.com/watch?v=UmgP7jbhU7s.

[11] District Court of Baden, Civil Court Presidium, Decision of 17 Oct. 2025, SZ.2025.169 / hu, Vladimir Vedeneev v. Roman Anin and Google LC (attached as **Exhibit C**, together with a certified English translation).

minutes 1:10 and 1:41), Mr. Anin asked for permission to publish excerpts of the interview but Mr. Vedeneev did not consent—thus, the disclosure was unlawful.

85.    The Swiss court granted provisional measures and ordered that Mr. Anin remove the interview from publication and refrain from sharing it with any third parties.

86.    But as of the date of this filing, Mr. Anin has not complied with the court order and has not removed the videos (or portions thereof) from YouTube, where they remain available and accessible to this day.

### OCCRP Republishes Its False and Defamatory Accusations Against Mr. Vedeneev and GNM in an Additional Article

87.    Still, OCCRP was not done targeting Mr. Vedeneev and GNM.

88.    On June 12, 2025, OCCRP published an article headlined "Telegram Responds to Investigation that Links Its Infrastructure to Russian Security Services."[12]  OCCRP's June 12 article reiterated OCCRP's false claim that OCCRP had "exposed ties between Telegram's backend providers and Russian intelligence services" and further sought to undermine Telegram's statement that (as Mr. Vedeneev had explained to OCCRP and Mr. Anin) Mr. Vedeneev and GNM had not accessed Telegram's data.

89.    In the June 12 article, OCCRP claimed that GNM "acknowledged complying with Russia's SORM surveillance regulations."  But that claim is categorically false.  GNM *never* made such a statement because GNM is *not* subject to Russia's SORM surveillance regulations.  Russia's SORM surveillance regulations apply to telecommunication companies operating in Russia—and

---

[12] Alena Koroleva, *Telegram Responds to Investigation That Links Its Infrastructure to Russian Security Services*, OCCRP (June 12, 2025), https://www.occrp.org/en/news/telegram-responds-to-investigation-that-links-its-infrastructure-to-russian-security-services.

***GNM has never operated in Russia.***  Thus, ***GNM has never been subject to SORM regulations***. Tellingly, OCCRP does not cite any GNM-related documents that relate to surveillance activities.

90.    Moreover, OCCRP twisted the evidence in its possession by writing that "[l]eaked documents cited in the report show that Russian companies founded by Vedeneev have ***surveillance contracts with the FSB***, Russia's main domestic intelligence service, and other sensitive agencies."  That claim, too, is categorically false.

91.    Global Network Management Ltd. (BVI) and GNM have never had any contracts with the FSB or other Russian agencies.  And ElectronTelecom and GlobalNet—neither of which performed any work for Telegram and both of which Mr. Vedeneev had divested his interests in years prior—likewise did not have any surveillance contracts with the FSB or other Russian agencies and did not engage in any work involving surveillance or SORM; the only work either performed or contracts either had in Russia were infrastructure-related.

92.    Notably, OCCRP further published in its June 12 article Mr. Anin's statement that OCCRP's defamatory June 10 Article contained "proven facts."

### Mr. Vedeneev and GNM Repeatedly Demand That OCCRP Retract and Stop Repeating Its False Claims About Them— But OCCRP Refuses to Do So

93.    Plaintiffs, through counsel, repeatedly contacted OCCRP, through counsel, and explained that its accusations that Mr. Vedeneev and GNM served as a "man in the middle," provided Telegram data and information to the Russian FSB, and they committed espionage and other criminal acts were categorically false and defamatory, and Plaintiffs demanded that OCCRP retract its accusations.  But OCCRP steadfastly refused to do so.

94.    First, on June 23, 2025, Mr. Vedeneev and GNM, through their counsel, delivered their first retraction demand to OCCRP, putting OCCRP on notice that its accusations were false and defamatory.

95.     After OCCRP refused to retract its false and defamatory accusations, Mr. Vedeneev hired Clare Locke LLP as defamation counsel to contact OCCRP and demand that it retract its defamatory Article.

96.     On August 12, 2025, Clare Locke LLP sent OCCRP and its partner Important Stories a 14-page letter explaining in detail the falsity and defamatory nature of its accusations against Mr. Vedeneev and GNM and demanding that they retract them.[13]  The letter identified the specific falsehoods in the Article; catalogued its inaccuracies; and provided factual, technical, and business evidence demonstrating that OCCRP's accusations were untrue.

97.     On September 23, 2025, counsel for OCCRP and Important Stories responded by letter to Plaintiffs' demand and refused to retract their false and defamatory statements.[14]  Notably, OCCRP's and Important Stories' counsel's letter barely attempted to argue that the falsehoods explained in Plaintiffs' counsel's letter were true.

98.     On October 30, 2025, Clare Locke LLP sent a 12-page letter to OCCRP's and Important Stories' counsel further explaining the falsity and defamatory nature of their accusations against Mr. Vedeneev and GNM and reiterating their demand that OCCRP and Important Stories retract the Article.[15]  Once again, Clare Locke LLP identified the specific falsehoods in the Article; catalogued its inaccuracies; and provided factual, technical, and business evidence demonstrating that OCCRP's accusations were untrue.

---

[13] Letter from J. Oliveri and K. Humphrey to M. Patrucic, A. Papachristou, & A. Marohovskya re False and Defamatory Statements About Vladimir Vedeneev and Global Network Management, Inc. (Aug. 12, 2025) (attached as **Exhibit D**).

[14] Letter from M. Perry to J. Oliveri & K. Humphrey re Telegram Article (OCCRP and iStories) (Sept. 23, 2025) (attached as **Exhibit E**).

[15] Letter from J. Oliveri and K. Humphrey to M. Patrucic, A. Papachristou, & A. Marohovskya re False and Defamatory Statements About Vladimir Vedeneev and Global Network Management, Inc. (Oct. 30, 2025) (attached as **Exhibit F**).

99.    On November 19, 2025, counsel for OCCRP and Important Stories sent Clare Locke LLP a brief response again refusing to retract the Article.[16]  OCCRP's and Important Stories' counsel notably did not even attempt to engage with Mr. Vedeneev and GNM's factual explanations of the falsity of OCCRP's and Important Stories' accusations against Plaintiffs.

**OCCRP Published Its Defamatory Statements and Implications
with Actual Malice—That Is, With Actual Knowledge That They
Are False or, at Minimum, with Reckless Disregard for the Truth**

100.    OCCRP published its defamatory accusations about Mr. Vedeneev and GNM with actual malice—that is, with actual knowledge that they are false or, at an absolute minimum, with reckless disregard for their falsity and of the truth.

101.    There is substantial evidence that OCCRP, through Mr. Anin, had actual knowledge that its defamatory statements and implications were false when it published them, and there is likewise substantial evidence that it recklessly disregarded the truth in publishing them.

*OCCRP Had Actual Knowledge That Its Defamatory Accusations
Were False When It Published Them*

102.    OCCRP and Mr. Anin had actual knowledge that their defamatory accusations against Mr. Vedeneev and GNM in their Article were false when they published them.

103.    OCCRP's knowledge that their defamatory accusations against Mr. Vedeneev and GNM in the Article were false when they published them (and remain false) is indicated by the fact that OCCRP and Mr. Anin admit in the Article—in a sentence buried amidst its false and defamatory accusations so as to downplay its significance and minimize it in comparison to the false accusations throughout the Article—that there is "no evidence that [GNM] has worked with

---

[16] Letter from M. Perry to J. Oliveri & K. Humphrey re Telegram Article (OCCRP and iStories) (Nov. 19, 2025) (attached as **Exhibit G**).

the Russian government or provided any data" to the Russian government. But OCCRP published its defamatory accusations anyway.

104. There is also substantial additional evidence that OCCRP knew that its accusations against Mr. Vedeneev and GNM in the Article were false when it published them.

105. *First*, OCCRP and Mr. Anin had actual knowledge that their accusation that Mr. Vedeneev and GNM controlled Telegram's IP addresses was false when they published it. They knew that because Mr. Vedeneev told Mr. Anin that GNM only allocated IP address blocks to Telegram pursuant to its role as an LIR and performed routine physical maintenance on server equipment during their three-and-a-half-hour interview. Mr. Vedeneev explained that allocating IP addresses does not equate to routing authority or network control, that routing was exclusively managed by Telegram, and that routing determines actual operational control over network traffic.

106. Moreover, Mr. Vedeneev's truthful explanations regarding the allocation of IP addresses are confirmed by publicly accessible logs that Mr. Anin admitted he reviewed.

107. *Second*, OCCRP and Mr. Anin had actual knowledge that their accusation that Mr. Vedeneev and GNM accessed Telegram's data was false when they published it. They knew that because Mr. Vedeneev told Mr. Anin so during his prepublication off-the-record interview.

108. Moreover, Mr. Vedeneev's truthful explanation was supported by Telegram's public statements in which it explained that it operates all servers internally, that "no unauthorized access is possible," and that it has "never shared personal messages" or "encryption keys" with any third party.[17]

109. *Third*, OCCRP and Mr. Anin had actual knowledge that their accusation that Mr. Vedeneev and GNM spied on Telegram users for the Russian FSB or government was false

---

[17] *See* BBC Russia, Telegram (June 10, 2025), https://t.me/bbcrussian/81393.

when they published it. They knew that because they fabricated the accusation and had (and have) no evidence whatsoever to substantiate it. Mr. Vedeneev and Telegram both explained the falsity of that accusation but OCCRP and Mr. Anin published it regardless.

110. *Fourth*, OCCRP and Mr. Anin had actual knowledge that their accusation that Mr. Vedeneev and GNM have "a history of collaborating with Russia's defense sector, the FSB security service, and other highly sensitive agencies" was false when they published it. They knew that because they fabricated the accusation and had (and have) no evidence whatsoever to substantiate it. Mr. Vedeneev and Telegram both explained the falsity of that accusation but OCCRP and Mr. Anin published it regardless.

111. OCCRP's knowledge of the falsity of the accusations it published about Mr. Vedeneev and GNM is further indicated by the fact that, according to OCCRP itself, "Fact-checking [for the Article] was provided by the OCCRP Fact-Checking Desk," and such fact-checking would have necessarily revealed—and surely did reveal—the falsity of those accusations, for the reasons explained above, and OCCRP intentionally disregarded the demonstration of falsity from such fact-checking. In the alternative, to the extent no such fact-check was undertaken, OCCRP's knowledge of falsity of the accusations it published is further demonstrated by the fact that it lied to its readers about a supposed fact-check confirming its false allegations while knowing that no such fact check had verified its false claims.

*OCCRP Published Its False Accusations Against*
*Mr. Vedeneev and GNM as Part of a Preconceived Plan and Narrative*

112. OCCRP's reckless disregard for the truth is demonstrated by its and Mr. Anin's publication of their defamatory accusations as part of a preconceived plan to publish a sensational narrative attacking Mr. Vedeneev and GNM and casting doubt on the well-known security of Telegram.

31

113.    OCCRP's and Mr. Anin's preconceived plan is evidenced by, among other things, the fact that they had written most of the Article before ever reaching out to Mr. Vedeneev—as indicated by the fact that they published the Article shortly after Mr. Anin spoke with Mr. Vedeneev—and the fact that Mr. Anin did not discuss and in fact hid the true substance of the Article from Mr. Vedeneev when he spoke with him (because he surely knew Mr. Vedeneev would have provided even more information and evidence rebutting it).

114.    OCCRP's and Mr. Anin's preconceived plan is also evidenced by their continued refusal to accept objective evidence that Mr. Vedeneev and GNM did not engage in any wrongdoing with respect to Telegram and did not serve as a "man in the middle" between Telegram and its users engaging in espionage, as explained above.

115.    OCCRP's and Mr. Anin's preconceived plan is also indicated by OCCRP's boast that it is "mission-driven ... to publish stories that lead to real-world action," which suggests they published the Article to cause an impact rather than to simply report on the (true) facts wherever they led.

*OCCRP Purposefully Avoided Receiving, Pre-Publication,*
*Evidence and Information That It Knew Would Contradict*
*Its Accusations Against Mr. Vedeneev and GNM*

116.    OCCRP's reckless disregard for the truth is further demonstrated by its purposeful avoidance of evidence and information that it knew would contradict its false and defamatory accusations against Mr. Vedeneev and GNM.

117.    OCCRP's and Mr. Anin's purposeful avoidance of such evidence is demonstrated by the fact that Mr. Anin spoke to Mr. Vedeneev under false pretenses by telling him that he was simply working on an article about Telegram and Mr. Anin's deliberate decision not to ask Mr. Vedeneev about the accusations that OCCRP and he intended to publish—and did publish—in their Article so as to deprive Mr. Vedeneev (and GNM) of the opportunity to provide them

specific evidence and information that would demonstrate the falsity of those accusations. Indeed, OCCRP and Mr. Anin surely did so because they must have known that Mr. Vedeneev would have provided them evidence and information that would demonstrate the falsity of their accusations.

*OCCRP Published Its False Accusations Against Mr. Vedeneev and GNM*
*with Ill Will, Animus, and an Improper Motive*

118.    OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin—even apart from their preconceived narrative—published their defamatory accusations against Mr. Vedeneev and GNM with ill will, animus, and an improper motive.

119.    OCCRP's and Mr. Anin's ill will and animus toward Mr. Vedeneev and GNM are demonstrated by, among other things, the fact that in response to Mr. Vedeneev defending himself and GNM by calling out and explaining their false and defamatory accusations against him, Mr. Anin published cherry-picked portions of his illegally-recorded, off-the-record interview with Mr. Vedeneev to make Mr. Vedeneev and GNM appear guilty of wrongdoing (when in fact the full interview or representative selections thereof demonstrate the falsity of OCCRP's and Mr. Anin's accusations against Mr. Vedeneev and GNM).

120.    OCCRP's and Mr. Anin's ill will and animus toward Mr. Vedeneev and GNM are further demonstrated by their refusal to comply with the order of the Swiss court to take down the illegally recorded video of Mr. Vedeneev, which as of the date of this filing remains available online—despite Mr. Vedeneev and his counsel raising the issue to OCCRP.

*OCCRP Deliberately Ignored and Intentionally Omitted or*
*Downplayed Evidence That Mr. Vedeneev and GNM Did Not Engage*
*in the Misconduct of Which It Accused Them*

121.    OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin deliberately ignored and intentionally omitted from (or downplayed in) the defamatory Article the substantial evidence and information demonstrating the falsity of its

33

accusations against Mr. Vedeneev and GNM that Mr. Vedeneev provided them and/or that is publicly available and that they surely possessed. Such evidence includes the evidence cited above in Paragraphs 22-32, 37-41, 48-49, 81, and 93-99.

*OCCRP Has No Evidence to Substantiate*
*Its Defamatory Accusations Against Mr. Vedeneev and GNM—*
*Thus Giving Rise to an Inference They Are Fabricated*

122. OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin have no evidence to substantiate their false and defamatory accusations against Mr. Vedeneev and GNM.

123. OCCRP's and Mr. Anin's lack of evidence to substantiate their defamatory accusations against Mr. Vedeneev and GNM is demonstrated by, among other things, the fact that OCCRP and Mr. Anin admit in the Article—in a sentence buried amidst its false and defamatory accusations—that there is "no evidence that [GNM] has worked with the Russian government or provided any data" to it. But OCCRP published its false and defamatory accusations to the contrary anyway.

124. OCCRP's and Mr. Anin's lack of evidence to substantiate their defamatory accusations against Mr. Vedeneev and GNM is also demonstrated by, among other things, the fact that OCCRP and Mr. Anin have not produced any evidence to support their accusations despite being given multiple opportunities to do so.

*OCCRP's False and Defamatory Accusations Are*
*Inherently Improbable—Which It Knew*

125. OCCRP's reckless disregard for the truth is further demonstrated by the fact that its and Mr. Anin's false and defamatory accusations are inherently improbable.

126. As OCCRP and Mr. Anin knew, Telegram's servers are continuously monitored such that Telegram would be almost immediately alerted to any tampering with its equipment to

34

extract user data—including the type of tampering that would be necessary to carry out the data theft of which Mr. Anin accused Mr. Vedeneev and GNM.

127. Additionally, as Mr. Vedeneev explained to Mr. Anin before the publication of the Article, engaging in data theft would be immediately discovered, and there would be no benefit for a private business to do so, as it would substantially impair its ability to attract and retain customers—an impact that OCCRP's defamation is in fact causing Mr. Vedeneev and GNM, as explained below.

### OCCRP Grossly Departed from Journalistic Standards in Its Reporting on Mr. Vedeneev and GNM

128. OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin grossly departed from journalistic standards.

129. For example, Mr. Anin never revealed to Mr. Vedeneev in his correspondence or during the interview that he intended to accuse Mr. Vedeneev or GNM of espionage or of acting as a "man-in-the-middle" for the Russian FSB. Mr. Anin never provided Mr. Vedeneev a meaningful opportunity to comment on that allegation and purposely avoided learning information that would contradict his preconceived narrative.

130. Additionally, Mr. Anin secured an interview with Mr. Vedeneev by hiding the true subject of the Article, promising the interview was off the record, and further promising that none of Mr. Vedeneev's companies would be named in the Article. In doing so, Mr. Anin lied to Mr. Vedeneev and tricked him into providing information.

### OCCRP Knowingly Relied on Inherently Unreliable Sources for Its Defamatory Accusations.

131. OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin knowingly relied on inherently unreliable sources to support his defamatory accusations.

132.    For example, OCCRP and Mr. Anin relied on Elies Campo as a source, who they claim is "a former partnership development manager with Telegram," but Telegram has repeatedly explained that Mr. Campo was **not** a Telegram employee.[18]   Moreover, it has been publicly reported that Mr. Campo has a history of making false claims about his employment.[19]   And Mr. Campo is a political activist who claims to be a victim of spyware, and therefore is obviously not an impartial source.[20]  OCCRP and Mr. Anin failed to disclose any of that to its readers in the Article.

133.    Additionally, OCCRP and Mr. Anin cite a source who spoke on the condition of anonymity but provided no explanation for why anonymity was necessary.  That contradicts basic tenets of journalistic ethics and standards, as evidenced by the explanation in the Society of Professional Journalists' Code of Ethics that publishers should "[r]eserve anonymity for sources who may face danger, retribution or other harm, and have information that cannot be obtained elsewhere," and when anonymity is granted, "[e]xplain why."[21]

---

[18] Staff, *Elies Campo Has Deceived 'Citizenlab' and 'The New Yorker,'* elTriangle (May 6, 2022), https://www.eltriangle.eu/es/2022/05/06/elies-campo-ha-enganado-a-citizenlab-y-a-the-new-yorker; Staff, *Elies Campo, the 'Mastermind' Behind Catalangate: Neither Hired by Telegram nor a Graduate in Engineering*, Cronica (Apr. 10, 2023), https://cronicaglobal.elespanol.com/politica/20230410/elies-campo-catalangate-ni-contratado-telegram-licenciado/755174507_0.html; Staff, *The Curriculum Vitae of the Mastermind Behind Architect of the 'Catalangate,' Under Suspicion*, Cronica (May 7, 2022), https://cronicaglobal.elespanol.com/politica/20220507/el-curriculum-del-artifice-catalangate-bajo-sospecha/670682946_0.html.

[19] Jose Javier Olivas Osuna, *The Pegasus Spyware Scandal – A Critical Review of Citizen Lab's 'CatalanGate' Report*, Department of Political Science and Administration, Universidad Nacional de Educación a Distancia, 75 (2023), https://eprints.lse.ac.uk/118492/5/ThePegasusspywarescandal_AcriticalreviewCatalanGate_OlivasOsunaJJ2023.pdf.

[20] *Id.* at 46.

[21] Society of Professional Journalists, *Code of Ethics* (Sept. 6, 2014), https://www.spj.org/spj-code-of-ethics.

*OCCRP's Actual Malice Is Indicated by OCCRP's Intentional Misuse*
*of Terminology to Mischaracterize and Overstate Limited Services,*
*GNM and Mr. Vedeneev Performed for Telegram*

134.    OCCRP's reckless disregard for the truth is further demonstrated by the fact that it and Mr. Anin manipulated and misused technical language to mischaracterize and overstate the limited services that GNM has provided to Telegram—to falsely state and imply that GNM and Mr. Vedeneev had greater involvement with Telegram than they have had and thereby further their false accusation that Mr. Vedeneev and GNM acted as a "man in the middle" providing Telegram data and information to the Russian FSB.

135.    For example, OCCRP and Mr. Anin repeatedly state in the Article that GNM "assigned" thousands of IP addresses to Telegram.  That is false.  "To 'assign' [an IP address] means to delegate address space to an ISP or End User for specific use within the Internet infrastructure they operate."[22]  In other words, to "assign" an IP address means to give a specific IP address to a specific device.  As explained above, Telegram—not GNM or Mr. Vedeneev— assigned particular IP addresses to its servers and devices.  What GNM did for Telegram was to "allocate" blocks of IP addresses to it for Telegram to then assign.  "To 'allocate' means to distribute address space ... for the purpose of subsequent distribution."[23]  Upon information and belief, Mr. Anin and OCCRP—including the fact-checkers that OCCRP states fact-checked the Article were familiar with this industry-standard terminology (or recklessly failed to familiarize themselves with it and/or recklessly withheld relevant information from the putative "expert(s)" they consulted in their reporting for the Article) and mischaracterized the services that GNM has

---

[22] RIPE NCC, *IPv6 Address Allocation and Assignment Policy* (Mar. 16, 2020), https://www.ripe.net/publications/docs/ripe-738.

[23] *Id.*

provided Telegram to overstate those services and support their false and defamatory accusations against Mr. Vedeneev and GNM.

*OCCRP Has Steadfastly Refused to Retract Its Defamatory Statements Despite*
*Mr. Vedeneev and GNM's Explanations of Falsity and Retraction Demands*

136. OCCRP's reckless disregard for the truth is further demonstrated by the fact that it has refused to retract its defamatory statements despite Mr. Vedeneev and GNM's multiple explanations of their falsity and demands that it retract them, as detailed above in Paragraphs 93-99.

137. And OCCRP's reckless disregard for the truth is likewise demonstrated by the fact that rather than retracting the Article when provided additional information explaining the falsity of its defamatory accusations against Mr. Vedeneev and GNM, OCCRP repeatedly doubled-down on those defamatory falsehoods: in its June 12, 2025 article and through Mr. Anin's publication of misleading selections of his illegally recorded videoconference with Mr. Vedeneev.

**OCCRP's False and Defamatory Accusations Have Caused**
**Mr. Vedeneev and GNM Substantial Reputational and Economic Damages**

138. OCCRP's false and defamatory accusations have caused—and continue to cause—substantial and irreparable damage to Mr. Vedeneev and GNM and their reputations.

139. OCCRP's defamatory accusations have directly and proximately caused enormous reputational harm to Mr. Vedeneev and GNM. Before OCCRP published its defamatory statements and implications, Mr. Vedeneev had a reputation as a forthright, trusted, and ethical businessman and telecommunications executive and as a man of integrity, and GNM had a reputation as a trusted and trustworthy provider of telecom services. OCCRP's false and defamatory statements and implications against Mr. Vedeneev and GNM have severely and irreparably damaged those reputations.

38

140. Mr. Vedeneev and GNM's reputational harm is demonstrated by, among other things, the fact that the Article was foreseeably republished and circulated online—as OCCRP surely intended—and commented on by readers who believed the false allegations. The Article was posted on Reddit with thirty-eight comments and 377 up-votes.[24] It was posted by users to LinkedIn, including a post that received thirty-seven reactions and four comments.[25] And OCCRP published a link to the Article on X (f/k/a Twitter) in a string of posts along with a photo of Mr. Vedeneev;[26] it received over 63,000 views, 560 likes, and 375 reposts. Upon information and belief, the scope of publication of the Article exceeds these metrics, as it was shared and distributed elsewhere online.

141. OCCRP's defamatory accusations have likewise directly and proximately caused substantial economic harm to Mr. Vedeneev and GNM.

142. OCCRP's defamatory statements and accusations—and the fallout they reasonably and foreseeably caused and that OCCRP intended to cause with them—directly and proximately caused Mr. Vedeneev and GNM to lose business deals and incur substantial damages, which reach into the hundreds of millions of dollars.

143. As one example, OCCRP's defamatory statements and accusations—and the fallout they reasonably and foreseeably caused and that OCCRP intended to cause—directly and proximately caused the collapse of a major high-tech transaction and acquisition valued between

---

[24] Article posted by u/Doener23, Reddit (r/privacy), *Telegram, the FSB, and the Man in the Middle*, OCCRP, https://www.reddit.com/r/privacy/comments/1l7v0td/telegram_the_fsb_and_the_man_in_the_middle.

[25] Sergei Burkov, LinkedIn, https://www.linkedin.com/posts/sergeiburkov_telegram-the-fsb-and-the-man-in-the-middle-activity-7338268221243801600-NsKb/.

[26] OCCRP (@OCCRP), X (June 10, 2025 3:18 a.m.), https://x.com/OCCRP/status/1932336673473405075; OCCRP (@OCCRP), X (June 10, 2025 3:18 a.m.), https://x.com/OCCRP/status/1932336673473405075.

$100 million and $200 million. Specifically, Mr. Vedeneev lost a deal and other market opportunities involving the company Fixar Global Inc. ("Fixar")—of which Mr. Vedeneev is the sole owner—and its technologies because of the counterparty's concerns that Mr. Vedeneev is working for Russian intelligence as OCCRP falsely claimed.

144. As another example, OCCRP's defamatory statements and accusations—and the fallout they reasonably and foreseeably caused and that OCCRP intended to cause—directly and proximately caused Mr. Vedeneev to be unable to introduce Fixar and its technology to the U.S. market. That causation and harm is not speculative, as evidenced by the fact that, before OCCRP published its defamatory Article, agencies in the United States, including the New York City Police Department expressed interest in Fixar's technologies—but OCCRP's false accusation that Mr. Vedeneev has engaged in espionage for the Russian FSB ended their interest in Fixar and its technologies.

145. OCCRP's defamatory statements and accusations—and the fallout they reasonably and foreseeably caused and that OCCRP intended to cause with them—directly and proximately caused multiple financial institutions to close or refuse to open accounts with Mr. Vedeneev and GNM. For example, EFG Bank (Luxembourg) S.A. closed an account owned by Mr. Vedeneev; MBaer Merchant Bank refused to open an account for Mr. Vedeneev or GNM; Lombard Odier required an independent legal opinion as a condition of continuing its relationship with Mr. Vedeneev (which had an adverse impact on Mr. Vedeneev); ABN AMRO Bank N.V. initiated enhanced due diligence on Mr. Vedeneev (which cost Mr. Vedeneev time and money); and DBS Bank Limited required both Mr. Vedeneev and GNM to provide formal explanations of and rebuttal to OCCRP's false and defamatory accusations against them (which cost Mr. Vedeneev and GNM time and money).

146. As a direct and proximate result of OCCRP's defamatory statements and implications, Mr. Vedeneev and GNM have been forced to incur substantial expenses to attempt to correct the public record about themselves and their actions, including hiring counsel and incurring attorneys' fees—separate from fees incurred in bringing this lawsuit—to demand retraction of OCCRP's false and defamatory accusations and devoting employee hours and spending money to public relations efforts to counter OCCRP's false and defamatory accusations.

## CLAIMS

### COUNT ONE
### DEFAMATION
**(False Accusations That Plaintiffs Engage in Espionage for the Russian FSB)**
**(Article Headline and Key Findings)**

147. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1-146 as if set forth fully herein.

148. On June 10, 2025, Defendant Journalism Development Network, Inc., d/b/a the Organized Crime and Corruption Reporting Project (**"OCCRP"**) published an article headlined "Telegram, the FSB, and the Man in the Middle" (the **"Article"**). A true and correct copy of the Article is attached hereto as **Exhibit A**.

149. In the Article, OCCRP published the following false and defamatory statements (with emphases added) about Plaintiffs (the **"Statements"**):

    (a)    "Telegram, the FSB, and *the Man in the Middle*";

    (b)    "The technical infrastructure that underpins Telegram is *controlled by a man whose companies have collaborated with Russian intelligence services*";

    (c)    *"Key Findings"*:

        (i)    "A company owned by a Russian network engineer named *Vladimir Vedeneev controls thousands of Telegram IP addresses* and maintains its servers";

41

(ii)     "***Vedeneev's other companies have a history of collaborating with*** Russia's defense sector, ***the FSB security service***, and other highly sensitive agencies"; and

(iii)    "Because of the way Telegram's encryption protocols work, even users who use its 'end-to-end' encryption features are vulnerable to being tracked by anyone who can monitor its network traffic."

150.    The Statements are of and concerning Plaintiffs.  Indeed, the Statements identify Mr. Vedeneev by name and GNM is readily identifiable to readers (and was so identified by readers) by the Statements' reference to "company owned by a Russian network engineer named Vladimir Vedeneev," and Mr. Vedeneev and GNM are the express focus of the Article and are identified by name, repeatedly, in the Article.

151.    The Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Plaintiffs have served as a "man in the middle" and provided Telegram data and information to the Russian Federal Security Service ("FSB"), thereby committing criminal acts, including espionage for the FSB.

152.    The Statements are false.  Plaintiffs have not provided Telegram data and information to the Russian FSB, have not committed criminal acts, and have not engaged in espionage for the Russian FSB or anyone else.

153.    The Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Plaintiffs up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community and because they tend to impair Plaintiffs' standing in the community, including by accusing them of providing Telegram data and information to the Russian FSB and thereby committing criminal acts, including espionage for the FSB.

154.    The Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they impute to Plaintiffs criminal offenses—including

42

espionage—and adversely affect Plaintiffs' fitness for their trade, business, or profession—including by accusing them of providing Telegram data and information to the Russian FSB.

155.    OCCRP knew the substantial danger of injury to Plaintiffs and their reputations from the Statements, which is readily apparent, and in fact intended to cause injury to Plaintiffs and their reputations by publishing the Statements.

156.    For the reasons set forth in detail above—*see supra* Paragraphs 100-137—OCCRP published the Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that OCCRP:

(a)    Had actual knowledge that the Statements are false—as described in detail above in Paragraphs 102-110—because, among other things, Mr. Vedeneev explained to OCCRP prepublication that GNM allocated IP address blocks to Telegram as a Local Internet Registry (LIR) and performed routine physical maintenance on server equipment, that allocating IP addresses does not equate to routing authority or network control (and does not even equate to assigning IP addresses to particular devices), that Telegram manages its own routing, that Telegram's routing determines actual operational control over network traffic, and that neither he nor GNM accessed Telegram's data or provided it to the FSB;

(b)    Published the Statements to advance a preconceived narrative that Plaintiffs had engaged in misconduct and espionage;

(c)    Purposefully and deliberately avoided obtaining information and evidence it knew would contradict the Statements, which it desired to publish despite their falsity, including by willfully hiding from Plaintiffs the precise accusations that it intended to publish—and did publish in the Statements—so as to deprive them of the opportunity to respond to and provide specific evidence disproving those accusations;

(d)    Published the Statements with ill will and animus—as demonstrated by, among other things, OCCRP republishing the claims and releasing an illegally recorded off-the-record interview of Mr. Vedeneev in response to his defense of himself and GNM;

(e)    Deliberately ignored and intentionally omitted from (or downplayed in) its defamatory publications the substantial evidence and information that demonstrated the falsity of the Statements—including Plaintiffs' denials

and publicly available information about the function of an LIR and database records;

(f) Published the Statements despite knowing that there is no evidence to substantiate them—indeed, it admitted as much in its Article;

(g) Published the Statements despite knowing that its accusations of misconduct were inherently improbable, including because Telegram's servers are continuously monitored such that Telegram would be almost immediately alerted to any tampering with its equipment to extract user data and such data theft would be almost immediately discovered, and because such a data theft would ruin GNM and destroy its ability to attract and retain customers;

(h) Knew that, to the extent OCCRP relied on any sources at all as supporting its defamatory accusations, those sources were biased against Plaintiffs and therefore unreliable; and

(i) Steadfastly refused to retract the Statements despite Plaintiffs demanding multiple times that it do so and despite Plaintiffs providing it additional evidence and information demonstrating the falsity of the Statements.

157. OCCRP had no applicable privilege or legal authorization to publish the Statements, or, if it did, it abused that privilege or authorization. OCCRP published its Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

158. As a direct and proximate result of OCCRP's Statements, and as detailed above, Plaintiffs have suffered substantial economic damages including, among other things, the loss of hundreds of millions of dollars in business deals, loss of banking and financial institution relationships, and the inability to enter banking and financial institutional relationships, plus substantially increased compliance and legal costs.

159. As a direct and proximate result of OCCRP's Statements, and as detailed above, Plaintiffs have suffered severe reputational damage and have had to spend considerable sums of money, retain and utilize the services of counsel, and devote time to efforts to counter OCCRP's false and defamatory accusations and defend its reputation in the court of public opinion.

44

160.   OCCRP published the Statements maliciously, willfully, wantonly, heedlessly, with common law malice, with express malice, with actual malice, and with a conscious, reckless, and willful indifference to Plaintiffs' rights, and with ill will, animus, and a desire to cause injury to Plaintiffs.  Accordingly, punitive damages are appropriate.

161.   In view of the foregoing, Plaintiffs are entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

## COUNT TWO
## DEFAMATION-BY-IMPLICATION
### (False Accusations That Plaintiffs Engage in Espionage for the Russian FSB)
### (Article Headline and Key Findings)

162.   Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1-146 as if set forth fully herein.

163.   On June 10, 2025, Defendant Journalism Development Network, Inc., d/b/a the Organized Crime and Corruption Reporting Project (**"OCCRP"**) published an article headlined "Telegram, the FSB, and the Man in the Middle" (the **"Article"**).  A true and correct copy of the Article is attached hereto as **Exhibit A**.

164.   In the Article, OCCRP published and juxtaposed the following statements (with emphasis added) to imply a false and defamatory connection between them or otherwise create the false and defamatory implication that Plaintiffs have provided Telegram data and information to the Russian Federal Security Service ("FSB"), thereby committing criminal acts, including espionage for the FSB (the **"Implications"**):

(a)   "Telegram, the FSB, and *the Man in the Middle*";

(b)   "The technical infrastructure that underpins Telegram is *controlled by a man whose companies have collaborated with Russian intelligence services*";

(c)   ***"Key Findings"***:

45

(i)     "A company owned by a Russian network engineer named ***Vladimir Vedeneev controls thousands of Telegram IP addresses*** and maintains its servers";

(ii)     "***Vedeneev's other companies have a history of collaborating with*** Russia's defense sector, ***the FSB security service***, and other highly sensitive agencies"; and

(iii)     "Because of the way Telegram's encryption protocols work, even users who use its 'end-to-end' encryption features are vulnerable to being tracked by anyone who can monitor its network traffic."

165. The Implications are of and concerning Plaintiffs. Indeed, Mr. Vedeneev is identified by name in connection with them, GNM is readily identifiable to readers (and was so identified by readers) in connection with them through the reference to "company owned by a Russian network engineer named Vladimir Vedeneev," and Mr. Vedeneev and GNM are the express focus of the Article and are identified by name, repeatedly, in the Article.

166. The Implications are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Plaintiffs have provided Telegram data and information to the Russian FSB, thereby committing criminal acts, including espionage for the FSB.

167. OCCRP intended the Implications to convey factual assertions that Plaintiffs provided Telegram data and information to the Russian FSB, thereby committing criminal acts, including espionage for the FSB, as indicated by OCCRP featuring the Article on its "Espionage" page with the tag "ESPIONAGE":[27]

---

[27] *Espionage*, OCCRP, https://www.occrp.org/en/power-and-influence/espionage/page/1 (visited Mar. 30, 2026).



168.    The Implications are false. Plaintiffs have not provided Telegram data and information to the Russian FSB, have not committed criminal acts, and have not engaged in espionage for the Russian FSB or anyone else.

169.    The Implications are defamatory, and readers understood them to be defamatory, because they tend to hold Plaintiffs up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community and because they tend to impair Plaintiffs' standing in the community, including by accusing them of providing Telegram data and information to the Russian FSB and thereby committing criminal acts, including espionage for the FSB.

170.    The Implications are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because they impute to Plaintiffs criminal offenses—including espionage—

47

and adversely affect Plaintiffs' fitness for their trade, business, or profession—including by accusing them of providing Telegram data and information to the Russian FSB.

171.    OCCRP knew the substantial danger of injury to Plaintiffs and their reputations from the Implications, which is readily apparent, and in fact intended to cause injury to Plaintiffs and their reputations by publishing the Implications.

172.    For the reasons set forth in detail above—*see supra* Paragraphs 100-137—OCCRP published the Implications with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that OCCRP:

(a)    Had actual knowledge that the Implications are false—as described in detail above in Paragraphs 102-110—because, among other things, Mr. Vedeneev explained to OCCRP prepublication that GNM allocated IP address blocks to Telegram as a Local Internet Registry (LIR) and performed routine physical maintenance on server equipment, that allocating IP addresses does not equate to routing authority or network control (and does not even equate to assigning IP addresses to particular devices), that Telegram manages its own routing, that Telegram's routing determines actual operational control over network traffic, and that neither he nor GNM accessed Telegram's data or provided it to the FSB;

(b)    Published the Implications to advance a preconceived narrative that Plaintiffs had engaged in misconduct and espionage;

(c)    Purposefully and deliberately avoided obtaining information and evidence it knew would contradict the Implications, which it desired to publish despite their falsity, including by willfully hiding from Plaintiffs the precise accusations that it intended to publish—and did publish in the Implications—so as to deprive them of the opportunity to respond to and provide specific evidence disproving those accusations;

(d)    Published the Implications with ill will and animus—as demonstrated by, among other things, OCCRP republishing the claims and releasing an illegally recorded off-the-record interview of Mr. Vedeneev in response to his defense of himself and GNM;

(e)    Deliberately ignored and intentionally omitted from (or downplayed in) its defamatory publications the substantial evidence and information that demonstrated the falsity of the Implications—including Plaintiffs' denials

and publicly available information about the function of an LIR and database records;

(f)    Published the Implications despite knowing that there is no evidence to substantiate them—indeed, it admitted as much in its Article;

(g)    Published the Implications despite knowing that its accusations of misconduct were inherently improbable, including because Telegram's servers are continuously monitored such that Telegram would be almost immediately alerted to any tampering with its equipment to extract user data and such data theft would be almost immediately discovered, and because such a data theft would ruin GNM and destroy its ability to attract and retain customers;

(h)    Knew that, to the extent OCCRP relied on any sources at all as supporting its defamatory accusations, those sources were biased against Plaintiffs and therefore unreliable;

(i)    Intentionally manipulated and misused technical language to mischaracterize and overstate the limited services that GNM has provided to Telegram to further its false and defamatory accusations; and

(j)    Steadfastly refused to retract the Implications despite Plaintiffs demanding multiple times that it do so and despite Plaintiffs providing it additional evidence and information demonstrating the falsity of the Implications.

173.    OCCRP had no applicable privilege or legal authorization to publish the Implications, or, if it did, it abused that privilege or authorization.  OCCRP published its Implications in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

174.    As a direct and proximate result of OCCRP's Implications, and as detailed above, Plaintiffs have suffered substantial economic damages including, among other things, the loss of hundreds of millions of dollars in business deals, loss of banking and financial institution relationships, and the inability to enter banking and financial institutional relationships, plus substantially increased compliance and legal costs.

175.    As a direct and proximate result of OCCRP's Implications, and as detailed above, Plaintiffs have suffered severe reputational damage and have had to spend considerable sums of

money, retain and utilize the services of counsel, and devote time to efforts to counter OCCRP's false and defamatory accusations and defend its reputation in the court of public opinion.

176.    OCCRP published the Implications maliciously, willfully, wantonly, heedlessly, with common law malice, with express malice, with actual malice, and with a conscious, reckless, and willful indifference to Plaintiffs' rights, and with ill will, animus, and a desire to cause injury to Plaintiffs.  Accordingly, punitive damages are appropriate.

177.    In view of the foregoing, Plaintiffs are entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT THREE**
**DEFAMATION-BY-IMPLICATION**
**(False Accusations That Plaintiffs Engaged in Espionage for the Russian FSB)**
**(Body of the Article)**

178.    Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1-146 as if set forth fully herein.

179.    On June 10, 2025, Defendant Journalism Development Network, Inc., d/b/a the Organized Crime and Corruption Reporting Project **("OCCRP")** published an article headlined "Telegram, the FSB, and the Man in the Middle" (the **"Article"**).  A true and correct copy of the Article is attached hereto as **Exhibit A**.

180.    In the Article, OCCRP published and juxtaposed the following statements (with emphasis added) to imply a false and defamatory connection between them or otherwise create the false and defamatory implication that Plaintiffs have provided Telegram data and information to the Russian Federal Security Service ("FSB"), thereby committing criminal acts, including espionage for the FSB (the **"Implications"**):

>     (a)     "[A] new investigation by OCCRP's Russian partner, Important Stories, reveals a critical vulnerability. ***When reporters investigated who controls the infrastructure that keeps Telegram's billions of messages flowing,***

50

*they found a man with no public profile but unparalleled access: Vladimir Vedeneev, a 45-year-old network engineer.*"

(b)    *"Vedeneev owns the company that maintains Telegram's networking equipment and assigns thousands of its IP addresses."*

(c)    *"[T]wo other closely linked Vedeneev companies—one of which also assigns Telegram IP addresses, and another which did so until 2020—have had multiple highly sensitive clients tied to the security services."*

(d)    "A Ukrainian IT specialist who spoke with reporters on condition of anonymity said that *the Russian military has used 'man-in-the-middle' type surveillance* in his country after capturing network infrastructure."

(e)    *"The Man in the Middle"*

(f)    "To learn how Telegram messages travel, reporters messaged each other through the service and recorded the traffic using Wireshark, a network traffic analyzer.  The results showed that *the IP addresses were controlled by a company registered in Antigua and Barbuda called Global Network Management (GNM).*"

(g)    *"GNM's owner ... is a Russian network engineer named Vladimir Vedeneev."*

(h)    "*Vedeneev was the only person authorized to access Telegram servers in a Miami data center. ... [H]is company owns a router in the Telegram server room.*  'If a company controls the routers that distribute traffic passing through Telegram servers, *this means that it, or anyone to whom it grants such access, can see the identifiers of messenger users,*' says Wozniak, the security specialist."

(i)    "*Vedeneev ... is the founder of GlobalNet*, a St. Petersburg backbone telecom operator that controls 18,000 kilometers of backbone infrastructure from Siberia to Western Europe in two dozen countries.  (Last year, Vedeneev handed over his majority share in the company to relatives.)  *Until 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet.*"

(j)    "*But GlobalNet is not just any network provider.  Among its clients is the Main Research Computing Center of the Presidential Property Management Department of Russia (GlavNIVTS).*  Officially, this organization provides technical support for President Putin's public 'direct line' question-and-answer events, summits, and other high-level meetings.  But GlavNIVTS is also perhaps *the most secret and little-studied special service in* Russia.  The agency helped plan the invasion of Ukraine, upgraded a major bot network, developed a centralized video surveillance system, and built tools to track and deanonymize internet users."

51

(k)    "More About GlavNIVTS[.]  In 2019, former GlavNIVTS employees told reporters from Meduza that *the center* has access to secret materials and wo*rks in the interests of a litany of security agencies, including the FSB,* the FSO, the Interior Ministry, the Defense Ministry, and the GRU military intelligence service.  *GlavNIVTS specialists have also 'cleaned up' the digital traces of Russian military personnel* in Syria and eastern Ukraine, developed tools to predict the results of strikes on Ukrainian infrastructure, helped upgrade a major network of pro-Kremlin bots, and developed a centralized video surveillance system with facial recognition technology.  In addition, *GlavNIVTS helped develop a Russian analogue to Palantir, the American mass data analysis system used by the military and CIA*.  Elements of the 'Russian Palantir'—which used names like "Media Monitor," 'Sherlock,' and 'PSKOV'—*help the government track and deanonymize internet users*, as reported by Meduza in 2019."

(l)    "According to data from Russia's official state procurement portal, GlobalNet also provides communications infrastructure to the Kurchatov Institute, a flagship state-owned nuclear research laboratory led by Putin ally Mikhail Kovalchuk and sanctioned by the United States.  Shortly after Russia's full-scale invasion of Ukraine in 2022, *GlobalNet said it was the first Russian operator to implement a system for monitoring user traffic called Deep Packet Inspection (DPI)* 'according to [Russian internet regulator] Roskomnadzor rules.'  It also has a notable minority co-owner: Roman Venediktov, a Russian space forces officer." (brackets in original)

(m)    "At the same time [last year], *he [Vedeneev] also transferred his share of another company called Electrontelecom*—a telecom operator that is also related to Telegram's infrastructure: the company assigned more than five thousand of the messenger's IP addresses.  Reporters obtained the company's internal accounting documents for 2024 which show that *one of its most important government clients is the FSB*.  The documents show that *Electro[n]telecom installs and manages equipment for a system that is being used by the FSB* offices in St. Petersburg and the Leningrad region for surveillance."

(n)    "'If *someone has access to Telegram traffic and cooperates with Russian intelligence service*s, this means that the device identifier becomes a really big problem—a tool for global surveillance of messenger users, regardless of where they are and what server they connect to.'"

181.    The Implications are of and concerning Plaintiffs.  Indeed, Mr. Vedeneev is identified by name in connection with them, GNM is readily identifiable to readers (and was so identified by readers) in connection with them through the reference to "company owned by a

Russian network engineer named Vladimir Vedeneev," and Mr. Vedeneev and GNM are the express focus of the Article and are identified by name, repeatedly, in the Article.

182.    The Implications are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Plaintiffs have provided Telegram data and information to the Russian FSB, thereby committing criminal acts, including espionage for the FSB.

183.    OCCRP intended the Implications to convey factual assertions that Plaintiffs provided Telegram data and information to the Russian FSB, thereby committing criminal acts, including espionage for the FSB, as indicated by OCCRP featuring the Article on its "Espionage" page with the tag "ESPIONAGE":[28]



---

[28] *Espionage*, OCCRP, https://www.occrp.org/en/power-and-influence/espionage/page/1 (visited Mar. 30, 2026).

184. The Implications are false. Plaintiffs have not provided Telegram data and information to the Russian FSB, have not committed criminal acts, and have not engaged in espionage for the Russian FSB or anyone else.

185. The Implications are defamatory, and readers understood them to be defamatory, because they tend to hold Plaintiffs up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community and because they tend to impair Plaintiffs' standing in the community, including by accusing them of providing Telegram data and information to the Russian FSB and thereby committing criminal acts, including espionage for the FSB.

186. The Implications are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because they impute to Plaintiffs criminal offenses—including espionage—and adversely affect Plaintiffs' fitness for their trade, business, or profession—including by accusing them of providing Telegram data and information to the Russian FSB.

187. OCCRP knew the substantial danger of injury to Plaintiffs and their reputations from the Implications, which is readily apparent, and in fact intended to cause injury to Plaintiffs and their reputations by publishing the Implications.

188. For the reasons set forth in detail above—*see supra* Paragraphs 100-137—OCCRP published the Implications with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that OCCRP:

> (a) Had actual knowledge that the Implications are false—as described in detail above in Paragraphs 102-110—because, among other things, Mr. Vedeneev explained to OCCRP prepublication that GNM allocated IP address blocks to Telegram as a Local Internet Registry (LIR) and performed routine physical maintenance on server equipment, that allocating IP addresses does not equate to routing authority or network control (and does not even equate

to assigning IP addresses to particular devices), that Telegram manages its own routing, that Telegram's routing determines actual operational control over network traffic, and that neither he nor GNM accessed Telegram's data or provided it to the FSB;

(b)     Published the Implications to advance a preconceived narrative that Plaintiffs had engaged in misconduct and espionage;

(c)     Purposefully and deliberately avoided obtaining information and evidence it knew would contradict the Implications, which it desired to publish despite their falsity, including by willfully hiding from Plaintiffs the precise accusations that it intended to publish—and did publish in the Implications—so as to deprive them of the opportunity to respond to and provide specific evidence disproving those accusations;

(d)     Published the Implications with ill will and animus—as demonstrated by, among other things, OCCRP republishing the claims and releasing an illegally recorded off-the-record interview of Mr. Vedeneev in response to his defense of himself and GNM;

(e)     Deliberately ignored and intentionally omitted from (or downplayed in) its defamatory publications the substantial evidence and information that demonstrated the falsity of the Implications—including Plaintiffs' denials and publicly available information about the function of an LIR and database records;

(f)     Published the Implications despite knowing that there is no evidence to substantiate them—indeed, it admitted as much in its Article;

(g)     Published the Implications despite knowing that its accusations of misconduct were inherently improbable, including because Telegram's servers are continuously monitored such that Telegram would be almost immediately alerted to any tampering with its equipment to extract user data and such data theft would be almost immediately discovered, and because such a data theft would ruin GNM and destroy its ability to attract and retain customers;

(h)     Knew that, to the extent OCCRP relied on any sources at all as supporting its defamatory accusations, those sources were biased against Plaintiffs and therefore unreliable; and

(i)     Steadfastly refused to retract the Implications despite Plaintiffs demanding multiple times that it do so and despite Plaintiffs providing it additional evidence and information demonstrating the falsity of the Implications.

189.    OCCRP had no applicable privilege or legal authorization to publish the Implications, or, if it did, it abused that privilege or authorization.  OCCRP published its

Implications in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

190.   As a direct and proximate result of OCCRP's Implications, and as detailed above, Plaintiffs have suffered substantial economic damages including, among other things, the loss of hundreds of millions of dollars in business deals, loss of banking and financial institution relationships, and the inability to enter banking and financial institutional relationships, plus substantially increased compliance and legal costs.

191.   As a direct and proximate result of OCCRP's Implications, and as detailed above, Plaintiffs have suffered severe reputational damage and have had to spend considerable sums of money, retain and utilize the services of counsel, and devote time to efforts to counter OCCRP's false and defamatory accusations and defend its reputation in the court of public opinion.

192.   OCCRP published the Implications maliciously, willfully, wantonly, heedlessly, with common law malice, with express malice, with actual malice, and with a conscious, reckless, and willful indifference to Plaintiffs' rights, and with ill will, animus, and a desire to cause injury to Plaintiffs.  Accordingly, punitive damages are appropriate.

193.   In view of the foregoing, Plaintiffs are entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Vladimir Vedeneev and Global Network Management Inc. ("Plaintiffs") respectfully request that the Court enter judgment in their favor and against Defendant Journalism Development Network Inc. d/b/a the Organized Crime and Corruption Reporting Project's ("OCCRP"), as follows:

(1)   Award Plaintiffs compensatory and actual damages in amounts to be proven at trial;

(2)   Award Plaintiffs presumed and special damages in amounts to be proven at trial;

(3)    Award Plaintiffs punitive and/or exemplary damages in an amount to be proven at trial;

(4)    Award Plaintiffs their reasonable expenses, including but not limited to reasonable attorneys' fees, incurred to mitigate the harm caused by Defendant OCCRP's defamation and tortious conduct, including but not limited to money spent in demanding that Defendant OCCRP retract false and defamatory statements and implications and money spent in seeking to counteract the impact of Defendant OCCRP's false and defamatory statements and implications;

(5)    Award Plaintiffs their reasonable costs and attorneys' fees spent in bringing this action to vindicate their reputations and good names;

(6)    Award Plaintiffs all costs, disbursements, fees, and pre- and post-judgment interest as authorized by law; and

(7)    Award Plaintiffs such other and additional relief and remedies as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs Vladimir Vedeneev and Global Network Management Inc. demand a jury on all claims and issues triable by way of jury.

Dated:  May 4, 2026

Respectfully Submitted,

 /s/ Thomas A. Clare, P.C.
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Joseph R. Oliveri (D.C. Bar No. 994029)
Kathryn G. Humphrey*
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: joe@clarelocke.com
Email: kathryn@clarelocke.com
* *pro hac vice* forthcoming

*Attorneys for Plaintiffs Vladimir Vedeneev and Global Network Management Inc.*

# Exhibit A



Support OCCRP     EN

# Telegram, the FSB, and the Man in the Middle

**INVESTIGATION**

The technical infrastructure that underpins Telegram is controlled by a man whose companies have collaborated with Russian intelligence services.



Banner: Koshiro K/Alamy Stock Photo

## Key Findings

- A company owned by a Russian network engineer named Vladimir Vedeneev controls thousands of Telegram IP addresses and maintains its servers.

- Vedeneev's other companies have a history of collaborating with Russia's defense sector, the FSB security service, and other highly sensitive agencies.

- Because of the way Telegram's encryption protocols work, even users who use its "end-to-end" encryption features are vulnerable to being tracked by anyone who can monitor its network traffic.

Reported by

**Roman Anin**
*Important Stories*

**Nikita Kondratyev**
*Important Stories*

Also published by our partner
Important Stories (Russia, in Russian)

June 10, 2025

Telegram, the wildly popular chat and messaging app, is the pride of the Russian IT industry. According to Pavel Durov, the enigmatic entrepreneur who created the service twelve years ago, it now has over a billion monthly active users around the world.

Among the reasons for this success is Telegram's reputation for security, coupled with Durov's image as a free speech champion who has defied multiple governments.

"Unlike some of our competitors, we don't trade privacy for market share," he wrote this April. "In its 12-year history, Telegram has never disclosed a single byte of private messages."



Credit: Steve Jennings/Getty Images for TechCrunch/Flickr

Telegram founder Pavel Durov.

But a new investigation by OCCRP's Russian partner, Important Stories, reveals a critical vulnerability.

When reporters investigated who controls the infrastructure that keeps Telegram's billions of messages flowing, they found a man with no public profile but unparalleled access: Vladimir Vedeneev, a 45-year-old network engineer.

Vedeneev owns the company that maintains Telegram's networking equipment and assigns thousands of its IP addresses. Court documents show that he was granted exclusive access to some of Telegram's servers and was even empowered to sign contracts on Telegram's behalf.

There is no evidence that this company has worked with the Russian government or provided any data. But two other closely linked Vedeneev companies — one of which also assigns Telegram IP addresses, and another which did so until 2020 — have had multiple highly sensitive clients tied to the security services. Among their clients is the FSB intelligence agency; a secretive "research computing center" that helped plan the invasion of Ukraine and developed tools to deanonymize internet users; and a flagship state-owned nuclear research laboratory.



Credit: Alexander Kazakov/Kremlin Pool/Russian Government / Alamy Stock Photo

Russian President Vladimir Putin speaks at the annual meeting of the FSB Board, with FSB Director Alexander Bortnikov, on February 27, 2025, in Moscow.

"If true, this reporting highlights the dangerous disconnect between what many believe about Telegram's security and privacy features, and the reality," said John Scott-Railton, a Senior Researcher at The Citizen Lab. "When people don't know what is actually going on, but assume

they have metadata privacy, they can unknowingly make risky choices, bringing danger to themselves and the people they're communicating with. This is doubly true if the Russian government sees them as a threat."

A Ukrainian IT specialist who spoke with reporters on condition of anonymity said that the Russian military has used "man-in-the-middle" type surveillance in his country after capturing network infrastructure.

"You get physical access to the data transmission channel and install your equipment there," he said. "In such an attack, the hackers aren't even interested so much in the user's correspondence. They get metadata to analyze. And that means IP addresses, user locations, who exchanges data packets with whom, the kind of data it is... really, all possible information."

Durov is currently under investigation in France after being arrested last August on charges related to the circulation of illegal content on Telegram. The company has since implemented a number of measures to crack down and step up its collaboration with the authorities. Durov has been released under judicial supervision and is allowed to travel.

He did not reply to requests for comment. Vedeneev spoke with reporters but declined to make any of his comments public.

## Leaving Russia

The story of Telegram begins with another social networking site that is less well-known outside of Russia: VKontakte.

Created by Durov in 2006, when he was just 21 years old, the site quickly earned a large userbase because it duplicated many of Facebook's popular features and provided free access to vast troves of pirated music and videos.

But VKontakte's rise ran up against Russian President Vladimir Putin's growing authoritarianism. When opposition groups used the site to help organize mass anti-government protests in 2012, the authorities demanded that Durov ban them.

"Armed policemen [came] to my house, tried to break in because I refused," he told right-wing commentator Tucker Carlson in an interview last year, explaining that this episode gave him the idea of creating a new, more secure messaging service.



Credit: Bogomolov.PL/Wikimedia Commons

An anti-government rally on Moscow's Sakharov Avenue in December 2011.

Facing further pressure from the authorities, who now demanded that he disclose the personal data of Ukrainians protesting the Kremlin-aligned government in Kyiv, Durov left Russia in 2014. He sold his stake in VKontakte — which was taken over by people close to the Kremlin — and even published a manifesto: "Seven Reasons Not to Return to

Russia.

Then, along with his brother, a talented mathematician named Nikolai, Durov created Telegram — a new messenger service with an emphasis on privacy. From the beginning, he claimed that his product was "safer" than its competitors and that "messages sent through Telegram cannot be bugged by third parties."

He has denied that Telegram had any infrastructure in Russia, and even claims never to have visited his home country since he left in 2014. "I don't go to any of the big geopolitical powers, countries like China or Russia or even the U.S.," he told Carlson. (Last year, reporters from Important Stories revealed that this was untrue. A leaked database of border crossings showed that Durov had traveled to Russia more than 50 times between 2015 and 2021.)

In the meantime, Telegram's reputation for privacy contributed to its massive growth. Russian users saw the messenger as a safe alternative to VKontakte. The app became a mainstay not only for pro-Kremlin propagandists and security services, but also for independent media outlets and opposition figures. Millions from other countries also joined after WhatsApp made clear that it could share certain data with its parent company, Facebook.

Telegram's official FAQ stresses its security features and emphasizes transparency: "Anyone can check Telegram's open source code and confirm that the app is not doing anything behind their back," it reads.

But the reality is more nuanced. Unlike other apps like WhatsApp or Signal, Telegram chats do not use end-to-end encryption by default. The option is available for users who enable it, but as Durov's former colleague Anton Rosenberg pointed out as far back as 2018, the vast majority do not do so, instead corresponding through regular "cloud" chats, which are stored on the company's servers.

Telegram assures users that their data is safe: "Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions," the company's FAQ reads. "The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. ... Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression."

But network security experts warn that even Telegram's end-to-end encrypted chats can leave users vulnerable to being tracked. The app's MTProto protocol, which governs how its encryption works, specifies that an unencrypted element is attached to the beginning of each encrypted message.

"The unencrypted part is called 'auth_key_id,'" said Michał "rysiek" Woźniak, a security specialist who used to work for OCCRP as head of infrastructure and information security. "This makes it possible to identify a specific user device."

"If I know your device's 'auth_key_id,' and I can listen in on the network that handles the data ... I know it is your specific device communicating with Telegram servers," he explains. "By looking at the network packets ... I also get your IP address at a given time, which tells me your rough geographic location."

This means that whoever controls Telegram's network traffic may be able to track users, even if the messages themselves cannot be read.

> Woźniak conducted several tests to confirm these claims. He has published the technical details in a blog post. Other experts have also pointed out the 'auth_key_id' issue.

## The Man in the Middle

To learn how Telegram messages travel, reporters messaged each other

through the service and recorded the traffic using Wireshark, a network traffic analyzer. The results showed that the IP addresses were controlled by a company registered in Antigua and Barbuda called Global Network Management (GNM).

Analyzing additional IP ranges managed by the company, reporters found that it had leased over 10,000 IP addresses to Telegram, meaning that it plays a significant role in the messenger's infrastructure.

Documents from an otherwise unremarkable court case filed in Florida in 2018 — a dispute between GNM and a contractor — reveal much more.

GNM's owner, they show, is a Russian network engineer named Vladimir Vedeneev. He tells the court that his company "is involved in the installation of client equipment — in this case for the Telegram Messenger — and further technical support of this equipment."

According to his company's legal filings, Vedeneev was the only person authorized to access Telegram servers in a Miami data center. He also testified that his company owns a router in the Telegram server room.

"If a company controls the routers that distribute traffic passing through Telegram servers, this means that it, or anyone to whom it grants such access, can see the identifiers of messenger users," says Woźniak, the security specialist.

Documents from the court case also show that Vedeneev's relationship with Durov goes beyond providing network infrastructure.

As far back as nine years ago, they show, Durov had empowered Vedeneev to sign documents as Telegram's CFO. One contract found in the case materials empowers Vedeneev's GNM to deal with a third-party contractor on Telegram's behalf. It is signed by Vedeneev twice: Once as GNM's director and once as Telegram's CFO.

Credit: Screenshot of court document obtained by Important Stories

A contract signed by Vedeneev in two roles: As CFO of Telegram and as CEO of General Network Management.

In his testimony, Vedeneev describes the arrangement as "informal" and says he was never paid by Telegram as an employee. But he also tells the court that he "had a power of attorney to sign documents on behalf of Pavel Durov and on behalf of Telegram."

Neither Elies Campo, a former partnership development manager with Telegram who spoke with reporters, nor others familiar with Telegram's corporate structure, have ever heard of Vedeneev. Given Telegram's secretive corporate culture — not even all of its top managers are publicly known, and the company maintains a strict "No LinkedIn" policy — this may be no surprise.

In fact, Vedeneev is a key player in the Russian telecommunications market. He is the founder of GlobalNet, a St. Petersburg backbone telecom operator that controls 18,000 kilometers of backbone infrastructure from Siberia to Western Europe in two dozen countries. (Last year, Vedeneev handed over his majority share in the company to relatives.)

Until 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet.

But GlobalNet is not just any network provider. Among its clients is the Main Research Computing Center of the Presidential Property Management Department of Russia (GlavNIVTS). Officially, this organization provides technical support for President Putin's public "direct line" question-and-answer events, summits, and other high-level meetings.

But GlavNIVTS is also perhaps the most secret and little-studied special service in Russia. The agency helped plan the invasion of Ukraine, upgraded a major bot network, developed a centralized video surveillance system, and built tools to track and deanonymize internet users.

## More About GlavNIVTS

In 2019, former GlavNIVTS employees told reporters from Meduza that the center has access to secret materials and works in the interests of a litany of security agencies, including the FSB, the FSO, the Interior Ministry, the Defense Ministry, and the GRU military intelligence service.

GlavNIVTS specialists have also "cleaned up" the digital traces of Russian military personnel in Syria and eastern Ukraine, developed tools to predict the results of strikes on Ukrainian infrastructure, helped upgrade a major network of pro-Kremlin bots, and developed a centralized video surveillance system with facial recognition technology.

In addition, GlavNIVTS helped develop a Russian analogue to Palantir, the American mass data analysis system used by the military and CIA. Elements of the "Russian Palantir" — which used names like "Media Monitor," "Sherlock," and "PSKOV" — help the government track and deanonymize internet users, as reported by Meduza in 2019.

Show less ∧

According to data from Russia's official state procurement portal, GlobalNet also provides communications infrastructure to the Kurchatov Institute, a flagship state-owned nuclear research laboratory led by Putin ally Mikhail Kovalchuk and sanctioned by the United States.

Shortly after Russia's full-scale invasion of Ukraine in 2022, GlobalNet said it was the first Russian operator to implement a system for monitoring user traffic called Deep Packet Inspection (DPI) "according to [Russian internet regulator] Roskomnadzor rules."

It also has a notable minority co-owner: Roman Venediktov, a Russian space forces officer.

A graduate of the elite Mozhaisky Academy, Venediktov, who owns four percent of GlobalNet's shares, served for nearly 10 years in a defence ministry spacecraft testing center outside Moscow.

Venediktov began to cooperate with the Durov family about 15 years ago, when he became the joint co-owner of their St. Petersburg company "Peering," which owned the traffic exchange network DATAIX and handled traffic for VKontakte. He did not respond to requests for comment.





*Технический директор "GlobalNet" Владимир Веденеев (слева) и генеральный директор DataIX Роман Венедиктов.*

Credit: Screenshot of nag.ru website

Vladimir Vedeneev (left) and Roman Venediktov (right) featured on telecommunications supplier website Nag.ru.

Vedeneev's GlobalNet bought DATAIX in 2018, making him, the Durov family, and the space forces officer business partners for years. He transferred his share in GlobalNet to relatives last year. GlobalNet did not respond to requests for comment.

At the same time, he also transferred his share of another company called Electrontelecom — a telecom operator that is also related to Telegram's infrastructure: the company assigned more than five thousand of the messenger's IP addresses.

Reporters obtained the company's internal accounting documents for 2024 which show that one of its most important government clients is the FSB.

The documents show that Electrotelecom installs and manages equipment for a system that is being used by the FSB offices in St. Petersburg and the Leningrad region for surveillance.

"I am shocked, but not surprised," said Woźniak, the security expert, about reporters' findings. "If someone has access to Telegram traffic and cooperates with Russian intelligence services, this means that the device identifier becomes a really big problem — a tool for global surveillance of messenger users, regardless of where they are and what server they connect to."

*With additional reporting by Ilya Lozovsky (OCCRP).*

*UPDATE, June 12, 2025: The year the Miami court case was filed, 2018, was added to the story.*

Fact-checking was provided by the OCCRP Fact-Checking Desk.

June 10, 2025

# Exhibit B



# Official Statement Global Network Management Inc. (GNM Inc.) Regarding the OCCRP and Important Stories publication dated June 10, 2025

In response to a publication containing a series of inaccurate allegations, Global Network Management Inc. deems it necessary to issue the following official statement:



# Table of Contents

**This document contains the following policies:**

*1. Misinterpretations and Speculation in the Media* ........................................................... **3**

*2. Telegram IP Addresses and the Role of GNM Inc.* ........................................................ **4**

*3. Telegram Servers and GNM Inc.'s Involvement* ............................................................. **5**

*4. MTProto Protocol and Device Identifiers* ..................................................................... **6**

*5. GlobalNet and ElectronTelecom* ................................................................................... **7**

*6. "Physical Access" and Traffic Control* .......................................................................... **8**

*7. Document Signatures and the "CFO" Claim* ................................................................. **9**

*8. Political Accusations and Defamation* ..........................................................................**10**

*Conclusion* .......................................................................................................................**11**



# 1. Misinterpretations and Speculation in the Media

**Fact:** Several media outlets, referring to the OCCRP investigation, have published claims suggesting that Telegram Messenger is vulnerable to interception and decryption by intelligence services, including the FSB.

**Rebuttal:**

- These claims are not based on the conclusions of OCCRP but are speculative interpretations made by journalists without any technical or legal foundation.

- GNM Inc. is a transit network provider with no access to message content, encryption keys, or internal infrastructure of Telegram Messenger.

- It is technically impossible for a LIR-level provider, infrastructure operator, or data center to decrypt Telegram traffic without access to private encryption keys, which GNM Inc. does not possess and has never possessed.

- We have reviewed the statements and publication by Mr. Anin, the OCCRP author, and regretfully note that certain interpretations, subsequently published by third parties, misrepresent the original investigation and violate journalistic standards.

**GNM**

## 2. Telegram IP Addresses and the Role of GNM Inc.

**Fact:** GNM Inc. is a registered Local Internet Registry (LIR) with RIPE NCC and assigns IP addresses to its clients, including Telegram Messenger.

**Rebuttal:** IP registration via a LIR does not imply access to traffic content, routing decisions, or user identities. Routing is managed by the recipient network (Telegram), not by the LIR.

**References:**

- https://www.ripe.net
- https://www.cloudflare.com/learning/security/glossary/what-is-bgp/



### 3. Telegram Servers and GNM Inc.'s Involvement

**Fact:** GNM Inc. provides server connectivity and IP address services through colocation and lease agreements.

**Rebuttal:** GNM Inc. has no access to Telegram's data, encryption keys, or message content. Telegram uses a globally distributed infrastructure with physical and logical separation of keys and stored data.

**Source:** https://telegram.org/faq



# 4. MTProto Protocol and Device Identifiers

**Fact:** The MTProto protocol does include a field called auth_key_id, but it does not contain a unique user identifier.

**Rebuttal:** Even if network traffic is intercepted, it is not possible to determine who is communicating with whom or decrypt the message without the necessary keys. The vulnerability described by OCCRP is not technically substantiated.

**Source:** https://core.telegram.org/mtproto

6



## 5. GlobalNet and ElectronTelecom

**Fact:** GNM Inc. has always been a separate entity from GlobalNet and ElectronTelecom. While founded by the same owner, GlobalNet and ElectronTelecom have changed ownership in 2024.

**Additionally:** Since 2022, GNM Inc. has had no remote staff, and never had assets, or business operations in Russia. Its employees are located in the EU, USA, Switzerland, Antigua, Mumbai, Singapore, and other jurisdictions.

**Clarification:** ElectronTelecom is a Russian fixed broadband (FTTH) operator based in Saint Petersburg. In accordance with Russian law, including:

- Federal Law No. 126-FZ "On Communications" (07.07.2003)
- Russian Government Decree No. 538 on Telecom Operator Activity
- Orders of the Ministry of Digital Development and Roskomnadzor regarding SORM and TSPU systems

every telecom operator in Russia is **legally required** to install and operate systems for lawful interception (SORM) and state monitoring (TSPU), as mandated by authorities. ElectronTelecom is obliged to comply, regardless of ownership or intent.

**Rebuttal:** Suggesting that compliance with national telecommunications laws equates to participation in intelligence operations or cooperation with the FSB is legally unfounded and misleading. These requirements apply to **all telecom operators in Russia**.

**GNM**

# 6. "Physical Access" and Traffic Control

**Fact:** GNM Inc. does not have access to Telegram's telecom equipment beyond standard SLA-related technical access. All Telegram infrastructure is fully managed and isolated by Telegram Messenger.

**Rebuttal:** No GNM equipment has ever been used for inspecting, filtering, or monitoring Telegram traffic.

**GNM**

## 7. Document Signatures and the "CFO" Claim

**Fact:** Vladimir Vedeneev was at one point authorized to sign technical documents within the framework of colocation agreements.

**Rebuttal:** The designation of "CFO" in certain documents was informal and technical in nature. Vladimir Vedeneev has **never held any formal position** at Telegram Messenger, including managerial, technical, or legal roles.



# 8. Political Accusations and Defamation

**Fact:** Global Network Management Inc. is a global commercial telecom provider, registered in Antigua and Barbuda. The company provides:

- DWDM (Layer 1) transport services;
- Infrastructure for interconnection and traffic exchange (IX);
- IP Transit services;
- Other telecom solutions across its operational regions.

GNM Inc. supports infrastructure and transit services for hundreds of telecom and content providers worldwide, including in Europe, North America, South Asia, and the Caribbean. The company's reputation is backed by long-standing partnerships with major international clients.

**Commentary:** The lack of awareness of GNM Inc.'s operations by OCCRP authors suggests they are not telecom professionals, engineers, or part of the relevant industry — raising doubts about their technical competence.

**Rebuttal:** GNM Inc. does not operate and has never operated in the Russian Federation. It has no affiliations with Russian government entities or intelligence services and adheres strictly to the laws and regulations of all jurisdictions where it conducts business.



## Conclusion

We regard the OCCRP publication as inaccurate, damaging to our professional reputation, and misleading to the public. We reserve the right to defend our name through legal and regulatory channels in all relevant jurisdictions.

**Press contact:** press@gnm.net

**Date:** June 10, 2025

**Signed:** Vladimir Vedeneev, CEO, Global Network Management Inc.

11

# Exhibit C

**Bezirksgericht Baden**

Präsidium des Zivilgerichts

KANTON AARGAU

Mellingerstrasse 2a
5400 Baden
Telefon  056 200 13 32
Fax      056 200 13 14

SZ.2025.169 / hu

## Entscheid vom 17. Oktober 2025

| | |
|---|---|
| Besetzung | Gerichtspräsidentin Alina Enkegaard |
| | Gerichtsschreiber Stefan Hürst |
| | |
| Gesuchsteller | **Vladimir *Vedeneev,*** geboren am 5. Januar 1980, |
| | von Antigua und Barbuda, Eigerstrasse 2, 5453 Remetschwil |
| | |
| Gesuchs-gegner 1 | **Roman *Anin,*** geboren am 16. Dezember 1986, Wohnort unbekannt |
| | |
| Gesuchs-gegnerin 2 | ***Google LLC,*** Amphitheatre Parkway, US-94043 Mountain View |
| | vertreten durch Dr. iur., LL.M. Ralph Schlosser, Kasser Schlosser |
| | avocats SA, Avenue de la Gare 5, Postfach, 1001 Lausanne |
| | |
| Gegenstand | Summarisches Verfahren betreffend Vorsorgliche Massnahmen zum Schutz der Persönlichkeit |

- 2 -

**Die Gerichtspräsidentin entnimmt den Akten:**

**1.**

Mit Eingabe vom 14. Juli 2025 reichte der Gesuchsteller gestützt auf Art. 28 ff. ZGB ein Gesuch betreffend Persönlichkeitsschutz ein und stellte folgende Anträge:

" 1.

Das Gericht möge eine superprovisorische Verfügung erlassen, mit der die Veröffentlichung und Verbreitung der oben genannten YouTube-Videos bis zur rechtskräftigen Klärung untersagt wird.

2.

Dem Plattformbetreiber YouTube / Google und dem Journalisten Roman Anin soll die sofortige Sperrung / Entfernung dieser Inhalte auferlegt werden.

3.

Das Gericht möge mir eine Eingangsbestätigung und ein Aktenzeichen zukommen lassen.

4.

Das Gericht möge zudem anordnen, dass auch jede zukünftige Veröffentlichung von Inhalten, welche das ohne Zustimmung aufgenommene Gespräch vom 4. Juni 2025 ganz oder teilweise enthalten, durch Herrn Roman Anin oder in dessen Auftrag Dritten untersagt wird.
Eine einmalige Löschung der aktuellen Videos genügt nicht, da eine Wiederveröffentlichung des Materials droht und mein Persönlichkeitsrecht erneut verletzt würde."

**2.**

Mit Eingabe vom 18. Juli 2025 reichte der Gesuchsteller ein verbessertes Gesuch mit ergänzenden Unterlagen ein und beantragte sinngemäss, das Gesuch sei weiterzubearbeiten.

**3.**

Mit Verfügung vom 21. Juli 2025 wurden die superprovisorischen Anträge des Gesuchstellers einstweilen abgewiesen und seine Eingaben samt Beilagen an den Gesuchsgegner 1 und die Gesuchsgegnerin 2 (Schweizer Vertretung) zur Stellungnahme innert 10 Tagen zugestellt.

**4.**

Mit Eingaben vom 23. Juli 2025 nahm der Gesuchsteller zur Verfügung vom 21. Juli 2025 Stellung und stellte sinngemäss ein erneutes Gesuch um superprovisorische Sperrung zweier YouTube-Videos.

**5.**

Am 23. Juli 2025 informierte sodann der Head of Legal von Google Switzerland GmbH, dass verfahrenseinleitende Schriftstücke immer zuerst rechtshilfeweise an den Hauptsitz von Google inc. zugestellt werden müssten. Google Switzerland GmbH sei nicht bevollmächtigt, von sich aus in solchen

- 3 -

Verfahren tätig zu werden. Die Verfügung vom 21. Juli 2025 müsse deshalb an Google inc. in den USA zugestellt werden.

**6.**

Mit Verfügung vom 24. Juli 2025 wurden der Gesuchsgegner 1 und die Gesuchsgegnerin 2 einstweilen angewiesen, das im YouTube-Video "https://www.youtube.com/watch?v=UmgP7jbhU7s" veröffentlichte Bild-, Film- und Tonmaterial sofort von allen Plattformen zu entfernen, auf welche Dritte Zugriff nehmen können, und ihnen wurde einstweilen per sofort verboten, das im YouTube-Video "https://www.youtube.com/watch?v=UmgP7jbhU7s" veröffentlichte Bild-, Film- und Tonmaterial auf elektronischem Weg oder irgendeiner anderen Form Dritten zugänglich zu machen. Hinsichtlich das YouTube-Video "https://www.youtube.com/watch?v=s7pnANMPigg" wurden die superprovisorischen Anträge einstweilen abgewiesen.

**7.**

Mit Eingabe vom 14. August 2025 reichte die Gesuchsgegnerin 2 (Vertreter) eine Stellungnahme ein und stellte folgende Anträge:

> " I. Auf das (ergänzte) Gesuch um Anordnung vorsorglicher Massnahmen vom 14. Juli (bzw. 18. Juli) 2025 sei nicht einzutreten.
>
> II. Eventualiter zu Ziff. I sei das Gesuch vollumfänglich abzuweisen, soweit darauf eingetreten wird.
>
> III. Die mit Verfügung des Bezirksgerichts Badens vom 24. Juli 2025 angeordneten superprovisorischen Massnahmen seien mit sofortiger Wirkung aufzuheben.
>
> Alles unter Kosten- und Entschädigungsfolgen zzgl. allfällig geschuldeter MwSt. zu Lasten des Gesuchstellers."

**8.**

Mit Eingabe vom 18. August 2025 beantragte der Gesuchsteller die Fortsetzung des Verfahrens.

**9.**

Mit Verfügung vom 19. August 2025 wurden die Eingaben vom 14. und 18. August 2025 an die jeweils anderen Parteien zur freigestellten Stellungnahme bzw. Wahrung des Replikrechts gemäss Art. 53 Abs. 3 ZPO zugestellt.

**10.**

Mit Eingabe vom 29. August 2025 reichte die Gesuchsgegnerin 2 (Vertreter) eine weitere Stellungnahme ein.

- 4 -

**11.**

Mit Eingabe vom 31. August 2025 reichte der Gesuchsteller eine weitere Stellungnahme ein und stellte folgende Anträge:

" 1.
Das Gericht möge **Google Ireland Limited, Gordon House, Barrow Street, Dublin 4, Irland**, als zusätzliche Gesuchsgegnerin zum Verfahren beiziehen.

2.
Bestätigung, dass **Google LLC** Gesuchsgegnerin bleibt, da die streitige Veröffentlichung in den USA erfolgt ist.

3.
Verpflichtung der Google LLC, für den Fall entgegenstehender Behauptungen den Nachweis zu erbringen, dass die Veröffentlichung aus Europa/Schweiz erfolgt sei; andernfalls bleibt Google LLC als richtige Partei im Verfahren bestehen."

**12.**

Mit Eingabe vom 1. September 2025 reichte der Gesuchsteller eine als "Replik" bezeichnete Stellungnahme ein und stellte folgende Anträge:

" Antrage 1: Bestätigung und Umwandlung der superprovisorischen Verfügung vom 24.07.2025 in vorsorgliche Massnahmen,

Antrage 2: sofortige Löschung beider streitigen Videos,

Antrage 3: Verhängung einer Entschädigung zugunsten des Staates für die Missachtung des Gerichtsbeschlusses

Antrage 4: Zusprechung einer Entschädigung an den Gesuchsteller (Vladimir Vedeneev) für **jeden Tag der Nichtbefolgung** bis zur tatsächlichen Löschung.

Antrage 5: Zusätzlicher Antrag auf Weiterleitung an die Staatsanwaltschaft (Art. 309 StPO): Das Gericht wird ersucht, die Akten bezüglich der fortgesetzten Missachtung der superprovisorischen Verfügung vom 24.07.2025 an die zuständige Staatsanwaltschaft Aargau weiterzuleiten, zur Prüfung der Einleitung eines Strafverfahrens gegen Google LLC und Roman Anin nach Art. 292 StGB (Nichtbefolgung einer behördlichen Verfügung) sowie Art. 179bis StGB (unbefugte Aufnahme eines privaten Gesprächs). [...]

Antrage 6: Zusätzlicher Antrag auf Geheimhaltung der Beilagen (Art. 156 ZPO): Das Gericht wird ersucht, die folgenden Beilagen als geheimhaltungsbedürftig zu erklären und entsprechende Schutzmassnahmen anzuordnen: Beilage 1 (Legal opinion), Beilage 3 (Fotos des Wohnsitzes), Beilage 4 (Swisscom-Daten), Beilage 6/7/10/18 (persönliche Korrespondenz), Beilage 8 (Polizeiberichte zu Drohungen), Beilage 19 (Finanzbericht GNM), Beilage 20 (Vertrag Clare Locke LLP) und Beilage 21 (MTProto-Audit) sowie weitere Beilagen, soweit sie sensible Daten enthalten. Anzuordnende Massnahmen: Schwärzung sensibler Passagen (z. B. Adressen, Finanzdetails, persönliche Fotos). Einschränkung des Zugangs

auf das Gericht, die Parteien und deren Vertreter. Strafbewehrte Geheimhaltungspflicht für alle Beteiligten. Begründung: Die genannten Beilagen enthalten sensible personenbezogene Daten (Art. 3 DSG), Geschäftsgeheimnisse, finanzielle Informationen und Angaben zur persönlichen Sicherheit. Ihre Offenlegung würde weitere Persönlichkeitsverletzungen verursachen und den Zweck des Verfahrens (Schutz der Persönlichkeit nach Art. 28 ZGB) vereiteln. Ihre Offenlegung würde den Streisand-Effekt verstärken und weitere Drohungen provozieren (vgl. Beilage 8). Dies ist notwendig, um den Reputations- und Privatsphäreschutz des Gesuchstellers zu gewährleisten.

Die Höhe der Entschädigung hat zu berücksichtigen:
- Millionen CHF/USD an Kosten (Anwälte, Experten, Reputationsschutz),
- den Reputationsschaden,
- den Eingriff in die Privatsphäre,
- die erzwungene öffentliche Exponierung.

**13.**

Mit Verfügung vom 8. September 2025 wurde die Bezeichnung der Gesuchsgegnerin 2 im Rubrum von Amtes wegen von "Google inc." zu "Google LLC" angepasst sowie die letzten Eingaben an die jeweils anderen Parteien zur Kenntnis zugestellt.

**14.**

Im Anschluss fällte die Gerichtspräsidentin den vorliegenden Entscheid.

---

### Die Gerichtspräsidentin zieht in Erwägung:

**1.**
**1.1.**

Das Gericht prüft die Prozessvoraussetzungen von Amtes wegen (Art. 60 ZPO).

**1.2.**

Die Gesuchsgegnerin 2 bringt vor, dass es dem Gesuchsteller nicht gelungen sei, einen schweizerischen Gerichtsstand glaubhaft zu machen, weshalb auf sein Gesuch nicht einzutreten sei. Es sei zweifelhaft, dass er seinen Wohnsitz oder gewöhnlichen Aufenthaltsort in der Schweiz habe und er habe es versäumt, etwas anderes zu substantiieren.

Der Gesuchsteller macht seinerseits geltend, er habe seinen gewöhnlichen Aufenthalt in Remetschwil. Bei Internet-Delikten stelle der Wohnsitz des Verletzten den Erfolgsort dar. Der Gesuchsgegner 1 habe ausdrücklich von seinem Wohnsitz in der Schweiz gewusst und habe über seine schweizerische Telefonnummer verfügt.

**1.3.**

Das eingereichte Gesuch richtet sich gegen eine natürliche Person mit unbekanntem Wohnsitz (mutmasslich im Ausland) als Gesuchsgegner 1

sowie gegen die Google LLC mit Sitz in den USA als Gesuchsgegnerin 2. Es liegt deshalb ein internationaler Sachverhalt vor und die internationale Zuständigkeit richtet sich nach den anwendbaren Staatsverträgen und dem IPRG. Vorliegend kommt mangels einschlägiger Staatsverträge das IPRG zur Anwendung.

**1.4.**

Gemäss Art. 129 Abs. 1 i.V.m. Art. 33 Abs. 2 IPRG sind für Ansprüche aus Persönlichkeitsverletzung die schweizerischen Gerichte am Handlungs- oder Erfolgsort zuständig. Bei Mediendelikten befindet sich der Erfolgsort überall dort, wo sich das Medium empfangen, erwerben oder abrufen lässt. Bei Persönlichkeitsverletzungen durch einen Beklagten im Ausland befindet sich der Erfolgsort am (schweizerischen) gewöhnlichen Aufenthaltsort des Klägers (RODRIGUEZ/KRÜSI/UMBRICHT, in: Grolimund/ Loacker/Schnyder [Hrsg.], Basler Kommentar, Internationales Privatrecht, 4. Auflage, Basel 2021 [zit. BSK IPRG-BEARBEITER/IN], Art. 129 N 30).

**1.5.**

Entgegen den Ausführungen der Gesuchsgegnerin 2 hat der Gesuchsteller seinen Wohnsitz in der Schweiz hinreichend dargelegt. Er nannte seit Beginn des Verfahrens seine Adresse in Remetschwil. Sämtliche gerichtlichen Postsendungen konnten dem Gesuchsteller an dieser Adresse erfolgreich zugestellt werden. Zudem gab er dem Gesuchsgegner 1 für die Kontaktaufnahme seine schweizerische Telefonnummer an (Beilage 6 des Gesuchstellers vom 1. September 2025). Es gibt für das Gericht somit keinen Grund, am Wohnsitz und gewöhnlichen Aufenthaltsort des Gesuchstellers in Remetschwil zu zweifeln. Der Hinweis der Gesuchsgegnerin 2, wonach der Gesuchsteller ein leitender Angestellter einer in Moskau ansässigen Firma sei, ist nicht glaubhaft. Das eingereichte Profil (Beilage 1 der Gesuchsgegnerin 2 vom 15. August 2025) zeigt ein Foto, welches der Person im Video nicht ähnlich sieht und beschreibt im Übrigen eine Tätigkeit im Finanzbereich, in welcher der Gesuchsteller nicht tätig ist.

Nachdem der Gesuchsteller somit seinen Wohnsitz und auch seinen gewöhnlichen Aufenthaltsort in Remetschwil hat, befindet sich dort der Erfolgsort, weshalb die Gerichte der Schweiz örtlich zur Beurteilung des vorliegenden Massnahmebegehrens zuständig sind. Dies gilt für den Gesuchsgegner 1 und die Gesuchsgegnerin 2 gleichermassen.

Die örtliche Zuständigkeit des angerufenen Gerichts in Baden ergibt sich aufgrund des Wohnsitzes des Gesuchstellers in Remetschwil. Für vorsorgliche Massnahmen ist die Gerichtspräsidentin als Einzelrichterin sachlich zuständig (§ 6 Abs. 1 lit. b EG ZPO).

**2.**

**2.1.**

Die Gesuchsgegnerin 2 macht geltend, dass selbst bei einer Bejahung einer schweizerischen Zuständigkeit für die Anwendung schweizerischen Rechts kein Raum bestehe. Sie habe nicht mit einem Erfolgseintritt in der

Schweiz rechnen müssen, da vorliegend keine Bekanntheit des Gesuchstellers in der Schweiz festzustellen sei und die russischsprachigen Videos nicht für ein Schweizer Publikum konzipiert seien.

Der Gesuchsteller bringt vor, die Vorhersehbarkeit ergebe sich dadurch, dass YouTube weltweit und mit automatischen Untertiteln und Übersetzungen angeboten werde.

### 2.2.

Ansprüche aus Verletzung der Persönlichkeit durch Medien, insbesondere durch Presse, Radio, Fernsehen oder durch andere Informationsmittel in der Öffentlichkeit unterstehen nach Wahl des Geschädigten dem Recht des Staates, in dem der Geschädigte seinen gewöhnlichen Aufenthalt hat oder in dem der Erfolg der verletzenden Handlung eintritt, sofern der Schädiger mit dem Eintritt des Erfolges in diesem Staat rechnen musste (Art. 139 Abs. 1 lit. a und c). Als «Erfolgsort» gilt im Fall von Persönlichkeitsverletzungen der Ort, an dem die Persönlichkeit durch Kenntnisnahme der Veröffentlichung verletzt wird, z.B. der Ort, an dem Informationen aus dem Internet heruntergeladen werden (BSK IPRG-DASSER/DAL MOLIN, Art. 139 N 17 f.). Das Kriterium der Vorhersehbarkeit des Erfolgseintritts bei Internetdelikten wird in der Lehre unterschiedlich beurteilt. Teilweise wird die Auffassung vertreten, dass beim Abruf persönlichkeitsverletzender Inhalte über das Internet eine gewisse – für den Schädiger erkennbare – Wahrscheinlichkeit gegeben sein muss, dass im Staat, dessen Recht gewählt wird, ein solcher Abruf auch tatsächlich stattfinden wird (BSK IPRG-DASSER/DAL MOLIN, Art. 139 N 20). Eine andere Auffassung stipuliert, dass im Internet grundsätzlich mit weltweitem Erfolgseintritt zu rechnen ist, wobei lediglich das allgemeine Rechtsmissbrauchsverbot (z.B. Wahl einer exotischen Rechtsordnung ohne Bezug zum Sachverhalt) und der Ordre public Schranken bilden würden. Es spreche sodann eine tatsächliche Vermutung dafür, dass mit dem Erfolgseintritt am gewöhnlichen Aufenthaltsort des Geschädigten gerechnet werden musste (VISCHER/GÖKSU, in: Müller-Chen/Widmer Lüchinger [Hrsg.], Zürcher Kommentar zum IPRG, Band II, Art. 108a-200, 3. Auflage, Zürich 2018, Art. 139 N 16 f.)

### 2.3.

Vorliegend macht der Gesuchsteller eine Persönlichkeitsverletzung durch zwei Videos geltend, die auf dem Videoportal YouTube publiziert wurden: ein am 10. Juni 2025 veröffentlichtes Video (https://www.youtube.com/watch?v=s7pnANMPigg; fortan: Video 1) sowie ein am 10. Juli 2025 veröffentlichtes Video (https://www.youtube.com/watch?v=UmgP7jbhU7s; fortan: Video 2;). Der Gesuchsteller hat seinen gewöhnlichen Aufenthalt in Remetschwil in der Schweiz und stützt sich in seinen Eingaben auf schweizerische Gesetzesbestimmungen. Von einem rechtsmissbräuchlichen Verhalten durch die Wahl einer exotischen Rechtsordnung kann somit keine Rede sein. Wenn sodann die Gesuchsgegnerin 2 als mutmassliche Schädigerin bei der Aufschaltung der Videos gar nicht wusste, wo auf der Welt sich der Aufenthaltsort des Gesuchstellers befindet, so kann dies nicht dazu führen, dass über das Kriterium der

Erkennbarkeit die Rechtswahl des Gesuchstellers gänzlich vereitelt wird. Andernfalls könnte die in ihrer Persönlichkeit verletzte Partei nie von der ihr gemäss Art. 139 Abs. 1 IPRG gewährten Rechtswahl Gebrauch machen, wenn der Schädiger geltend macht, keine Kenntnis von deren Aufenthaltsort gehabt zu haben. Die Gesuchsgegnerin 2 macht denn auch nicht geltend, dass sie konkrete Anhaltspunkte für einen anderen Aufenthaltort des Gesuchstellers gehabt hat. Die Gesuchsgegner 1 und 2 mussten nach dem Gesagten damit rechnen, dass der Gesuchsteller an seinem gewöhnlichen Aufenthaltsort von der in Frage stehenden Veröffentlichung Kenntnis nimmt und das entsprechende Recht zur Anwendung gelangt. Da der Gesuchsteller seinen gewöhnlichen Aufenthalt in Remetschwil hat, ist folglich Schweizer Recht anwendbar.

### 3.

### 3.1.

Die Gesuchsgegnerin 2 reichte am 29. August 2025 eine Stellungnahme zur Eingabe des Gesuchstellers vom 18. August 2025 ein und macht darin geltend, dass die neuen Äusserungen und Beilagen des Gesuchstellers nicht zu berücksichtigen seien. Der Aktenschluss sei nämlich bereits mit der Einreichung ihrer ersten Stellungnahme am 14. August 2025 eingetreten. Nach Aktenschluss bestehe im vorliegenden Fall kein Raum für die Einreichung von Noven, nachdem das Gericht weder eine entsprechende Frist gesetzt habe noch eine Gerichtsverhandlung stattfinde.

Der Gesuchsteller reichte in der Folge noch weitere Eingaben ein, äusserte sich jedoch nicht zu diesen Vorbringen der Gesuchsgegnerin 2.

### 3.2.

Über vorsorgliche Massnahmen befindet das Gericht im summarischen Verfahren (Art. 261 ff. ZPO). In diesem Verfahren wird in der Regel kein zweiter Schriftenwechsel und keine Instruktions- oder Hauptverhandlung durchgeführt (vgl. Art. 253 ZPO; BGE 138 III 252 E. 2.1). Grundsätzlich liegt es im Ermessen des Gerichts, ob es das Verfahren rein schriftlich durchführt oder nach einer mündlichen Verhandlung entscheidet (Art. 256 Abs. 1 ZPO; BGer 4A_273/2012 E. 3.2.). Im summarischen Verfahren darf sich demnach keine der Parteien darauf verlassen, dass das Gericht nach einmaliger Anhörung einen zweiten Schriftenwechsel oder eine mündliche Hauptverhandlung anordnet. Es besteht insofern kein Anspruch der Parteien darauf, sich zweimal zur Sache zu äussern, denn grundsätzlich tritt der Aktenschluss nach einmaliger Äusserung ein (BGE 144 III 117 E. 2.2).

### 3.3.

Der Gesuchsteller hat das vorliegende Verfahren mit seiner Eingabe vom 14. Juli 2025 eingeleitet und diese vor der ersten Stellungnahme einer Gegenpartei mit Eingaben vom 18. und 23. Juli 2025 ergänzt. Der Gesuchsgegner 1 liess die ihm während des Verfahrens angesetzten Fristen jeweils ungenutzt verstreichen und liess sich nie vernehmen. Die Gesuchsgegnerin 2 reichte mit Eingabe vom 14. August 2025 ihre Stellungnahme zu den Eingaben des Gesuchstellers ein. Diese wurde den Parteien mit Verfügung

vom 19. August 2025 zur freigestellten Stellungnahme bzw. Wahrung des Replikrechts gemäss Art. 53 Abs. 3 ZPO zugestellt. Ein zweiter Schriftenwechsel wurde damit explizit nicht angeordnet. Ebenso wenig wurde eine Verhandlung in Aussicht gestellt. Der Aktenschluss trat somit in diesem Zeitpunkt ein und neue Tatsachen und Beweismittel, die erst später in den Prozess eingebracht wurden, bleiben grundsätzlich unbeachtlich. Das Replikrecht gemäss Art. 53 Abs. 3 ZPO dient nicht dazu, vorher Versäumtes nachzuholen, sondern ist Ausfluss des Anspruchs auf rechtliches Gehör, das es den Parteien erlaubt, sich innert nützlicher Frist zu Stellungnahmen der Gegenseite zu äussern.

Ob das Novenrecht gemäss Art. 229 ZPO in so einer Konstellation trotz fehlender zweiter Äusserungsmöglichkeit und fehlender Verhandlung analog anwendbar ist, solange das Gericht die Urteilsberatung noch nicht aufgenommen hat, wurde vom Bundesgericht soweit ersichtlich bisher offen gelassen. Die Frage muss indes auch vorliegend nicht beantwortet werden, nachdem keine entscheidrelevanten Vorbringen des Gesuchstellers nach Eintritt des Aktenschlusses ersichtlich sind, die die Voraussetzungen von Art. 229 ZPO erfüllen würden. Auf die Eingaben und insbesondere die neuen Anträge zur Sache, die nach dem Aktenschluss ergangen sind, ist nach dem Gesagten nicht einzugehen.

**4.**
**4.1.**
Die Gesuchsgegnerin 2 macht geltend, ihr fehle es im vorliegenden Verfahren an der Passivlegitimation. Betreiberin von YouTube für Nutzer mit Wohnsitz im Europäischen Wirtschaftsraum und der Schweiz sei einzig Google Ireland Limited, eine von ihr getrennte juristische Person nach irischem Recht. Die öffentlich zugänglichen Allgemeinen Geschäftsbedingungen würden als notorisch gelten.

Der Gesuchsteller bringt dagegen zunächst vor, dass deliktische Ansprüche nicht durch AGB ausgeschlossen oder auf andere Gesellschaften verschoben werden könnten. Die Gesuchsgegnerin 2 sei die Muttergesellschaft und Eigentümerin von YouTube. Die Domains youtube.com und google.com seien auf die Gesuchsgegnerin 2 registriert. Diese sei somit nicht nur Konzernmutter, sondern auch unmittelbare Eigentümerin der zentralen technischen Infrastruktur. Für den Nutzer sei entscheidend, wer die Domain kontrolliert. Selbst wenn ein Parteiirrtum anzunehmen wäre, könnte dies nach Art. 132 ZPO geheilt werden.

**4.2.**
Wer in seiner Persönlichkeit widerrechtlich verletzt wird, kann zu seinem Schutz gegen jeden, der an der Verletzung mitwirkt, das Gericht anrufen (Art. 28 Abs. 1 ZGB). Die Passivlegitimation bei Klagen aus Persönlichkeitsschutz beschränkt sich somit nicht nur auf den "direkten" Urheber des verletzenden Inhalts, sondern erstreckt sich auf jeden, der daran mitwirkt. Auf den einzelnen Tatbeitrag kommt es zivilrechtlich nicht an, denn bei Persönlichkeitsverletzungen spielt das Verschulden keine Rolle (MEILI, in:

- 10 -

Geiser/Fountoulakis [Hrsg.], Basler Kommentar, Zivilgesetzbuch I, 7. Auflage, Basel 2022 [zit. BSK ZGB I-BEARBEITER/IN], Art. 28 N 37). Ins Recht gefasst werden kann also auch, wer zur Übermittlung der streitigen Äusserungen beiträgt, ohne selbst deren direkter Urheber zu sein oder deren Inhalt oder Urheber auch nur zu kennen. Der Verletzte kann gegen jeden vorgehen, der bei der Entstehung oder Verbreitung der Verletzung objektiv betrachtet eine Rolle gespielt hat, sei diese auch nur von zweitrangiger Bedeutung. Das geschilderte weite Verständnis der Mitwirkung im Sinne von Art. 28 Abs. 1 ZGB ändert mit anderen Worten nichts daran, dass zwischen dem Verhalten desjenigen, der ins Recht gefasst wird, und der Persönlichkeitsverletzung ein Kausalzusammenhang bestehen muss. Soll die unerlaubte Handlung – hier die Mitwirkung an einer Persönlichkeitsverletzung – in einem Dulden oder Unterlassen bestehen, so fällt ein solch passives Verhalten nach allgemeinen schuldrechtlichen Grundsätzen als Ursache einer Persönlichkeitsverletzung nur dann in Betracht, wenn eine entsprechende Pflicht zum Handeln bestand (vgl. zum Ganzen BGE 141 III 513 E. 5.3.1).

### 4.3.

Die möglicherweise persönlichkeitsverletzenden Videos 1 und 2 wurden auf dem Videoportal YouTube hochgeladen. Problematische Inhalte können gemeldet werden, worauf das Videoportal prüfen muss, ob Massnahmen angezeigt sind (z.B. die Löschung eines Videos). Gemäss den auf der Website youtube.com öffentlich zugänglichen Nutzungsbedingungen gilt Google Ireland Limited als Dienstanbieter, d.h. als Gesellschaft, die den Dienst im Europäischen Wirtschaftsraum und in der Schweiz zur Verfügung stellt. Es ist deshalb mangels anderer Anhaltspunkte davon auszugehen, dass diese Gesellschaft mit Sitz in Irland zuständig ist für die Prüfung von Nutzermeldungen und gegebenenfalls für die Umsetzung von Massnahmen. Der Gesuchsteller vermag nicht glaubhaft zu machen, dass auch die Gesuchsgegnerin 2 eine entsprechende Zuständigkeit und insbesondere die Kompetenz hat, Massnahmen betreffend YouTube-Videos zu ergreifen. Der Hinweis auf die Eigentümerstellung in Bezug auf die technische Infrastruktur und die Domain reicht nicht, um eine Handlungspflicht der Gesuchsgegnerin zu begründen. Eine solche Handlungspflicht ist jedoch Voraussetzung dafür, dass passives Verhalten als Mitwirkung qualifiziert werden kann, und folglich eine Passivlegitimation vorliegt. Nach dem Gesagten ist der Gesuchsgegnerin 2 die Passivlegitimation abzusprechen und auf die Begehren in Bezug auf sie nicht einzutreten.

### 5.
### 5.1.

In seiner Eingabe vom 31. August 2025 beantragte der Gesuchsteller, dass Google Ireland Limited, Gordon House, Barrow Street, Dublin 4, Irland, als zusätzliche Gesuchsgegnerin zum Verfahren beizuziehen und die Gesuchsgegnerin 2 jedoch beizubehalten sei. Nach den obigen Ausführungen zum Aktenschluss (vgl. E. 3), ist dieser Antrag als verspätet zu betrachten. Selbst wenn man von der Rechtzeitigkeit des Antrags ausgehen würde, wäre dieser jedoch abzuweisen, wie im Folgenden aufzuzeigen ist.

**5.2.**

In der Schweizerischen Zivilprozessordnung herrscht der Grundsatz, dass die Parteien bei Eintritt der Rechtshängigkeit fixiert sind und sich entsprechend während einem Prozess von Anfang bis Ende dieselben Parteien gegenüberstehen. Ausnahmen bilden die spätere Prozessteilnahme einer intervenierenden, streitberufenen oder streitverkündungsbeklagten Partei oder ein Parteiwechsel (STALDER, in: Sutter-Somm/Lötscher/Leuenberger/Seiler [Hrsg.], Kommentar zur Schweizerischen Zivilprozessordnung, Art. 1-218 ZPO, 4. Auflage, Zürich/Genf 2025 [zit. ZPOKomm-BEARBEITER/IN], Art. 83, N 4; GRABER, in: Spühler/Tenchio/Infanger [Hrsg.], Basler Kommentar, Schweizerische Zivilprozessordnung, 4. Auflage, Basel 2025 [zit. BSK ZPO-BEARBEITER/IN], Art. 83 N 1). Nach Art. 221 Abs. 1 lit. a ZPO enthält die Klageschrift die Bezeichnung der Parteien und ihrer allfälligen Vertreter. Klarheit über die Identität der Partei kann sich etwa auch aus dem Streitgegenstand ergeben; diesfalls, wenn weder für das Gericht noch für die Parteien die Gefahr einer Verwechslung besteht, ist eine Berichtigung unklarer Parteibezeichnungen zulässig. Die Berichtigung einer Parteibezeichnung ist vom Parteiwechsel zu unterscheiden und darf nicht zu einem solchen führen (vgl. BGer 4A_242//2016, E. 3.4.; BGE 131 I 57 E. 2.2). Ein Parteiwechsel ist nur unter den Voraussetzungen von Art. 83 ZPO zulässig. Ausser dem vorliegend nicht einschlägigen Fall, dass der Streitgegenstand veräussert wird, ist ein Parteiwechsel nur mit Zustimmung der Gegenpartei möglich (Art. 83 Abs. 4 ZPO). So kann derjenige, der eine nicht passivlegitimierte Partei eingeklagt hat, diese nicht einfach durch die (korrekte) passivlegitimierte Partei ersetzen (BSK ZPO-GRABER, Art. 83 N 34).

**5.3.**

**5.3.1.**

Der Gesuchsteller wurde bereits nach seiner verfahrensleitenden Eingabe mit Verfügung vom 15. Juli 2025 aufgefordert, die beklagten Parteien genau zu bezeichnen, was er in der Folge mit Eingabe vom 18. Juli 2025 nachholte. Hinsichtlich des Gesuchsgegners 1 konnte er zwar keine Adresse eruieren, die Identität wurde jedoch hinreichend konkretisiert, weshalb die Zustellungen an den Gesuchsgegner 1 in der Folge gestützt auf Art. 141 Abs. 1 lit. a ZPO mittels amtlicher Publikation erfolgten. Die Gesuchsgegnerin 2 wurde vom Gesuchsteller hinreichend konkret und auch korrekt als "Google LLC" bezeichnet. Zunächst wurde die Gesuchsgegnerin 2 fälschlicherweise als "Google inc." ins Rubrum aufgenommen. Dies wurde schliesslich mit Verfügung vom 8. September 2025 von Amtes wegen korrigiert, was nach den obigen Ausführungen ohnehin zulässig war, da die Identität und der Sitz der Gesuchsgegnerin 2 für alle Verfahrensbeteiligten stets klar war.

**5.3.2.**

Der Gesuchsteller verlangte mit Eingabe vom 31. August 2025, dass Google Ireland Limited mit Sitz in Irland ebenfalls als beklagte Partei aufzunehmen sei. Nur schon aus dem Umstand, dass er gleichzeitig die Beibehaltung der Gesuchsgegnerin 2 beantragt, geht hervor, dass es sich hierbei nicht um eine Berichtigung einer unklaren Parteibezeichnung handeln

- 12 -

kann. Vielmehr möchte der Gesuchsgegner das Verfahren auf weitere Parteien erweitern. Ein solches Vorgehen findet aber nach den obigen Ausführungen keine Rechtsgrundlage. Es handelt sich dabei nicht um einen Parteiwechsel – welcher aufgrund der fehlenden Zustimmung der Gegenparteien ohnehin scheitern würde –, sondern um eine unzulässige subjektive Klageerweiterung. Nichts anderes lässt sich aus Art. 132 ZPO ableiten. Diese Bestimmung gewährt die Möglichkeit zur Verbesserung von gewissen formellen Mängeln. Sie dient jedoch nicht als Grundlage für nachträgliche Änderungen des Streitgegenstands oder der Verfahrensparteien, sobald diese fixiert sind. Google Ireland Limited ist somit nicht als beklagte Partei ins Verfahren aufzunehmen.

### 6.
### 6.1.
### 6.1.1.

Der Gesuchsteller macht geltend, dass er am 4. Juni 2025 mit dem Investigativ-Journalisten Roman Anin ein privates Gespräch via Videoanruf geführt habe, welches ausdrücklich "off the record" und unter der Bedingung stattgefunden habe, dass keine Aufzeichnung oder Veröffentlichung erfolgt. Er habe in einem Schreiben an den Gesuchsgegner 1 am 4. Juni 2025 klar zum Ausdruck gebracht, dass er bereit sei, allgemeine Sachverhalte der Telekommunikationsbranche zu erläutern, jedoch ausdrücklich darum gebeten, weder seine Person noch seine Firma in einer Veröffentlichung zu erwähnen. Der Gesuchsgegner 1 habe diese Bedingung akzeptiert, indem er seine Telefonnummer angefordert und das Gespräch initiiert habe. Entgegen dieser Vereinbarung sei das Gespräch ohne sein Wissen aufgenommen und anschliessend in zwei öffentlich zugänglichen Videos auf YouTube veröffentlicht worden. Diese Videos enthielten vertrauliche Aussagen in einem falschen Kontext, die seinem Ruf als Unternehmer schaden und seine persönliche Sicherheit beeinträchtigen würden. Jeder weitere Tag der Veröffentlichung füge seinen Rechten irreparablen Schaden zu.

### 6.1.2.

Die Gesuchsgegnerin 2 argumentiert, dass keine Persönlichkeitsverletzung vorliege. Beim Vorbringen des Gesuchstellers, das Gespräch mit dem Gesuchsgegner 1 sei ausdrücklich "off the record" erfolgt, handle es sich um eine blosse Parteibehauptung. Sodann führe eine Missachtung des Geheimhaltungswillens nicht per se zu einer Persönlichkeitsverletzung, sondern diese hänge vom Inhalt des aufgezeichneten Gesprächs ab. Eine Persönlichkeitsverletzung könne nur vorliegen, wenn die wiedergegebenen Aussagen ehrverletzend oder unwahr seien oder seine Geheim- oder Privatsphäre tangieren würden. Dies habe der Gesuchsteller weder substantiiert noch glaubhaft gemacht. Das Gespräch beziehe sich nicht auf Themen, die der Geheim- oder Privatsphäre zugeordnet werden könnten. Im Übrigen sei die geltend gemachte Persönlichkeitsverletzung nicht widerrechtlich, weil gewichtige öffentliche und private Interessen an der Verbreitung der Videos beständen. Die Berichterstattung über Sicherheitslücken

- 13 -

des Kommunikationsnetzwerks Telegram durch einen ausgewiesenen Investigativ-Journalisten erfülle ein gewichtiges Informationsbedürfnis.

**6.2.**

**6.2.1.**

Das Gericht trifft die notwendigen vorsorglichen Massnahmen, wenn die gesuchstellende Partei glaubhaft macht, dass ein ihr zustehender Anspruch verletzt wird oder eine solche Verletzung zu befürchten ist und ihr aus der Verletzung ein nicht leicht wiedergutzumachender Nachteil droht (Art. 261 Abs. 1 ZPO). In anderen Worten hat ein Gesuchsteller einen materiellen Anspruch zivilrechtlicher Natur und dessen Gefährdung (Verfügungsanspruch, Art. 261 Abs. 1 lit. a ZPO) sowie einen drohenden nicht leicht wiedergutzumachenden Nachteil (Verfügungsgrund, Art. 261 Abs. 1 lit. b ZPO) glaubhaft zu machen (BGer 5A_931/2014 E. 4). Als Nachteil fällt jeder Nachteil mit einer gewissen Schwere in Betracht; es kann sich bspw. um einen finanziellen oder einen immateriellen Nachteil handeln. Dieser ist nicht leicht wieder gutzumachen, wenn er später glaubhafterweise nur schwer ermittelt, bemessen oder ersetzt werden kann (BSK ZPO-SPRECHER, Art. 261 ZPO N 28 und 34). Mit der Voraussetzung des drohenden, nicht leicht wiedergutzumachenden Nachteils verbunden ist alsdann die Voraussetzung der Dringlichkeit. Elemente der Dringlichkeit können die Begehungs- und Wiederholungsgefahr sein. Hingegen fehlt es an der Voraussetzung der Dringlichkeit, wenn sich dasselbe Ziel durch den richterlichen Endentscheid in der Hauptsache erreichen liesse (BSK ZPO-SPRECHER, Art. 261 N 39 f.). Glaubhaft gemacht ist eine Behauptung, wenn das Gericht aufgrund objektiver Gesichtspunkte den Eindruck hat, dass die geltend gemachte Tatsache auch wirklich vorhanden ist, selbst wenn nicht ausgeschlossen werden kann, dass es sich anders zugetragen haben könnte (BGE 139 III 86 E. 4.2).

**6.2.2.**

Bei vorsorglichen Massnahmen gegen periodisch erscheinende Medien ist sodann Art. 266 ZPO Beachtung zu schenken, der für eine Anordnung voraussetzt, dass die bestehende oder drohende Rechtsverletzung der gesuchstellenden Partei einen schweren Nachteil verursacht oder verursachen kann, offensichtlich kein Rechtfertigungsgrund vorliegt und die Massnahme nicht unverhältnismässig erscheint. Als Medien gelten u.a. Informationsquellen, die über das Internet verbreitet werden, wenn sie das Merkmal des unbestimmten und offenen Empfängerkreises erfüllen, wie z.B. Blogs, Beiträge auf sozialen Medien, über Videoplattformen verbreitete Videos. Periodisch ist ein Medium dann, wenn seine Inhalte regelmässig – in mehr oder weniger regelmässigen Abständen – aktualisiert und erweitert werden und an ein bestimmtes, mehr oder weniger gleich bleibendes Publikum gerichtet sind Um periodische Medien handelt es sich auch dann, wenn sie in unregelmässigen Abständen erscheinen; indessen muss die Verbreitung in einer gewissen Kontinuität und mindestens einmal im Jahr erfolgen (BSK ZPO-SPRECHER, Art. 266 N 18 und 20).

- 14 -

### 6.2.3.

Wer in seiner Persönlichkeit widerrechtlich verletzt wird, kann zu seinem Schutz gegen jeden, der an der Verletzung mitwirkt, das Gericht anrufen (Art. 28 Abs. 1 ZGB). Art. 28 ZGB schützt nach ständiger Rechtsprechung die Ehre weitergehend als das Strafrecht und umfasst insbesondere auch das berufliche und gesellschaftliche Ansehen einer Person (BGE 107 II 1 E. 2). Die geschützten Persönlichkeitsrechte umfassen u.a. das Recht auf Achtung der Privatsphäre. Der Privatbereich umfasst diejenigen Lebensäusserungen, die der Einzelne gemeinhin mit nahe verbundenen Personen, aber nur mit diesen, teilen will, so z.B. das Wohnen, das Arbeiten, das gemeinschaftliche Besprechen von Tagesereignissen, wobei der Kreis der nahe Verbundenen je nach der Art der Lebensbetätigung wechseln kann (BGE 118 IV 41 E. 4). Entsprechend kann die Verbreitung von Auskünften an Personen, für welche sie nicht bestimmt sind, eine Verletzung der Persönlichkeit darstellen (BUCHER, Natürliche Personen und Persönlichkeitsschutz, 4. Auflage, Basel 2009, N 453). In diesem Zusammenhang wird sodann für die Beurteilung der Widerrechtlichkeit zunehmend irrelevant, ob die offenbarten Tatsachen der Wahrheit entsprechen oder nicht (BGE 122 III 449 E. 3a).

Auch HAUSHEER/AEBI-MÜLLER kommen zum Schluss, dass das Weiterverbreiten von personenbezogenen Informationen an einen Personenkreis, der bisher keine entsprechende Kenntnis hatte, eine Persönlichkeitsverletzung darstellt, weshalb es eines Rechtfertigungsgrundes bedarf. Keine Verletzung liegt jedoch vor, wenn die veröffentlichte Tatsache einen hinsichtlich der Persönlichkeit völlig indifferenten Sachverhalt betrifft oder durch die Publikation eine Person nicht individualisiert wird (HAUSHEER/AEBI-MÜLLER, Das Personenrecht des Schweizerischen Zivilgesetzbuches, 5. Auflage, Bern 2020, N 687).

### 6.2.4.

Eine Persönlichkeitsverletzung liegt sodann immer vor bei der Veröffentlichung von individualisiertem Bildmaterial ohne Einwilligung des Betroffenen, unabhängig davon, ob die Aufnahme an sich rechtmässig erfolgte oder nicht. Das Bild darf nicht ausserhalb des Bereichs verbreitet werden, den der Betroffene ausdrücklich oder durch konkludentes Verhalten bestimmt hat. Vorbehalten bleiben allfällige Rechtfertigungsgründe, die z.B. im Informationsauftrag der Presse liegen können. Die Publikation ist diesfalls umso eher zulässig, je bekannter die Person ist und je stärker öffentlichkeitsorientiert die Umstände waren, unter denen sie anlässlich der Bildaufnahme aufgetreten ist (HAUSHEER/AEBI-MÜLLER, a.a.O., N 702 f.)

### 6.3.
### 6.3.1.

Bei den strittigen Videos handelt es sich um Beiträge in russischer Sprache, weshalb sich das Gericht für deren Inhalt lediglich auf die englischen Untertitel stützen kann. Im Video 1 sind nur wenige Sekunden des Interviews zwischen dem Gesuchsgegner 1 und dem Gesuchsteller zu sehen. Letzter ist dabei zwar klar identifizierbar, jedoch vermag die in diesem kurzen

- 15 -

Abschnitt getätigte Aussage keine hinreichend nahe Verknüpfung mit der Person des Gesuchstellers herzustellen. Im Unterschied dazu zeigt das Video 2 über 25 Minuten lang Gesprächsausschnitte zwischen dem Gesuchsteller und dem Gesuchsgegner 1 mittels Videotelefonie. Thematisiert werden dabei die Person des Gesuchstellers als Interview-Partner sowie seine beruflichen Tätigkeiten und die daraus gewonnen Erfahrungen. Das Gespräch dreht sich dabei u.a. um den Message-Dienstleister Telegram, für den der Gesuchsteller Infrastruktur bereitstellt, sowie mögliche Sicherheitslücken und die allfällige Möglichkeit von russischen Behörden, auf über Telegramm versendete Inhalte zugreifen zu können. Die Tätigkeit des Gesuchstellers sowie das Gesprächsthema an sich betrifft somit eine sicherheitssensible Branche, in welcher der Geheimhaltung naturgemäss eine hohe Bedeutung zukommt. Nicht erforderlich ist es in diesem Zusammenhang, dass die Aussagen an sich ehrverletzend sind. Die Persönlichkeitsverletzung gründet vielmehr in einem Verstoss gegen die Privatsphäre. Der im Video 2 veröffentlichte Inhalt ist somit hinsichtlich der Person des Gesuchstellers nicht indifferent, sondern vielmehr eng mit ihm und seiner beruflichen Tätigkeit verknüpft. Er ist im Video auch klar identifizierbar.

### 6.3.2.

Der Gesuchsteller macht geltend, dass das Gespräch mit dem Gesuchsgegner 1 explizit "off the record", sprich privat und ohne Zustimmung zu einer Veröffentlichung stattgefunden habe. Dass er bereits vor dem Gespräch eine Veröffentlichung explizit abgelehnt hat, belegt der Gesuchsteller nicht. Für die Beurteilung ist dies jedoch nicht von vorrangiger Bedeutung, da vielmehr eine explizite Zustimmung zur Veröffentlichung vorliegen müsste, sollte sich eine solche nicht aus konkludentem Verhalten ergeben. Ein solches Verhalten oder gar eine explizite Zustimmung ist nicht ersichtlich. Im Gegenteil erklärte der Gesuchsteller in einem Mail an den Gesuchsgegner 1 am 10. Juni 2025 – mitunter kurz nach der Veröffentlichung des Video 1 – dass er keine Zustimmung zur Aufzeichnung des Interviews gegeben habe (vgl. Beilage des Gesuchstellers vom 18. Juli 2025). Auch wenn eine Veröffentlichung des Gesprächs zu diesem Zeitpunkt nicht explizit thematisiert wurde, musste der Gesuchsgegner 1 spätestens nach dieser Nachricht davon ausgehen, dass der Gesuchsteller mit einer Veröffentlichung nicht einverstanden sein wird, wenn er ja bereits mit der Aufzeichnung an sich nicht einverstanden war.

Die Annahme einer fehlenden Zustimmung wird sodann gestützt durch Aussagen des Gesuchsgegners 1 selbst. So erklärt dieser im Video 2 zwischen Minute 1:10 und 1:41, dass er den Gesuchsteller einen Tag nach dem geführten Gespräch gefragt habe, ob er einzelne Ausschnitte davon veröffentlichen könne, was der Gesuchsteller nicht kommentiert habe. Es ist somit davon auszugehen, dass der Gesuchsteller weder vor noch nach dem geführten Gespräch einer Publikation in irgendwelcher Form zugestimmt hat.

### 6.3.3.

Eine Persönlichkeitsverletzung durch Weiterverbreiten von personenbezogenen Informationen an einen Personenkreis, der bisher keine entsprechende Kenntnis hatte, ist nach dem Gesagten hinsichtlich des Videos 1 nicht glaubhaft gemacht, hingegen hinsichtlich des Videos 2 erstellt.

### 6.4.
### 6.4.1.

Das Gespräch zwischen dem Gesuchsteller und dem Gesuchsgegner 1 wurde per Videotelefonie geführt. Der Gesuchsgegner 1 hat dieses Gespräch aufgenommen und mit Bild und Ton veröffentlicht. Im Video 1 ist dies zwischen Minute 19:44 und 20:05 der Fall. Das Video 2 ist im ganzen Umfang betroffen, da dort lange Ausschnitte des aufgenommenen Gesprächs wiedergegeben werden. Der Gesuchsteller ist dabei stets gut erkennbar und seine Aussagen sind deutlich hörbar. Ob die Aufnahme an sich rechtmässig erfolgte oder nicht, ist in diesem Zusammenhang nicht weiter relevant. Eine Einwilligung des Gesuchstellers zur Veröffentlichung an einen breiten Personenkreis lag nicht vor (vgl. E. 6.3.2.). Er hat weder ausdrücklich noch konkludent einer Verbreitung zugestimmt. Eine Persönlichkeitsverletzung hinsichtlich des Rechts am eigenen Bild ist somit gegeben.

### 6.4.2.

Ein Rechtfertigungsgrund kann im Informationsbedürfnis der Öffentlichkeit liegen. Dafür müsste das öffentliche Interesse das private Interesse des Verletzten überwiegen. Hinsichtlich des privaten Interesses des Gesuchstellers lässt sich sagen, dass es sich bei der Veröffentlichung eines privaten Gesprächs samt Bild und Ton auf einer weltweit zugänglichen Plattform um einen gravierenden Eingriff in die Persönlichkeitsrechte handelt. Es ist nicht auszuschliessen, dass der Gesuchsteller persönliche und berufliche Nachteile davontragen könnte, wenn seine Aussagen und Ansichten über sicherheitsrelevante Themen einem breiten Publikum bekannt werden. Sein privates Interesse ist entsprechend hoch zu gewichten. Die Berichterstattung über allfällige Sicherheitslücken des Kommunikationsnetzwerks Telegram vermag kein öffentliches Interesse begründen, das die privaten Interessen überwiegt. In diesem Zusammenhang ist es insbesondere nicht relevant, welche Qualifikationen oder welchen Ruf der Gesuchsgegner 1 als Journalist aufweist. Der Grad einer Persönlichkeitsverletzung ist nicht von der Person des Schädigers abhängig.

Nach dem Gesagten ist die Veröffentlichung des privaten Gesprächs an sich geeignet, das persönliche und berufliche Ansehen des Gesuchstellers zu schmälern, da Geheimhaltung in seiner beruflichen Tätigkeit stark gewichtet wird. Es liegen keine Rechtfertigungsgründe für die Persönlichkeitsverletzung vor. Diese ist somit für das Video 1 zwischen Minute 19:44 und 20:05 sowie für das gesamte Video 2 zu bejahen.

**6.5.**

Für die Anordnung von vorsorglichen Massnahmen ist sodann ein nicht leicht wiedergutzumachender Nachteil erforderlich. Dieser ist vorliegend ohne weiteres zu bejahen. Durch die Veröffentlichung des privaten Gesprächs wird dieses einem weltweiten Publikum zugänglich gemacht. Das Video 2 weist im Zeitpunkt dieses Entscheids bereits über 120'000 Aufrufe auf. Die Kenntnisnahme der Aussagen des Gesuchstellers durch ein breites Publikum kann nicht rückgängig gemacht werden. Gleiches gilt für die glaubhaft gemachten negativen Konsequenzen für die berufliche Tätigkeit des Gesuchstellers. Da Veröffentlichungen im Internet auch einer hohen Gefahr der unkontrollierten Weiterverbreitung unterliegen, liegt eine Dringlichkeit vor, die den Erlass vorsorglicher Massnahmen rechtfertigt.

**6.6.**

Die strittigen Videos wurden auf dem YouTube-Kanal "Wichtige Geschichten" (im Original: "Важные истории") veröffentlicht. Der Kanal teilt journalistische Inhalte und veröffentlicht dazu in unregelmässigen Abständen Videos. Zwischen dem 6. Mai 2020 und dem 12. Oktober 2025 hat der Kanal 104 Videos veröffentlicht. Somit ist "Wichtige Geschichten" als periodisch erscheinendes Medium zu qualifizieren, weshalb für die Anordnung von vorsorglichen Massnahmen gesteigerte Anforderungen gelten. Vorliegend sind diese aber erfüllt. Die bestehende Persönlichkeitsverletzung ist nach den obigen Ausführungen geeignet, dem Gesuchsteller einen schweren Nachteil zu verursachen und ein Rechtfertigungsgrund liegt nicht vor. Eine vorsorglich angeordnete Löschung des Videos erscheint schliesslich auch nicht unverhältnismässig, ist es doch für den Gesuchsgegner 1 nur mit kleinem technischem Aufwand verbunden. Sollte dereinst die vorsorgliche Massnahme aufgehoben werden, könnten die Videos auch ohne grossen Aufwand wieder aufgeschaltet werden. Dass dem Gesuchsgegner 1 aus der Löschung ein Schaden entsteht, ist nicht ersichtlich.

**7.**

**7.1.**

Der Gesuchsteller beantragt, dass die Veröffentlichung der Videos 1 und 2 vorsorglich zu untersagen, den Gesuchsgegnern 1 und 2 die sofortige Sperrung/Entfernung dieser Inhalte aufzuerlegen und jede zukünftige Veröffentlichung von Inhalten, welche das Gespräch vom 4. Juni 2025 enthalten, ganz zu untersagen sei.

**7.2.**

Wer in seiner Persönlichkeit widerrechtlich verletzt wird, kann dem Gericht beantragen, eine drohende Verletzung zu verbieten, eine bestehende Verletzung zu beseitigen oder die Widerrechtlichkeit einer Verletzung festzustellen, wenn sich diese weiterhin störend auswirkt (Art. 28a Abs. 1 ZGB).

**7.3.**

Vorliegend ist die Verletzung der Persönlichkeit mit der Veröffentlichung der Videos 1 und 2 bereits erfolgt. Der Gesuchsteller beantragt sinngemäss deren Verbietung. Die Anordnung der Löschung der Videos ist eine

schnelle und verhältnismässige Massnahme, um der Verletzung entgegen-zuwirken. Hinsichtlich des Videos 1 ist die Massnahme indes auf den Aus-schnitt zwischen Minute 19:44 und 20:05 zu beschränken, da nur in diesem Abschnitt das Gespräch mit dem Gesuchsteller in kurzen Ausschnitten mit Bild und Ton gezeigt wird. Da die Aufzeichnung der Gespräche ohne wei-teres in anderer Form oder an anderem Ort wieder veröffentlicht werden könnte, ist vorsorglich auch die künftige Publikation zu verbieten.

**8.**

Ist die Klage in der Hauptsache noch nicht rechtshängig, so setzt das Ge-richt der gesuchstellenden Partei eine Frist zur Einreichung der Klage, mit der Androhung, die angeordnete Massnahme falle bei ungenutztem Ablauf der Frist ohne Weiteres dahin (Art. 263 ZPO). Die Dauer der anzusetzen-den Frist zur Anhebung des Hauptprozesses liegt dabei im in Würdigung der Umstände im gerichtlichen Ermessen.

Vorliegend rechtfertigt es sich, dem Gesuchsteller eine Frist von drei Mo-naten nach Rechtskraft des Entscheids anzusetzen, um den Prozess in der Hauptsache rechtshängig zu machen.

**9.**
**9.1.**
**9.1.1.**
Gemäss Art. 104 Abs. 3 ZPO kann über die Verteilung der Prozesskosten vorsorglicher Massnahmen im Endentscheid bezüglich der Hauptsache oder zusammen mit der vorsorglichen Massnahme entschieden werden (vgl. ZPOKomm-JENNY, Art. 104 N 9). Wird über die Prozesskosten im Rah-men des Massnahmenverfahrens befunden, so gelten für ihre Verlegung stets die allgemeinen Grundsätze gemäss Art. 106 ff. ZPO. Die Prozess-kosten sind somit grundsätzlich auch im Massnahmenverfahren nach dem Obsiegen bzw. Unterliegen zu verlegen (STERCHI, in: Berner Kommentar zur ZPO, Bern 2012, Bd. I, Art. 104 ZPO N 11 ff.; FISCHER, in: Baker & McKenzie [Hrsg.], Schweizerische Zivilprozessordnung, Bern 2010, Art. 104 ZPO N 10). Schon unter der Geltung der kantonalen Prozessgesetze hat es das Bundesgericht als zulässig erachtet, das Massnahmenverfah-ren, bei dem eine vorläufige Prüfung des Sachverhalts und der Rechtslage genügt, als separates, vom Hauptprozess zu unterscheidendes Verfahren zu betrachten und der unterliegenden Partei dessen Kosten ungeachtet der Möglichkeit zu überbinden, dass die Massnahme nach eingehender Prü-fung der Sach- und Rechtslage im Hauptprozess oder zufolge unterbliebe-ner Klage dahinfällt (BGE 5A_702/2008 E. 3.3; BGE 5P. 496/2006 E.4.1). Nach der Rechtsprechung des Aargauischen Obergerichts besteht nach dem Inkrafttreten der Schweizerischen Zivilprozessordnung kein Anlass dafür, von dieser Rechtsprechung abzuweichen (Entscheid des Oberge-richts vom 12. Februar 2013 [ZSU.2012.277], bestätigt im Entscheid vom 17. Dezember 2015 [ZSU.2015.268]).

### 9.1.2.

Vorliegend ist der Gesuchsteller mit seinen Anträgen gegenüber dem Gesuchsgegner 1 vollumfänglich durchgedrungen bzw. hat er obsiegt, ist jedoch mit seinen Anträgen gegenüber der Gesuchgegnerin 2 unterlegen. Folglich rechtfertigt es sich, die Gerichtskosten in der Höhe von Fr. 1'500.00 je zur Hälfte dem Gesuchsteller und dem Gesuchsgegner 1 aufzuerlegen.

### 9.2.
### 9.2.1.

Gemäss Art. 95 Abs. 3 ZPO gilt als Parteientschädigung der Ersatz notwendiger Auslagen, die Kosten einer berufsmässigen Vertretung bzw. in begründeten Fällen eine angemessene Umtriebsentschädigung, wenn eine Partei nicht berufsmässig vertreten ist. Mit der Umtriebsentschädigung soll in erster Linie ein gewisser Ausgleich für den Verdienstausfall einer selbstständig erwerbenden Person, die den Prozess selbst führt, geschaffen werden. Die ansprechende Partei hat die Entschädigung zu beantragen und dem Gericht sachlich überzeugende Gründe für die geltend gemachte Höhe der Umtriebsentschädigung vorzulegen (Entscheid des Obergerichts des Kantons Aargau vom 4. Oktober 2017 [ZSU.2017.186]).

### 9.2.2.

Streitigkeiten betreffend Persönlichkeitsverletzungen sind nicht vermögensrechtlicher Natur (BGE 132 III 641). Die Parteientschädigung richtet sich bei nicht vermögensrechtlichen Streitigkeiten gemäss § 3 Abs. 2 i.V.m. § 3 Abs. 1 lit. b AnwT insbesondere nach dem mutmasslichen Aufwand des Anwaltes sowie nach der Bedeutung und der Schwierigkeit des Falles.

### 9.2.3.

Vorliegend ist von eher einfachen Verhältnissen bzw. geringerer Bedeutung und Schwierigkeit des Falles auszugehen. Zu berücksichtigen ist indessen, dass es sich vorliegend um einen internationalen Sachverhalt handelt. Hinzukommt aber, dass im vorliegenden Verfahren keine Verhandlung stattgefunden hat. In Anwendung von §§ 3 - 6 AnwT ist die Entschädigung für die Gesuchsgegnerin 2 auf Fr. 1'948.50 (inkl. Auslagenpauschale von 3% und inkl. MWST von 8,1%) festzusetzen.

### 9.2.4.

Der Gesuchsteller ist im vorliegenden Verfahren nicht anwaltlich vertreten. Weiter beziffert er weder die Höhe allfälliger notwendiger Auslagen resp. einer allfälligen Umtriebsentschädigung, noch begründet er, inwiefern und aus welchen Gründen ihm eine solche zustehen sollte. Entsprechend ist ihm keine Parteientschädigung zuzusprechen.

## Die Gerichtspräsidentin erkennt:

**1.**

**1.1.**

In Abänderung der superprovisorischen Verfügung vom 24. Juli 2025 wird der Gesuchsgegner 1 (Roman Anin) angewiesen, das im YouTube-Video "https://www.youtube.com/watch?v=UmgP7jbhU7s" veröffentlichte Bild-, Film- und Tonmaterial **sofort** von allen Plattformen zu entfernen, auf welche Dritte Zugriff nehmen können.

**1.2.**

Dem Gesuchsgegner 1 (Roman Anin) wird verboten, das im YouTube-Video "https://www.youtube.com/watch?v=UmgP7jbhU7s" veröffentlichte Bild-, Film- und Tonmaterial auf elektronischem Weg oder irgendeiner anderen Form Dritten zugänglich zu machen.

**2.**

**2.1.**

In Abänderung der superprovisorischen Verfügung vom 24. Juli 2025 wird der Gesuchsgegner 1 (Roman Anin) angewiesen, das im YouTube-Video " https://www.youtube.com/watch?v=s7pnANMPigg" zwischen Minute 19:44 und 20:05 veröffentlichte Bild-, Film- und Tonmaterial **sofort** von allen Plattformen zu entfernen, auf welche Dritte Zugriff nehmen können.

**2.2.**

Dem Gesuchsgegner 1 (Roman Anin) wird verboten, das im YouTube-Video "https://www.youtube.com/watch?v=s7pnANMPigg" zwischen Minute 19:44 und 20:05 veröffentlichte Bild-, Film- und Tonmaterial auf elektronischem Weg oder irgendeiner anderen Form Dritten zugänglich zu machen.

**3.**

Auf die Rechtsbegehren des Gesuchstellers hinsichtlich der Gesuchsgegnerin 2 (Google LLC) wird nicht eingetreten.

**4.**

Dem Gesuchsteller wird eine **Frist von 3 Monaten ab Zustellung dieses Entscheids** angesetzt zur Einreichung der Klage im ordentlichen Verfahren, verbunden mit der Androhung, dass die vorstehend unter den Ziffern 1. und 2. angeordneten Massnahmen bei unbenutztem Ablauf der Klagefrist ohne weiteres dahinfallen. Es gilt kein Fristenstillstand (Art. 145 Abs. 3 ZPO).

**5.**

Die Entscheidgebühr von Fr. 1'500.00 wird dem Gesuchsteller sowie dem Gesuchsgegner 1 je hälftig im Umfang von Fr. 750.00 auferlegt.

- 21 -

**6.**

**6.1.**

Der Gesuchsteller wird verpflichtet, der Gesuchsgegnerin 2 eine Parteient-schädigung von Fr. 1'948.50 inkl. MWST von 8,1% zu bezahlen.

**6.2.**

Es werden keine weiteren Parteientschädigungen zugesprochen.

Zustellung an:
- den Gesuchsteller
- den Gesuchsgegner 1 (mittels amtlicher Publikation)
- die Gesuchsgegnerin 2 (Vertreter)

**Rechtsmittelbelehrung (Art. 308 ff. ZPO)**

Dieser Entscheid kann **innert 10 Tagen** seit seiner Zustellung beim Obergericht, Obere Vorstadt 38, 5000 Aarau, mit **Berufung** angefochten werden.

Mit der Berufung kann eine unrichtige Rechtsanwendung oder eine unrichtige Fest-stellung des Sachverhaltes gerügt werden (Art. 310 ZPO). Die Berufung ist schrift-lich und begründet einzureichen (Art. 311 Abs. 1 ZPO). Es ist genau anzugeben, welche Punkte des Entscheides angefochten und welche Abänderungen beantragt werden. Der angefochtene Entscheid ist beizulegen (Art. 311 Abs. 2 ZPO). Einga-ben und Beilagen in Papierform sind in je einem Exemplar für das Obergericht und für jede Gegenpartei einzureichen (Art. 131 ZPO).

Die Berufungsfrist kann nicht erstreckt werden (Art. 144 Abs. 1 ZPO). Fällt der letzte Tag der Frist auf einen Samstag, Sonntag oder einen anerkannten Feiertag i.S.v. § 21 EG ZPO, so endet sie am nächsten Werktag (Art. 142 Abs. 3 ZPO). Es gilt kein Fristenstillstand (Art. 145 Abs. 2 ZPO).

Der Entscheid wird mit dem unbenutzten Ablauf der Frist rechtskräftig und voll-streckbar. Wird eine Berufung erhoben, so hemmt dies die Vollstreckbarkeit des Entscheides im Umfang der Anträge, ausser der Entscheid beinhaltet vorsorgliche Massnahmen, Anweisungen an die Schuldner oder die Sicherstellung des Unter-halts (Art. 315 Abs. 1 und 2 ZPO); Ausnahmen davon richten sich nach Art. 315 Abs. 4 und 5 ZPO.

Baden, 17. Oktober 2025

**Präsidium des Zivilgerichts Baden**

Die Gerichtspräsidentin:

Alina Enkegaard





**District Court Baden**

Presiding Judge of the Civil Court

Mellingerstrasse 2a
5400 Baden
Tel.   056 200 13 32
Fax   056 200 13 14

Ref. No. 2025.169 / hu

## Decision dated October 17, 2025

| | |
|---|---|
| Bench | Presiding Judge: Alina Enkegaard<br>Court Clerk: Stefan Hürst |
| Applicant | **Vladimir *Vedeneev***, born January 5, 1980,<br>citizen of Antigua and Barbuda, Eigerstrasse 2, 5453 Remetschwil |
| Respondent 1 | **Roman *Anin***, born December 16, 1986, place of residence unknown |
| Respondent 2 | ***Google LLC***, Amphitheatre Parkway, US-94043 Mountain View,<br>represented by Dr. iur., LL.M. Ralph Schlosser, Kasser Schlosser avocats SA,<br>Avenue de la Gare 5, P.O. Box, 1001 Lausanne |
| Subject Matter | Summary proceedings concerning provisional measures for the protection of privacy |

**The Presiding Judge notes the following from the case file:**

**1**.

By submission dated July 14, 2025, the Applicant filed a petition regarding the protection of privacy rights pursuant to Art. 28 et seq. of the Swiss Civil Code (ZGB) and submitted the following motions:

"1.
The Court is requested to issue an ex parte-provisional order prohibiting the publication and dissemination of the aforementioned YouTube videos pending a final and binding legal determination.

2.
The platform operator YouTube / Google and the journalist Roman Anin shall be ordered to immediately block / remove said content.

3.
The Court is requested to provide me with an acknowledgment of receipt and a case file number.

4.
Furthermore, the Court is requested to order that any future publication—whether by Mr. Roman Anin personally or by third parties acting on his behalf—of content containing, in whole or in part, the conversation recorded without consent on June 4, 2025, be prohibited. A one-time deletion of the current videos is insufficient, as there is a risk that the material will be republished, thereby resulting in a renewed violation of my privacy rights."

**2.**

By submission dated July 18, 2025, the Applicant filed an amended petition accompanied by supplementary documents and requested, in essence, that the petition be processed further.

**3.**

By order dated July 21, 2025, the Applicant's ex parte-provisional motions were provisionally rejected. Furthermore, his submissions—together with the accompanying exhibits—were served upon Respondent 1 and Respondent 2 (Swiss Representative) for the purpose of submitting a written statement within 10 days.

**4.**

In submissions dated July 23, 2025, the Applicant responded to the order of July 21, 2025, and subsequently filed a renewed request for the ex parte provisional blocking of two YouTube videos.

**5.**

On July 23, 2025, the Head of Legal at Google Switzerland GmbH subsequently advised that documents initiating legal proceedings must always first be served upon the headquarters of Google Inc. by way of judicial assistance. Google Switzerland GmbH, he stated, was not authorized to act on its own behalf in such proceedings. The order dated July 21, 2025, therefore had to be served on Google Inc. in the USA.

- 3 -

**6**.

By order dated July 24, 2025, Respondent 1 and Respondent 2 were provisionally directed to immediately remove the image, video, and audio material published in the YouTube video "https://www.youtube.com/watch?v=UmgP7jbhU7s" from all platforms accessible to third parties. Furthermore, they were provisionally prohibited, effective immediately, from making the image, video, and audio material published in the YouTube video "https://www.youtube.com/watch?v=UmgP7jbhU7s" accessible to third parties, whether electronically or in any other form. With regard to the YouTube video "https://www.youtube.com/watch?v=s7pnANMPigg," the applications for ex parte provisional injunction were provisionally dismissed.

**7.**

By submission dated August 14, 2025, Respondent 2 (Legal Counsel) filed a statement and submitted the following motions:

"I. The (supplemented) motion for the ordering of provisional measures dated July 14 (or July 18), 2025, shall not be entertained.

II. Alternatively to Section I, the motion shall be dismissed in its entirety, insofar as it is entertained.

III. The ex parte provisional measures ordered by the ruling of the District Court of Baden dated July 24, 2025, shall be lifted with immediate effect.

All applicable costs and compensation, including any applicable VAT, are to be borne by the Applicant."

**8.**

By submission dated August 18, 2025, the Applicant requested the continuation of the proceedings.

**9.**

By ruling dated August 19, 2025, the submissions dated August 14 and 18, 2025, were served on the respective opposing parties for the purpose of filing an optional statement or exercising the right of reply pursuant to Art. 53 para. 3 of the Code of Civil Procedure (ZPO).

**10.**

By submission dated August 29, 2025, Respondent 2 (counsel) filed a further statement.

- 4 -

**11.**

By submission dated August 31, 2025, the Applicant filed a further statement and submitted the following motions:

"1.
The Court is requested to let **Google Ireland Limited, Gordon House, Barrow Street, Dublin 4, Ireland,** join the proceedings as an additional Respondent.

2.
Confirmation that **Google LLC** remains a respondent, given that the publication at issue took place in the USA.

3.
An obligation on Google LLC, in the event of any assertions to the contrary, to provide proof that the publication originated from Europe or Switzerland. Failing this, Google LLC shall remain the proper Party to the proceedings.

**12.**

By submission dated September 1, 2025, the Applicant filed a statement designated as a "Reply" and submitted the following motions:

"Motion 1: Confirmation and conversion of the ex parte-provisional order dated July 24, 2025, into provisional measures.

Motion 2: Immediate deletion of both videos at issue.

Motion 3: Imposing a penalty payable to the State for non-compliance with the Court order.

Motion 4: Awarding compensation to the Applicant (Vladimir Vedeneev) for each day of non-compliance until actual deletion.

Motion 5: Additional Motion for Referral to the Public Prosecutor's Office (Art. 309 of the Code of Criminal Procedure (StPO). The Court is requested to forward the case files regarding the continued disregard of the ex parte-provisional injunction dated July 24, 2025, to the competent Public Prosecutor's Office of Aargau, for the purpose of assessing the initiation of criminal proceedings against Google LLC and Roman Anin pursuant to Art. 292 StGB (Failure to Comply with an Official Order) and Art. 179bis of the Swiss Criminal code (StGB) (Unauthorized Recording of a Private Conversation). [...]

Motion 6: Additional Motion for Confidentiality of Exhibits (Art. 156 CPC): The Court is requested to declare the following exhibits as requiring confidentiality and to order appropriate protective measures: Exhibit 1 (Legal opinion), Exhibit 3 (Photos of residence), Exhibit 4 (Swisscom data), Exhibits 6/7/10/18 (Personal correspondence), Exhibit 8 (Police reports regarding threats), Exhibit 19 (GNM Financial Report), Exhibit 20 (Contract with Clare Locke LLP), and Exhibit 21 (MTProto Audit), as well as further exhibits insofar as they contain sensitive data. Measures to be ordered: Redaction of sensitive passages (e.g., addresses, financial details, and personal photos). Restriction of access to the Court, the parties, and their representatives.

- 5 -

A confidentiality obligation, enforceable by criminal sanctions, applies to all parties involved. Grounds: The aforementioned Appendices contain sensitive personal data (Art. 3 DSG), trade secrets, financial information, and details regarding personal safety. Their disclosure would cause further violations of personal rights and frustrate the purpose of the proceedings (protection of privacy rights pursuant to Art. 28 ZGB). Their disclosure would exacerbate the "Streisand effect" and provoke further threats (cf. Appendix 8). This measure is necessary to ensure the protection of the Applicant's reputation and privacy.

The amount of compensation must take into account:
- Millions of CHF/USD in costs (attorneys, experts, and reputation management);
- Damage to reputation;
- Invasion of privacy;
- Forced public exposure.

**13.**
By order dated September 8, 2025, the designation of Respondent 2 in the heading was amended ex officio from "Google Inc." to "Google LLC," and the latest submissions were served upon the other parties.

**14.**
Subsequently, the Presiding Judge rendered the present decision.

**The Presiding Judge considers the following:**

**1.**
**1.1.**
The Court examines the procedural prerequisites ex officio (Art. 60 ZPO).

**1.2.**
Respondent 2 submits that the Applicant has failed to credibly demonstrate a Swiss venue. Consequently, the application should be deemed inadmissible. It is argued that it is doubtful whether the Applicant maintains his domicile or habitual residence in Switzerland, and that he has failed to substantiate any claim to the contrary.

For his part, the Applicant asserts that his habitual residence is in Remetschwil. In cases involving internet-related offenses, the domicile of the injured party constitutes the place where the offense took place. Respondent 1 was expressly aware of the Applicant's domicile in Switzerland and had his Swiss telephone number.

**1.3.**
The submitted application is directed against a natural person of unknown domicile (presumably abroad) as Respondent 1, and against Google LLC, domiciled in the USA, as Respondent 2. Consequently, the matter involves an international factual situation, and international jurisdiction is governed by applicable international treaties and the Swiss Private International Law Act (IPRG). In the present case, in the absence of relevant international treaties, the IPRG applies.

**1.4.**

Pursuant to Article 129(1) in conjunction with Article 33(2) of the Swiss Private International Law Act (IPRG), Swiss courts have jurisdiction over claims arising from infringements of personality rights at the place where the act was committed or where the consequences occurred. In the case of media offences, the place where the consequences occurred is wherever the medium can be received, acquired or accessed. In the case of infringements of personality rights by a defendant abroad, the place where the harmful event occurred is the plaintiff's (Swiss) habitual residence (RODRIGUEZ/KRÜSI/UMBRICHT, in: Grolimund/Loacker/Schnyder [eds.], Basler Kommentar, Internationales Privatrecht, 4th edition, Basel 2021 [cited as BSK IPRG-BEARBEITER/IN], Art. 129 N 30).

**1.5.**

Contrary to the submissions of Respondent 2, the Applicant has sufficiently demonstrated his domicile in Switzerland. Since the beginning of the proceedings, he has provided his address in Remetschwil. All Court correspondence was successfully delivered to the Applicant at this address. Furthermore, he gave Respondent 1 his Swiss telephone number for contact purposes (Applicant's Exhibit 6, dated September 1, 2025). The Court therefore has no reason to doubt that the Applicant is domiciled and has his habitual place of residence in Remetschwil. The statement by Respondent 2 that the Applicant is a senior employee of a company based in Moscow is not credible. The submitted profile (Appendix 1 of Respondent 2 dated 15 August 2025) shows a photo which does not resemble the person in the video and otherwise describes an activity in the financial sector in which the applicant is not active.

Since the Applicant is thus domiciled in Remetschwil and also has his habitual residence there, that is therefore the place where the action is to be brought. Consequently, the Swiss Courts have local jurisdiction to hear the present application for interim measures. This applies equally to Respondent 1 and Respondent 2.

The local jurisdiction of the Court in Baden arises from the Applicant's place of residence in Remetschwil. For provisional measures, the Presiding Judge has subject-matter jurisdiction as a single judge (Section 6 para. 1 lit. b of the Introductory Act to the Code of Civil Procedure (EG ZPO).

**2.**

**2.1**

Respondent 2 argues that, even if Swiss jurisdiction is assumed, there is no basis for the application of Swiss law. It contends that it could not reasonably have anticipated the occurrence of a harmful effect in Switzerland, given that the Applicant's reputation in Switzerland cannot be established in the present case and that the Russian-language videos were not designed for a Swiss audience.

The applicant argues that predictability arises from the fact that YouTube is offered worldwide and with automatic subtitles and translations.

**2.2**

Claims arising from violation of privacy by the media, in particular by the press, radio, television or other means of public information are governed, at the choice of the injured party, by the law of the State in which the injured party has their habitual residence or in which the harmful consequence of the act occurs, provided that the tortfeasor could have foreseen the occurrence of the consequence in that State Art. 139 para. 1 lit. a and c). In cases involving violations of privacy, the "place of effect" is deemed to be the location where the privacy is violated by becoming aware of the publication,  e.g., the place where information is downloaded from the Internet (BSK IPRG-DASSER/DAL MOLIN, Art. 139 N 17 et seq.). The criterion regarding the foreseeability of the occurrence of harm in the context of internet-related offenses is subject to varying interpretations in legal scholarship. In some cases, the view is held that when accessing content that violates privacy rights via the Internet, there must be a certain probability, recognizable to the tortfeasor, that such access will actually take place in the State whose law is chosen (BSK IPRG-DAS-SER/DAL MOLIN, Art. 139 N 20). A different view holds that in the context of the Internet, one must generally anticipate the occurrence of the harmful result on a worldwide scale, with the general prohibition against the violation of rights (e.g., the choice of an exotic legal system bearing no connection to the facts of the case) and public order serving as the sole limiting factor. Furthermore, there is a factual presumption that the occurrence of the result at the injured party's habitual residence was foreseeable. (VISCHER/GÖKSU, in: Müller-Chen/Widmer Lüchinger [eds.], Zürcher Kommentar zum IPRG, Vol. II, Arts. 108a–200, 3rd ed., Zurich 2018, Art. 139, paras. 16 et seq.).

**2.3.**

In the present case, the Applicant asserts a violation of his privacy rights arising from two videos published on the video portal YouTube. One video published on June 10, 2025 (https://www.youtube.com/watch?v=s7pnANMPigg; hereinafter: Video 1) and another video published on July 10, 2025 (https://www.youtube.com/watch?v=UmgP7jbhU7s; hereinafter: Video 2). The Applicant has his habitual place of residence in Remetschwil, Switzerland, and bases his submissions on Swiss statutory provisions. Consequently, there can be no question of abusive conduct arising from the choice of an exotic legal system. Furthermore, if Respondent 2 at the time the videos were uploaded, as the alleged tortfeasor, was entirely unaware of the Applicant's whereabouts, this cannot result in the Applicant's choice of law being completely frustrated by application of the criterion of foreseeability. Otherwise, the Party whose privacy rights have been violated could never exercise the right of choice of law granted to it under Art. 139 para. 1 IPRG if the tortfeasor were to claim that they had no knowledge of that Party's whereabouts. Indeed, Respondent 2 does not assert that it possessed concrete indications pointing to a different place of residence for the Applicant. In light of the foregoing, Respondents 1 and 2 were bound to anticipate that the Applicant would become aware of the publication in question at his habitual place of residence and that the corresponding law would apply. Since the Applicant has his habitual residence in Remetschwil, Swiss law is therefore applicable.

- 8 -

### 3.

### 3.1.

On August 29, 2025, Respondent 2 submitted a statement regarding the Applicant's submission of August 18, 2025, arguing that the Applicant's new statements and appendices should not be considered. The case file was closed with the submission of its initial statement on August 14, 2025. After the case file was closed, there was no room for submitting new evidence in the present case, as the court had neither set a deadline nor held a hearing.

The Applicant subsequently submitted further documents but did not comment on the arguments presented by respondent 2.

### 3.2.

The Court decides on provisional measures in summary proceedings (Art. 261 et seq. ZPO). In these proceedings, a second exchange of written submissions and no preliminary hearing or main hearing are usually conducted (see Art. 253 ZPO; Federal Supreme Court Decision 138 III 252 E. 2.1). In principle, it is at the court's discretion whether to conduct the proceedings purely in writing or to decide after an oral hearing (Art. 256 para. 1 Swiss Code of Civil Procedure; Federal Supreme Court decision 4A_273/2012, para. 3.2). In summary proceedings, neither party can rely on the court ordering a second exchange of written submissions or an oral hearing after a single hearing. The parties are therefore not entitled to submit statements on the matter twice, as the case file is generally closed after a single submission (BGE 144 III 117 E. 2.2).

### 3.3

The Applicant initiated these proceedings with his submission of July 14, 2025, and supplemented this with submissions of July 18 and 23, 2025, before the first statement from an opposing party. Respondent 1 allowed the deadlines set for him during the proceedings to expire without taking any action and never submitted a statement. Respondent 2 submitted its statement regarding the Applicant's submissions on August 14, 2025. This statement was served on the parties by order dated August 19, 2025, for optional comment or for exercising the right of reply pursuant to Art. 53 para. 3 ZPO. Consequently, a second exchange of written submissions was explicitly not ordered. Nor was a hearing scheduled or envisaged. The case file was therefore closed at that point, and new facts and evidence that are introduced later into the proceedings should be disregarded. The right of reply under Art. 53 para. 3 ZPO serves not to remedy omissions made at an earlier stage, but rather to discharge the right to be heard, enabling parties to respond within a reasonable timeframe to submissions made by the opposing party.

Whether the right to introduce new evidence pursuant to Art. 229 ZPO is applicable by analogy in such a constellation despite the lack of a second opportunity to present evidence and the lack of a hearing, as long as the Court has not yet begun deliberating on the judgment, has so far been left open by the Federal Court. However, the question does not need to be answered in the present case, since no submissions relevant to the decision by the Applicant are apparent after the closing of the case file that would meet the requirements of Art. 229 ZPO. In light of the above, it is not necessary to address the submissions and, in particular, the new applications concerning the matter that were filed after the case file was closed.

- 9 -

**4.**
**4.1.**
Respondent 2 contends that it lacks standing as a defendant in the present proceedings. The sole operator of YouTube for users residing in the European Economic Area and Switzerland is Google Ireland Limited, a separate legal entity under Irish law. It further asserts that the publicly accessible General Terms and Conditions are to be regarded as a matter of common knowledge.

In response, the Applicant primarily argues that tort claims cannot be excluded by General Terms and Conditions or shifted to other companies. Respondent 2 is the parent company and owner of YouTube. The domains youtube.com and google.com are registered to Respondent 2. Consequently, it is not only the corporate parent but also the direct owner of the central technical infrastructure. For the user, the decisive factor is who controls the domain. Even if a party were to be assumed to have made a mistake, this could be remedied pursuant to Art. 132 of the ZPO.

**4.2.**
Anyone whose privacy rights are unlawfully violated may, for their protection, appeal to the courts against anyone who contributes to the violation (Art. 28 para. 1 ZGB). The locus standi in actions based on privacy rights is therefore not limited to the "direct" author of the infringing content, but extends to anyone who contributes to it. Under civil law, the specific contribution of an individual to the act is irrelevant, for in cases of violations of personality rights, fault plays no role (MEILI, in: Geiser/Fountoulakis [eds.], Basler Kommentar, Zivilgesetzbuch 1, 7th ed., Basel 2022 [cited as BSK ZGB I-AUTHOR], Art. 28 N 37). Consequently, legal action may also be taken against anyone who contributes to the transmission of the disputed statements, even without being their direct author or having any knowledge of their content or authorship. The injured party can take action against anyone who, objectively speaking, played a role in the occurrence or spread of the injury, even if that role was of secondary importance. In other words, the broad understanding of participation described above in Article 28 paragraph 1 ZGB does not change the fact that there must be a causal link between the conduct of the person who is subject to the law and the violation of privacy rights. If the tortious act, which in the present case concerns the participation in a violation of privacy rights, consists of toleration or omission, such passive conduct is, in accordance with general principles of legal obligations, to be considered a cause of the violation of privacy rights only if a corresponding duty to act existed (cf., regarding this entire matter, BGE 141 III 513 E. 5.3.1).

- 10 -

**4.3.**

Videos 1 and 2, which potentially may violate privacy rights, were uploaded to the video portal YouTube. Problematic content may be reported, whereupon the video portal is required to assess whether measures are warranted (e.g., the deletion of a video). Pursuant to the Terms of Service publicly available on the website youtube.com, Google Ireland Limited is deemed to be the service provide, i.e., the entity that makes the service available within the European Economic Area and in Switzerland. Therefore, in the absence of other indications, it must be assumed that this company, based in Ireland, is responsible for reviewing has failed to credibly demonstrate that Respondent 2 also has the corresponding jurisdiction and, in particular, the competence to take measures regarding the YouTube videos in question. Mere reference to ownership of the technical infrastructure and the domain is insufficient to establish a duty to act on the part of the Respondent. However, such a duty to act is a prerequisite for locus standi to qualify as participation and, consequently, for the existence of standing as a Respondent. In light of the foregoing, Respondent 2 must be deemed to lack standing as a Respondent, and the requests directed against it must be dismissed without substantive examination.

**5.**

**5.1.**

In his submission dated August 31, 2025, the Applicant requested that Google Ireland Limited, Gordon House, Barrow Street, Dublin 4, Ireland, be joined to the proceedings as an additional Respondent, while Respondent 2 be retained. In light of the above statements regarding the closing of the case file (see Section 3), this application must be considered as being filed late. Even assuming the application was submitted in a timely manner, it would still have to be rejected, as will be shown below.

- 11 -

**5.2.**

Under the Swiss Code of Civil Procedure, the prevailing principle is that the parties are fixed upon the commencement of legal proceedings. Consequently, the same parties face one another form beginning to end throughout these proceedings. Exceptions include the subsequent entry into the proceedings by an intervening party, a party summoned to join the dispute, or a party notified of the dispute, as well as a change of parties (STALDER, in: Sutter-Somm/Lötscher/Leuenberger/Seiler [eds.], Kommentar zur Schweizerischen Zivilprozessordnung, Art. 1–218 ZPO, 4th ed., Zurich/Geneva 2025 [cited as ZPOKomm-AUTHOR], Art. 83, para. 4; GRABER, in: Spühler/Tenchio/Infanger [eds.], Basler Kommentar, Schweizerische Zivilprozessordnung, 4th ed., Basel 2025 [cited as BSK ZPO-AUTHOR], Art. 83, para. 1). Pursuant to Art. 221 para. 1 lit. a ZPO, the statement of claim must contain the designations of the parties and any representatives they may have. Clarity regarding the identity of a party may also emerge, for instance, from the subject matter of the dispute. In this case, if there is no risk of confusion for either the court or the parties, a correction of unclear party designations is permissible. The correction of a party designation is to be distinguished from a change of party and must not result in such a change (cf. Federal Supreme Court judgment 4A_242/2016, para. 3.4; BGE 131 I 57, para. 2.2). A change of parties is permissible only under the conditions set forth in Art. 83 ZPO. Except in the case of the subject matter of the dispute being alienated, which is not relevant here, a change of parties is only possible with the consent of the opposing party (Art. 83 para. 4 ZPO). Thus, a party who has sued another party that lacks standing to be sued, cannot simply replace that party with the (correct) party that does (BSK ZPO-GRABER, Art. 83 N 34).

**5.3.**

**5.3.1.**

Following his initial procedural submission, the Applicant was requested by order of July 15, 2025, to specify the defending parties precisely, which he subsequently did by submission of July 18, 2025. He subsequently complied with this request in a submission dated July 18, 2025. With regard to Respondent 1, although the Applicant was unable to ascertain an address, the identity of the party was sufficiently specified. Consequently, service upon Respondent 1 was subsequently effected by means of official publication pursuant to Art. 141 para. 1 lit. a ZPO. Respondent 2 was sufficiently and correctly identified by the Applicant as "Google LLC". Initially, Respondent 2 was incorrectly identified as "Google inc." This was ultimately corrected ex officio by order dated September 8, 2025, which was in light of the foregoing explanations, permissible in any event given that the identity and registered office of Respondent 2 were at all times clear to all parties involved in the proceedings.

**5.3.2.**

In a submission dated August 31, 2025, the Applicant requested that Google Ireland Limited, domiciled in Ireland, also be joined as a Respondent. The mere fact that he simultaneously requests the retention of Respondent 2 demonstrates that this cannot constitute the rectification of an unclear designation of a party. Rather, the Respondent [sic] seeks to expand the proceedings to include additional parties. However, in light of the foregoing, such a course of action lacks any legal basis. This does not constitute a change of parties, which would, in any event, fail due to the lack of consent from the opposing parties.

- 12 -

Rather, it rather constitutes an impermissible subjective expansion of the action. Nothing else can be inferred from Art. 132 of the Code of Civil Procedure (ZPO). This provision provides the possibility to rectify certain formal defects. However, it does not serve as a basis for subsequent amendments to the subject matter of the dispute or the parties to the proceedings once these have been established. Consequently, Google Ireland Limited is not to be joined to the proceedings as a Respondent.

**6.**
**6.1.**
**6.1.1.**
The Applicant asserts that, on June 4, 2025, he held a private video call with investigative journalist Roman Anin. This conversation took place expressly "off the record" and subject to the condition that it would neither be recorded nor published. In a letter addressed to Respondent 1 dated June 4, 2025, he clearly expressed his willingness to provide explanations regarding general matters within the telecommunications industry, but explicitly requested that neither he personally nor his company be mentioned in any publication. Respondent 1 allegedly accepted this condition by requesting his telephone number and initiating the conversation. Contrary to this agreement, the conversation was recorded without his knowledge and subsequently published in two publicly accessible videos on YouTube. These videos contained confidential statements taken out of context, which would harm his reputation as an entrepreneur and compromise his personal safety. Each additional day of publication would inflict irreparable harm upon his rights.

**6.1.2.**
Respondent 2 argues that no violation of privacy rights has occurred. The Applicant's contention that the conversation with Respondent 1 took place expressly "off the record" constitutes merely unsubstantiated assertion by a party. Furthermore, a disregard for the desire for confidentiality does not in itself constitute a violation of privacy rights. Rather, such a violation depends on the content of the recorded conversation. A violation of privacy rights could only be deemed to exist if the statements reproduced were defamatory or untrue, or if they encroached upon his confidential or private sphere. The Applicant has neither substantiated this claim nor made this credible. The conversation in question does not pertain to topics that could be classified as confidential or private. Furthermore, the alleged violation of privacy rights is not unlawful, as substantial public and private interests exist in the dissemination of the videos. Reporting on security vulnerabilities in the communication network Telegram by a distinguished investigative journalist fulfills a significant public need for information.

- 13 -

**6.2.**
**6.2.1.**
The Court shall take the necessary provisional measures if the requesting party credibly demonstrates that a right to which it is entitled is being violated or that such a violation is to be feared and that it faces a disadvantage that is not easily remedied as a result of the violation (Art. 261 para. 1 ZPO). In other words, an Applicant must demonstrate a substantive claim of a civil nature and its endangerment (claim for an injunction, Art. 261 para. 1 lit. a of the Swiss Code of Civil Procedure) as well as an imminent disadvantage that is not easily remedied (ground for an injunction, Art. 261 para. 1 lit. b of the Swiss Code of Civil Procedure) (Federal Supreme Court decision 5A_931/2014 E. 4). For the purposes of constituting a disadvantage, any detriment of a certain severity is taken into consideration; this may, for instance, be a financial or a non-pecuniary disadvantage. This is not easily remedied if it can later be credibly determined, measured, or replaced only with difficulty (BSK ZPO-SPRECHER, Art. 261 ZPO N 28 and 34). ). The requirement of imminent, irreparable harm is then linked to the requirement of urgency. Elements giving rise to such urgency may include the risk of an unlawful act being committed or repeated. Conversely, the prerequisite of urgency is deemed lacking if the same objective could be achieved through the Court's final judgment on the merits of the main proceedings (BSK ZPO-SPRECHER, Art. 261 N 39 et seq.). For the purposes of constituting a disadvantage, any detriment of a certain severity is taken into consideration; this may, for instance, be a financial or a non-pecuniary disadvantage. This is not easily remedied if it can later be credibly determined, measured or replaced only with difficulty (BSK ZPO-SPRECHER, Art. 261 ZPO N 28 and 34). The requirement of imminent, irreparable harm is then linked to the requirement of urgency. Elements giving rise to such urgency may include the risk of an unlawful act being committed or repeated. Conversely, the prerequisite of urgency is deemed lacking if the same objective could be achieved through the court's final judgment on the merits of the main proceedings (BSK ZPO-SPRECHER, Art. 261 N 39 et seq.). A claim is deemed credible if, based on objective considerations, the Court has the impression that the asserted fact actually exists, even if it cannot be ruled out that it could have happened differently (BGE 139 III 86 E. 4.2).

**6.2.2.**
With regard to provisional measures against periodically appearing media, particular attention must be paid to Art. 266 of the Code of Civil Procedure (ZPO). This provision stipulates that, for such a measure to be ordered, the existing or imminent infringement of rights must cause or be capable of causing serious detriment to the Applicant. Furthermore, there must be no apparent ground for justification and the measure itself must not appear to be disproportionate. Media is deemed to include, among other things, sources of information distributed via the Internet, such as blogs, social media posts, and videos distributed via video platforms, provided they meet the criterion of having an indeterminate and open circle of recipients. A medium is considered periodic if its content is regularly updated and expanded—at more or less regular intervals—and is directed at a specific, more or less consistent audience. A medium is also deemed periodic even if it appears at irregular intervals. However, its distribution must demonstrate a certain degree of continuity and occur at least once a year (BSK ZPO-SPRECHER, Art. 266 N 18 and 20).

- 14 -

**6.2.3.**

Any person whose personality rights are unlawfully infringed may, for their protection, apply to the Court against anyone participating in the infringement (Art. 28 para. 1 ZGB). According to established case law, Art. 28 ZGB protects a person's honor more broadly than does criminal law. In particular, it encompasses a person's professional and social reputation (BGE 107 II 1 cons. 2). Protected personality rights encompass, inter alia, the right to respect for one's private sphere. The private sphere encompasses those expressions of life that an individual generally wishes to share with closely connected persons, but only with them, such as living arrangements, work, or the joint discussion of daily events. Notably, the circle of closely connected persons may vary depending on the specific nature of the activity in question (BGE 118 IV 41 E. 4). Accordingly, the dissemination of information to persons for whom it is not intended may constitute a violation of personality rights (BUCHER, Natürliche Personen und Persönlichkeitsschutz, 4th ed., Basel 2009, para. 453). In this context, the question of whether or not the disclosed facts correspond to the truth becomes increasingly irrelevant for the assessment of unlawfulness (BGE 122 III 449 E. 3a).

HAUSHEER/AEBI-MÜLLER likewise conclude that the dissemination of personal information to a circle of persons previously unaware of such details constitutes an infringement of personality rights, thereby necessitating a ground for justification. However, a violation does exist if the published fact concerns a matter that is entirely indifferent with respect to the personality, or if the publication does not identify a specific individual (HAUSHEER/AEBI-MÜLLER, Das Personenrecht des Schweizerischen Zivilgesetzbuches, 5th ed., Bern 2020, No. 687).

**6.2.4.**

A violation of privacy rights always occurs when individualized images are published without the consent of the person depicted, regardless of whether the photograph itself was taken lawfully or not. The image may not be disseminated outside the area expressly or implicitly designated by the person depicted. This does not affect any justifications, such as the press's duty to inform. In such cases, publication is more permissible the more well-known the person is and the more public-oriented the circumstances were in which they appeared when the image was taken (HAUSHEER/AEBI-MÜLLER, op. cit., N 702 f.).

**6.3.**

**6.3.1.**

The videos in dispute are posts in the Russian language. Consequently, the court must rely solely on the English subtitles regarding their content. Video 1 shows only a few seconds of the interview between Respondent 1 and the Applicant. While the latter is clearly identifiable, the statement made in this brief passage fails to establish a sufficiently close link to the Applicant. In contrast, video 2 shows excerpts of a conversation between the Applicant and Respondent 1 via video telephony for over 25 minutes. The discussion focuses on the applicant as an interviewee, as well as his professional activities and the experience gained from them. The conversation revolves, inter alia, around the messaging service Telegram for which the Applicant provides infrastructure as well as potential security vulnerabilities and the conceivable possibility that Russian authorities could access content transmitted via Telegram.

- 15 -

The Applicant's professional activities as well as the topic of discussion itself thus concern a security-sensitive industry in which secrecy is naturally of paramount importance. In this context, it is not a requirement that the statements themselves be defamatory. Rather, the violation of privacy rights stems from an infringement of privacy.  The applicant, however, first argues that tortious claims cannot be excluded by general terms and conditions or transferred to other companies. The content published in Video 2 is therefore not irrelevant to the applicant as a person, but is in fact closely linked to him and his professional activities. Rather, the violation of personal rights stems from an infringement of privacy.

**6.3.2.**
The Applicant asserts that the conversation with Respondent 1 explicitly took place off the record, i.e., privately and without consent for publication. The Applicant has failed to substantiate the claim that he explicitly refused publication prior to the conversation. However, this is not of primary importance for the assessment, as explicit consent to publication would be required if such consent could not be inferred from implied conduct. Such behavior, or even explicit consent, is not apparent. On the contrary, the Applicant stated in an email to Respondent 1 on June 10, 2025, shortly after the publication of video 1, that he had not given his consent to the recording of the interview (see Applicant's appendices of July 18, 2025). Even though the publication of the conversation was not explicitly addressed at that time, Respondent 1 had to assume, at the latest after this message, that the Applicant would not agree to a publication, since he had already disagreed with the recording itself.

The assumption of a lack of consent is then supported by statements made by Respondent 1 himself. In video 2, between minutes 1:10 and 1:41, he explains that he asked the Applicant the day after the conversation whether he could publish excerpts from it, to which the Applicant did not comment. It must therefore be assumed that the Applicant did not consent to any form of publication, either before or after the conversation in question.

- 16 -

**6.3.3.**

Based on the above, a violation of personal rights through the dissemination of personal information to a group of people who previously had no such knowledge has not been credibly demonstrated with regard to video 1, but has been demonstrated with regard to video 2.

**6.4.**
**6.4.1.**

The conversation between the Applicant and Respondent 1 was conducted via video call. Respondent 1 recorded this conversation and published it in both video and audio form. In Video 1, this occurs between minutes 19:44 and 20:05. Video 2 is affected in its entirety, as it reproduces lengthy excerpts of the recorded conversation. Throughout this material, the Applicant remains clearly identifiable, and his statements are distinctly audible. Whether or not the recording itself was made lawfully is of no further relevance in this context. The Applicant did not provide consent for the publication of this material to a broad audience (cf. E. 6.3.2.). He consented to its dissemination neither expressly nor implicitly. Consequently, an infringement of personal rights has occurred, specifically the right to one's own image.

**6.4.2.**

A ground for justification may lie in the public's need for information. To this end, the public interest would have to outweigh the private interest of the injured party. Regarding the Applicant's private interest, it can be said that the publication of a private conversation, including image and sound, on a globally accessible platform constitutes a serious infringement of personal rights. It cannot be ruled out that the Applicant could suffer personal and professional detriment were his statements and views regarding security-related matters to become known to a broad audience. His private interest must therefore be given significant weight. Reporting on potential security vulnerabilities within the Telegram communication network does not establish a public interest sufficient to outweigh private interests. In this context, it is of particular irrelevance what qualifications or reputation Respondent 1 possesses as a journalist. The severity of a violation of personal rights does not depend on the person causing the harm.

In light of the foregoing, the publication of the private conversation is, in itself, liable to harm the Applicant's personal and professional reputation, given that confidentiality carries significant weight in his professional activities. No grounds for justification exist for the violation of personal rights. Such a violation must therefore be affirmed with respect to Video 1 between minutes 19:44 and 20:05, as well as for the entirety of Video 2.

- 17 -

**6.5.**

Furthermore, an order for provisional measures requires the existence of harm that cannot be easily remedied. In the present case, this requirement is readily affirmed. The publication of the private conversation renders it accessible to a worldwide audience. At the time of this decision, Video 2 has already garnered over 120,000 views. The fact that a broad audience has gained knowledge of the Applicant's statements cannot be undone. The same applies to the negative consequences for the Applicant's professional activities, which have been substantiated. Given that publications on the internet are also subject to a high risk of uncontrolled further dissemination, a degree of urgency exists that justifies issuing provisional measures.

**6.6.**

The videos in dispute were published on the YouTube channel "Important Stories" (original title: "Важные истории"). The channel shares journalistic content and publishes videos at irregular intervals. Between May 6, 2020, and October 12, 2025, the channel published 104 videos. Therefore, "Important Stories" qualifies as a periodically published medium, which is why increased requirements apply to an order for precautionary measures. In the present case, these conditions are met. As set out above, the existing violation of privacy rights is likely to cause serious harm to the Applicant, and no grounds for justification exist. Ultimately, a deletion of the video ordered as a precautionary measure does not appear disproportionate, given that it entails only minimal technical effort for Respondent 1. Should the precautionary measure eventually be lifted, the videos could be reinstated without significant effort. It is not apparent that Respondent 1 would suffer any damage as a result of the deletion.

**7.**
**7.1.**

The Applicant requests that the publication of Videos 1 and 2 be provisionally prohibited, that Respondents 1 and 2 be ordered to immediately block or remove said content, and that any future publication of content containing the conversation of June 4, 2025, be strictly prohibited.

**7.2**.

Any person whose privacy rights are unlawfully infringed can apply to the Court to prohibit an imminent violation, to eliminate an existing infringement, or to establish the unlawfulness of a violation if it continues to have a disruptive effect (Art. 28a para. 1 ZGB).

**7.3**

The violation of personal rights has already occurred with the publication of videos 1 and 2. The Applicant essentially requests that their publication be prohibited. The order to delete the videos constitutes a prompt and proportionate measure to counteract the violation. With regard to Video 1, however, the measure is to be restricted to the segment between minutes 19:44 and 20:05, as it is only within this section that the conversation with the Applicant is shown in brief excerpts, comprising both video and audio.

- 18 -

**8.**

If the main action is not yet pending, the Court sets a deadline for the Applicant to file the action, with the warning that the ordered measure will automatically lapse if the deadline is not met (Art. 263 ZPO). The duration of the time limit to be set for the initiation of the main proceedings lies within the court's discretion, based on an assessment of the circumstances. The length of the deadline for raising the main proceedings is at the Court's discretion, taking into account the circumstances.

In the present case, it is appropriate to grant the Applicant a period of three months after the decision becomes legally binding in order to initiate the main proceedings.

**9.**
**9.1.**
**9.1.1.**

Pursuant to Art. 104 para. 3 ZPO, the allocation of the costs of provisional measures may be decided in the final judgment regarding the main proceedings or together with the provisional measure (cf. ZPOKomm-JENNY, Art. 104 N 9). When a determination regarding procedural costs is made within the context of proceedings for provisional measures, the general principles set forth in Art. 106 et seq. ZPO invariably govern the allocation of such costs. Consequently, Court costs are, as a general rule, to be allocated in interim measures proceedings as well, based on the principle of success or failure (STERCHI, in: Berner Kommentar zur ZPO, Bern 2012, Vol. I, Art. 104 ZPO N 11 et seq.; FISCHER, in: Baker & McKenzie [ed.], Schweizerische Zivilprozessordnung, Bern 2010, Art. 104 ZPO N 10). Even under the cantonal procedural laws, the Federal Supreme Court considered it permissible to regard the preliminary injunction procedure, in which a preliminary examination of the facts and the legal situation suffices, as a separate procedure to be distinguished from the main proceedings and to impose the costs on the losing party, irrespective of the possibility that the injunction may be withdrawn after a thorough examination of the facts and the law in the main proceedings or due to the failure to file a claim (BGE 5A 702/2008 E. 3.3; BGE 5P. 496/2006 E.4.1). According to the case law of the Aargau Court of Appeal, following the entry into force of the Swiss Code of Civil Procedure, there are no grounds to depart from this case law (Decision of the Court of Appeal of February 12, 2013 [ZSU.2012.277], confirmed in the Decision of December 17, 2015 [ZSU.2015.268]).

- 19 -

**9.1.2.**

In the present case, the Applicant has fully prevailed with his applications against Respondent 1, but has lost with his applications against Respondent 2. However, he has been unsuccessful with his motions against Respondent 2. Consequently, it is appropriate to apportion the court costs, amounting to CHF 1,500.00, equally between the Applicant and Respondent 1.

**9.2.**
**9.2.1.**

Pursuant to Art. 95 Para. 3 ZPO, party compensation is deemed to consist of the reimbursement of necessary expenses, the costs of professional legal representation, or in justified cases appropriate compensation for time and effort where a party is not professionally represented. The primary purpose of this compensation for time and effort is to provide a certain measure of financial redress for the loss of earnings incurred by a self-employed individual who conducts the legal proceedings personally. The claiming party must formally request such compensation and submit to the Court objectively convincing grounds substantiating the specific amount of compensation claimed (Decision of the Court of Appeal of the Canton of Aargau dated October 4, 2017 [ZSU.2017.186]).

**9.2.2.**

Disputes concerning violations of personality rights are not of a pecuniary nature (BGE 132 III 641). In non-pecuniary disputes, the compensation for legal costs is determined pursuant to Section 3 Para. 2 in conjunction with Section 3 Para. 1 lit. b of the Swiss Attorney Fee Schedule (AnwT), in particular based on the attorney's estimated effort, as well as the significance and complexity of the case.

**9.2.3.**

In the present case, the circumstances are to be regarded as relatively simple, or the matter as being of limited significance and complexity. However, it must be taken into account that the case at hand involves an international factual situation. Furthermore, no hearing took place during the present proceedings. Applying Sections 3–6 AnwT, the compensation due to Respondent 2 is to be fixed at CHF 1,948.50 (including a flat-rate allowance for expenses of 3% and VAT of 8.1%).

**9.2.4.**

The Applicant is not represented by counsel in the present proceedings. Furthermore, he neither quantifies the amount of any necessary expenses or potential compensation for inconvenience, nor does he substantiate to what extent or on what grounds he should be entitled to such compensation. Accordingly, no party compensation shall be awarded to him.

- 20 -

**The Presiding Judge rules:**

**1.**
**1.1.**
Amending the ex parte-provisional order of July 24, 2025, Respondent 1 (Roman Anin) is ordered to immediately remove the image, film, and audio material published in the YouTube video "https://www.youtube.com/watch?v=UmgP7jbhU7s" from all platforms to which third parties have access.

**1.2.**
Respondent 1 (Roman Anin) is prohibited from making the image, film, and audio material published in the YouTube video "https://www.youtube.com/watch?v=UmgP7jbhU7s" accessible to third parties, whether electronically or in any other form.

**2.**
**2.1.**
In modification of the ex parte order dated July 24, 2025, Respondent 1 (Roman Anin) is ordered to immediately remove the image, film, and audio material published in the YouTube video "https://www.youtube.com/watch?v=s7pnANMPigg" between minutes 19:44 and 20:05 from all platforms to which third parties have access.

**2.2.**
Respondent 1 (Roman Anin) is prohibited from making the image, film, and audio material published in the YouTube video "https://www.youtube.com/watch?v=s7pnANMPigg" between minutes 19:44 and 20:05 accessible to third parties, whether electronically or in any other form.

**3.**
The Applicant's legal claims regarding Respondent 2 (Google LLC) shall not be entertained.

**4.**
The Applicant is granted a deadline of three months from the service of this decision to file an action in ordinary proceedings, subject to the warning that the measures ordered above under points 1 and 2 shall automatically lapse if the deadline for filing the action expires without having been utilized. No suspension of time limits applies (Art. 145 para. 3 ZPO).

**5.**
Court costs of CHF 1,500.00 is imposed equally upon the Applicant and the Respondent 1, in the amount of CHF 750.00 each.

- 21 -

**6.**
**6.1**
The Applicant is ordered to pay Respondent 2 party compensation in the amount of CHF 1,948.50, including 8.1% VAT.

**6.2.**
No further party compensation is awarded.

Served on:
- the Applicant
- Respondent 1 (by means of official publication)
- Respondent 2 (Representative)

**Instructions on Legal Remedies (Art. 308 et seq. ZPO)**

This decision may be challenged by filing an **appeal** with the Court of Appeal, Obere Vorstadt 38, 5000 Aarau, **within 10 days** of its service.

An appeal may be filed on the grounds of incorrect application of the law or incorrect determination of the facts (Art. 310 ZPO). The appeal must be submitted in writing and be substantiated (Art. 311 para. 1 ZPO). It must specify exactly which points of the decision are being challenged and which modifications are being requested. A copy of the challenged decision must be enclosed (Art. 311 para. 2 ZPO). Submissions and enclosures in paper form must be submitted in one copy for the Court of Appeal and one copy for each opposing party (Art. 131 ZPO).

The deadline for filing an appeal cannot be extended (Art. 144 para. 1 ZPO). If the last day of the deadline falls on a Saturday, Sunday, or a recognized public holiday within the meaning of § 21 EG ZPO, the deadline expires on the next working day (Art. 142 para. 3 ZPO). No suspension of deadlines applies (Art. 145 para. 2 ZPO).

The decision becomes legally binding and enforceable upon the expiry of the deadline without an appeal having been filed. If an appeal is filed, this suspends the enforceability of the decision to the extent of the requests made therein, unless the decision involves provisional measures, instructions to debtors, or the securing of maintenance payments (Art. 315 paras. 1 and 2 ZPO); exceptions to this rule are governed by Art. 315 paras. 4 and 5 ZPO.

Baden, October 17, 2025

**Civil Court of Baden**

The Presiding Judge:

[Signature]

Alina Enkegaard





**CERTIFICATE OF ACCURACY**

I, Debra De-Jong, declare that I have provided translation services executed on this May 2, 2026. Furthermore, I declare that I am a professional **German to English US translator**, and that I am competent to work in this language pair.

I hereby certify that I have translated the attached document to the best of my knowledge and ability and believe this file is true, accurate and complete.

The original file provided to me is titled:

20251017+Final+Court+Decision,+Vedeneev+v.+Anin,+Dist.+Ct.+of+Baden+(German)

**File names delivered:**

20251017+Final+Court+Decision,+Vedeneev+v.+Anin,+Dist.+Ct.+of+Baden+(German)

Sincerely,

Debra De-Jong

**Your signature**                                      **Date of service:**

                                                        May 2, 2026

U.S. Legal Support, Inc. – Translations Services Department – 855-538-3099
translations@uslegalsupport.com

# Exhibit D



C L A R E   L O C K E
L   L   P

**JOSEPH R. OLIVERI**
joe@clarelocke.com
(202) 628-7405

10 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

**KATHRYN HUMPHREY**
kathryn@clarelocke.com
(202) 899-3877

August 08, 2025

*Via Email*                                        *Confidential – Not for Publication or Attribution*

Miranda Patrucic                                Alesya Marohovskaya
Editor in Chief, OCCRP                        Editor-in-Chief, iStories; ISM Inc.
miranda@occrp.org                            alesya.marohovskaya@istories.media

Alex Papachristou
Counsel to OCCRP
Email: apapachristou@nycbar.org

> **Re:**    ***False and Defamatory Statements About Vladimir Vedeneev and***
> ***Global Network Management, Inc.***

Dear Ms. Patrucic, Ms. Marohovskaya, and Mr. Papachristou:

Our firm is defamation counsel to Vladimir Vedeneev, owner of Global Network Management, Inc. ("GNM").

We write to demand that the Organized Crime and Corruption Reporting Project ("OCCRP") and Important Stories ("iStories") immediately retract the article authored by Roman Anin, Nikita Kondratyev, and Ilya Lozovsky, headlined "Telegram, the FSB, and the Man in the Middle" (the "Article") and published by OCCRP and iStories.[1] The sensational narrative that the Article spins—that Mr. Vedeneev and GNM have access to, have hacked, or otherwise monitor Telegram communications to engage in espionage for the Russian government—is categorically and demonstrably false.

**Let the record be clear and unequivocal:**  Mr. Vedeneev and GNM have ***never*** engaged in espionage for the Russian government (or anyone else) and have ***never*** had access to, intercepted, hacked, or monitored Telegram communications, metadata, or network traffic, and they have ***never*** had the technical capacity to do so.  Likewise, neither GlobalNet nor ElectronTelecom, formerly owned by Mr. Vedeneev, has ever had any operational or contractual relationship with Telegram, nor have they ever engaged in any activity that would provide access to Telegram's systems or data. To the contrary, Mr. Vedeneev is and always has been a legitimate international entrepreneur, and

---

[1] Roman Anin, Nikita Kondratyev & Ilya Lozovsky, *Telegram, the FSB, and the Man in the Middle*, OCCRP (June 10, 2025), https://istories.media/en/stories/2025/06/10/telegram-fsb, and https://www.occrp.org/en/investigation/telegram-the-fsb-and-the-man-in-the-middle.



GNM has always been a legitimate business. The Article offers no support for its assertions otherwise.

Indeed, the Article's false and defamatory portrayal of Mr. Vedeneev and GNM is built on a house of cards: a series of false (and utterly unsupported) assertions and distortions about Mr. Vedeneev and GNM. And while it is not the purpose of this letter to comprehensively catalog every such falsehood, a sampling is illustrative.

In addition to the Article's overarching defamatory falsehoods about Mr. Vedeneev and GNM accessing confidential Telegram data for the Russian government, the Article makes the following specific false and defamatory claims:

- "A company owned by a Russian network engineer named Vladimir Vedeneev controls thousands of Telegram IP addresses...."

- "Vedeneev's other companies have a history of collaborating with Russia's defense sector, the FSB security service, and other highly sensitive agencies."

- "[A] new investigation by OCCRP's Russian partner, Important Stories, reveals a critical vulnerability. When reporters investigated who controls the infrastructure that keeps Telegram's billions of messages flowing, they found a man with no public profile but unparalleled access: Vladimir Vedeneev, a 45-year-old network engineer."

- "But two other closely linked Vedeneev companies—one of which also assigns Telegram IP addresses, and another which did so until 2020—have had multiple highly sensitive clients tied to the security services."

- "A Ukrainian IT specialist who spoke with reporters on condition of anonymity said that the Russian military has used 'man-in-the-middle' type surveillance in his country after capturing network infrastructure. 'You get physical access to the data transmission channel and install your equipment there,' he said. 'In such an attack, the hackers aren't even interested so much in the user's correspondence. They get metadata to analyze. And that means IP addresses, user locations, who exchanges data packets with whom, the kind of data it is ... really, all possible information'"—falsely implying that Mr. Vedeneev and GNM control or have access to Telegram's network traffic and can track users to spy for the Russian government.

- The Article refers to the unencrypted 'auth_key_id' and falsely claims that "[t]his means that whoever controls Telegram's network traffic may be able to track users, even if the messages themselves cannot be read"—falsely implying that Mr. Vedeneev and GNM control or have access to Telegram's network traffic and can track users.

- The Article falsely calls Mr. Vedeneev (and GNM) "the man in the middle" in both the title and a subheading—again falsely implying that Mr. Vedeneev (and GNM) control or have access to Telegram's network traffic and can track users.

- "... the IP addresses were controlled by a company registered in Antigua and Barbuda called Global Network Management (GNM)."

- The Article juxtaposes the statements that "Vedeneev was the only person authorized to access Telegram servers in a Miami data center" and "his company owns a router in the



Telegram server room" with the following statement to falsely imply that Mr. Vedeneev and GNM control Telegram's routers, traffic, and servers such that they can identify its users: "'If a company controls the routers that distribute traffic passing through Telegram servers, this means that it, or anyone to whom it grants such access, can see the identifiers of messenger users,' says Woźniak, the security specialist."

- The Article states that "Neither Elies Campo, a former partnership development manager with Telegram who spoke with reporters, nor others familiar with Telegram's corporate structure, have ever heard of Vedeneev"—but our contacts at Telegram have never heard of Elies Campo, thus suggesting that this sourcing is unreliable or nonexistent.

- "In fact, Vedeneev is a key player in the Russian telecommunications market."

- The Article falsely claims that "[u]til 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet," and juxtaposes that false statement with the following claim to imply that Mr. Vedeneev and GNM are spying on Telegram users for the Russian government: "But GlobalNet is not just any network provider. Among its clients is the Main Research Computing Center of the Presidential Property Management Department of Russia (GlavNIVTS). Officially, this organization provides technical support for President Putin's public 'direct line' question-and-answer events, summits, and other high-level meetings. But GlavNIVTS is also perhaps the most secret and little-studied special service in Russia. The agency helped plan the invasion of Ukraine, upgraded a major bot network, developed a centralized video surveillance system, and built tools to track and deanonymize internet users."

- The Article juxtaposes the statements that GlobalNet has Russian government clients and "a minority co-owner: Roman Venediktov, a Russian space forces officer. A graduate of the elite Mozhaisky Academy ... served for nearly 10 years in a defence ministry spacecraft testing center outside Moscow," to create the false impression that Mr. Vedeneev and GNM are spying on Telegram users for the Russian government.

- The Article falsely claims that "Electrontelecom—a telecom operator that is also related to Telegram's infrastructure: the company assigned more than five thousand of the messenger's IP addresses," and juxtaposes that false statement with the statement that "Electro[n]telecom installs and manages equipment for a system used by the FSB offices in St. Petersburg and the Leningrad region for surveillance" to falsely imply that Mr. Vedeneev and GNM are spying on Telegram users for the Russian government.

- The Article concludes that "'If someone has access to Telegram traffic and cooperates with Russian intelligence services, this means that the device identifier becomes a really big problem—a tool for global surveillance of messenger users, regardless of where they are and what server they connect to'"—thus falsely implying that the 'someone' is Mr. Vedeneev and GNM.

*        *        *

These falsehoods—explained in detail below—are all the more egregious because OCCRP and iStories ignored prepublication information provided by Mr. Vedeneev that refuted them, and because OCCRP and iStories deliberately concealed from Mr. Vedeneev the true nature of their

3



allegations before publication, thereby depriving him of a meaningful opportunity to provide additional information and evidence disproving the defamatory falsehoods they went on to publish.

On June 4, 2025, Mr. Anin reached out to Mr. Vedeneev about OCCRP's and iStories' then-forthcoming story with a list of nine questions. However, Mr. Anin's questions notably concealed the facts that Mr. Vedeneev and GNM would be the primary focus of the story and that the story would include false allegations that Mr. Vedeneev and GNM had engaged in espionage. Mr. Vedeneev responded to Mr. Anin's query the same day and agreed to answer his questions off the record on the express condition that neither Mr. Vedeneev nor any of his companies would be mentioned in the story. Mr. Anin accepted these terms and proceeded with a call.

Mr. Vedeneev was forthright and cooperative with Mr. Anin and provided detailed information about his work and GNM's operations, including that they had never violated any applicable laws, and were unable to access Telegram data. Nevertheless, when OCCRP and iStories published the Article, they completely disregarded the information he provided to Mr. Anin and instead published an attack piece falsely accusing him and GNM of accessing confidential Telegram data and engaging in espionage for the Russian government.

Worse still, after publication of the Article and the first related YouTube video, when Mr. Vedeneev publicly defended himself and GNM against OCCRP's and iStories' false accusations, OCCRP and iStories engaged in further retaliatory conduct. Mr. Vedeneev submitted detailed rebuttals to OCCRP and requested that they be published in full. Instead, Mr. Anin sent an email claiming that certain statements in the rebuttals allegedly contradicted statements made during their prior off-the-record interview and proposed publishing the rebuttals "alongside" excerpts from that interview so that "readers and viewers could compare." This email revealed for the first time that Mr. Anin had secretly recorded the off-the-record interview—without Mr. Vedeneev's knowledge or consent—in apparent violation of applicable Swiss and California criminal law. OCCRP subsequently published edited excerpts from that recording on YouTube without context, further misrepresenting Mr. Vedeneev's statements, and never published his rebuttals. These actions constitute both a violation of journalistic ethics and an improper attempt to exert pressure on Mr. Vedeneev after publication

As explained in detail below, OCCRP's and iStories' accusations against Mr. Vedeneev and GNM are categorically false and defamatory *per se*. And they have caused—and are continuing to cause—Mr. Vedeneev and GNM substantial damage. Indeed, a $120 million contract has been indefinitely delayed because of these false claims. OCCRP and iStories must immediately retract the Article and all associated accusations against Mr. Vedeneev and GNM.

## I.    Background:  Mr. Vedeneev's and GNU's Business.

Mr. Vedeneev founded Global Network Management Ltd. (BVI) in 2011 with the goal of establishing a company to facilitate burgeoning internet communications and traffic across the world. Although Mr. Vedeneev is a Russian citizen by birth (and also an Antiguan citizen who has not lived in Russia for nearly a decade), he deliberately chose to incorporate the company in the British Virgin Islands rather than in Russia in order to ensure that it would operate entirely outside Russian jurisdiction, be free from any control or influence by Russian authorities, and be positioned from inception to serve a global client base.

4



Mr. Vedeneev started working with Telegram—then a startup company—in 2015. At that time, Telegram Founder and CEO Pavel Durov asked him to assist solely with the selection of telecom service providers, and, to streamline the contracting process, granted him narrowly tailored authorization to sign provider contracts on Telegram's behalf. These limited rights did not include any authority over Telegram's internal systems, infrastructure, or data. Mr. Vedeneev never held a formal position at Telegram and was never paid by Telegram for any services. The Article claims that Mr. Vedeneev was the CFO of Telegram. This is false. Mr. Vedeneev never served as an officer or director of Telegram, never acted as its CFO in any functional capacity, and never had responsibility for Telegram's finances. The Article's false claim is based on contracts entered in a Miami breach-of-contract case in which Mr. Vedeneev signed on Telegram's behalf based on his limited authorization. Indeed, at that early stage of Telegram's history, it had no investors and no formal corporate structure. After choosing and contracting with providers under this limited authority, Global Network Management Ltd. (BVI) began installing and maintaining servers for Telegram, performing standard physical tasks such as replacing hard drives.

In 2018, Mr. Vedeneev restructured Global Network Management Ltd. (BVI) into Global Network Management Inc. ("GNM") in Antigua. All clients of Global Network Management Ltd. (BVI) were transferred to GNM, and the BVI company was dissolved. GNM continues to be an Antigua-based corporation today—it has never been a Russian company or entity of any kind. Also in 2018, GNM took over Telegram's telecom-related services because it was already handling most of the work with service providers.

Importantly, Global Network Management Ltd (BVI) and GNM have never been active in Russia and have never had or maintained any ties with the Russian government. Likewise, neither company has had clients or offices in Russia. The companies' only "connection" with Russia is that GNM has occasionally contracted directly with individual employees from ElectronTelecom or GlobalNet for work abroad, due to their relevant market knowledge, technical expertise, and prior experience in the specific type of projects required. GNM's selection of such specialists has always been based on professional qualifications and adherence to international business practices, ensuring compliance with applicable laws and industry standards. Because GNM contracted directly with these individuals, there were no contracts with either ElectronTelecom or GlobalNet, and these contractors had no operational control over Global Network Management Ltd (BVI) or GNM.

Separately, although Mr. Vedeneev previously owned businesses in Russia—ElectronTelecom and GlobalNet—*ElectronTelecom and GlobalNet never operated internationally and never contracted with Telegram.* Since 2017, Mr. Vedeneev has focused his professional efforts on GNM and its work; ElectronTelecom and GlobalNet have been managed by hired directors. Mr. Vedeneev's involvement with ElectronTelecom and GlobalNet has been limited to attending board meetings to review performance; he has not been operationally involved in either business.

In 2024, Mr. Vedeneev sold his ownership interests in ElectronTelecom and GlobalNet to his brother-in-law in a commercial sale conducted on agreed terms. GNM has never had any corporate, operational, financial, managerial, or technical control over either ElectronTelecom or GlobalNet.

GNM's only cooperation with these companies is limited to occasional technical coordination with GlobalNet. Both companies own and operate physically separate segments of fiber optic infrastructure: GNM owns and manages the segment up to the Russian border, while



GlobalNet owns and manages the segment within Russia. Although the fiber cable between Europe and Russia is physically continuous, operational control is strictly divided at the border.

In Russia, GlobalNet's equipment is used only for technical diagnostics and does not provide network control. While GNM and GlobalNet operate long-distance optical transport lines (DWDM), this system works only at the physical signal layer and does not process, inspect, or direct internet traffic. Telegram's data is carried exclusively through direct connections to major global Tier 1 providers such as Orange, Cogent, Lumen, Telxius, and Vodafone. Telegram is not connected to GNM or GlobalNet and does not route its traffic through them.

Publicly available internet routing records confirm that GNM and GlobalNet do not carry, process, or control any of Telegram's IP addresses. These records are considered authoritative, verifiable evidence worldwide for determining how internet traffic is routed. These facts are verifiable in real time using publicly available tools such as BGP.Tools and RIPEstat, and they conclusively disprove any allegation that GNM could intercept or manage Telegram's internet traffic.

## II.    The Article Falsely Claims That Mr. Vedeneev and GNM Control Telegram IP Addresses.

The Article falsely claims that Mr. Vedeneev and GNM control Telegram IP addresses. Beginning with its summary, the Article falsely asserts that Mr. Vedeneev and GNM "control[] thousands of Telegram IP addresses." It later repeats this false statement, claiming that Telegram's "IP addresses were controlled by" GNM. That allegation is demonstrably false, and OCCRP and iStories knew that when they published it. Mr. Vedeneev explained to Mr. Anin that GNM allocated IP address blocks to Telegram pursuant to its role as a Local Internet Registry (LIR) and performed routine physical maintenance on server equipment during his 3.5-hour interview. Mr. Vedeneev clearly explained that allocating IP addresses does not equate to routing authority or network control, that routing was exclusively managed by Telegram, and that routing determines actual operational control over network traffic.

GNM does not control Telegram's IP addresses, nor does it monitor or analyze Telegram's network traffic. GNM has never provided Telegram with global IP transit services. The company does not have direct or indirect access to Telegram's message content, encryption keys, or internal systems. GNM is a recognized Local Internet Registry (LIR) under the authority of RIPE NCC—an independent, not-for-profit organization that functions as the Regional Internet Registry (RIR) responsible for allocating and administering Internet number resources (including IP addresses and Autonomous System Numbers) in Europe, the Middle East, and Central Asia. As an LIR, GNM receives IP addresses from RIPE and allocates them to its clients—including Telegram—on a wholesale basis. Once allocated, Telegram independently configures and routes these IP addresses within its infrastructure. This routing process is entirely managed and controlled by Telegram, not GNM. While GNM has allocated thousands of IP addresses to Telegram over time, all routing decisions, usage policies, and operational control over those IP addresses remain solely with Telegram. These facts are verifiable through public records, including the RIPE WHOIS database and global BGP routing tables, which show that Telegram's prefixes are not originated, announced, or routed through GNM.

Like any LIR, infrastructure operator, or data center, GNM cannot directly or indirectly access, intercept, alter, or observe Telegram's communications. GNM cannot access or decrypt

6



Telegram traffic.  Decryption is technically impossible without private encryption keys, which GNM has never possessed.

GNM also provides colocation, installation, and maintenance services for its clients, including Telegram.  These activities include replacing faulty hardware components, rebooting servers, installing or removing hardware, and connecting client equipment to switches or routers.  Physical access is limited to performing these agreed-upon maintenance tasks and does not include access to client systems or data.  This is standard industry practice—there is nothing suspicious or unique about this arrangement.  It would not be practical for every company to install and maintain its own equipment worldwide without working with local providers.  Claiming that this common arrangement means Mr. Vedeneev and GNM are spying on Telegram users for Russia is false.

Allocating IP address blocks and installing or maintaining equipment do not give GNM or Mr. Vedeneev access to Telegram's internal server content, configurations, or network infrastructure.  Telegram's internet connectivity is handled through its own Tier 1 providers.  Traffic routing is exclusively managed by Telegram's own network engineering team.  Routing controls how traffic moves and which network equipment manages it; GNM neither performs nor oversees this function.  Public BGP records confirm that Telegram's IP prefixes are not originated, announced, or routed through GNM, meaning GNM does not control them.

These facts have been proven time and time again.  GNM's client base includes internationally recognized companies such as Google Ireland Limited (infrastructure subsidiary Raiden Unlimited), Cloudflare Inc., Vodafone, and Telecom Italia.  All of these companies conducted their own independent due diligence processes before engaging GNM.  Furthermore, these facts are consistent with Telegram's public statements in which the company has explained that it operates all servers internally, that "no unauthorized access is possible," and that it has "never shared personal messages" or "encryption keys" with any third party.

## III.    The Article Falsely Claims That Mr. Vedeneev and GNM Can Access Telegram Data.

The Article falsely claims that Mr. Vedeneev and GNM can access Telegram data because they have physical access to their servers.  Specifically, the Article juxtaposes the statements that "Vedeneev was the only person authorized to access Telegram servers in a Miami data center" and "his company owns a router in the Telegram server room" with a statement from a "security specialist" who said that "[i]f a company controls the routers that distribute traffic passing through Telegram servers, this means that it ... can see the identifiers of messenger users."  By so doing, the Article falsely implies that Mr. Vedeneev and GNM control Telegram's routers, traffic, and servers, and that they can identify Telegram's users.

This accusation was manufactured by security specialist Michal "Rysiek" Wozniak, who previously worked for OCCRP as head of infrastructure and information security and thus has a strong incentive to support OCCRP's (and iStories') narratives even when they are false.  Mr. Wozniak also wrote these allegations in a technical article published on Habr.ru, a website for tech professionals.  And, tellingly, Mr. Wozniak removed the article shortly after Mr. Vedeneev's response, raising serious doubts about the credibility and defensibility of his technical claims.

The truth is that Mr. Vedeneev and GNM do **not** have access to data stored on Telegram servers—which include Telegram's software and IP address routing information.  Authorized datacenter access (physical access to servers for maintenance) is entirely different from server access



(access to the data on the server). A so-called "security specialist" like Mr. Wozniak should (and almost certainly does) understand that distinction. Moreover, OCCRP and iStories knew the difference because Mr. Vedeneev explained it to Mr. Anin prepublication.

The Article asserts that mere physical access to servers poses a risk to the end user's privacy because Mr. Vedeneev and GNM could hack Telegram's servers to access user data. Even posed as a hypothetical, that allegation is highly damaging to a telecommunications company and an executive trusted by many clients to install and maintain servers—and the law recognizes that even so-called hypotheticals can convey actionable, defamatory implications.[2] **And that accusation is patently false: there is no evidence whatsoever that Mr. Vedeneev or GNM has engaged in hacking Telegram or any of their other clients—because they have not. Indeed, there is no evidence whatsoever that Mr. Vedeneev or GNM even has the ability to hack Telegram or any of their other clients—because they do not.**

Indeed, it would be impossible for Mr. Vedeneev or GNM to hack Telegram (or their other clients) without that hacking being discovered. Telegram monitors its servers 24/7/365, and any tampering would be detected within seconds. Even in the hypothetical scenario where a hacker installs equipment into Telegram's server, the hacker would still need to be able to control all Telegram traffic. Merely having access to install servers or network equipment does not mean a "man-in-the-middle" position, which requires control of the entire traffic route—something Mr. Vedeneev and GNM have never had. **Routing data, not IP assignment, determines who controls a company's internet infrastructure.** Mr. Vedeneev and GNM do not participate in—and have no access to—Telegram's routing and infrastructure management. Likewise, neither of Mr. Vedeneev's other previous companies (ElectronTelecom and GlobalNet) has ever had any relationship with Telegram, much less one that would give them that kind of control.

Lastly, even if Mr. Vedeneev and GNM could access Telegram's data (which they can't), and even if they decided to betray their clients' trust (which they wouldn't), Telegram's data is encrypted and they would not be able to decrypt or decipher it. Thus, they would not be able to obtain any useable information. The Article refers to the unencrypted 'auth_key_id' and falsely claims that "[t]his means that whoever controls Telegram's network traffic may be able to track users, even if the messages themselves cannot be read." The Article thereby plainly implies that Mr. Vedeneev and GNM control Telegram's network traffic and can track users. But that is false. And, in any event, the auth_key_id rotates every 24 hours according to Telegram's protocol, rendering it useless for tracking users. This rotation behavior is publicly available in Telegram's open-source MTProto protocol specification.[3]

Notably, Mr. Anin did not ask Mr. Vedeneev questions about the auth_key_id in the supposed "fact-check" he sent to Mr. Vedeneev. If he had, Mr. Vedeneev could and would have provided him evidence to disprove the false claim he sought to publish and did in fact publish. Mr. Anin certainly knew that, so he intentionally avoided asking Mr. Vedeneev about it to avoid

---

[2] *See, e.g., Visant Corp. v. Barrett*, No. 13-cv-389, 2013 WL 3450512, at *7 (S.D. Cal. July 9, 2013); *see also Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 n.7 (D.C. Cir. 2015); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993) (explaining that even a question can "be defamatory" if it may "reasonably read as an assertion of a false fact").

[3] MTProto Mobile Protocol, Telegram (last accessed Aug. 8, 2025), https://core.telegram.org/mtproto.



receiving information and evidence that he knew would contradict the claims he wanted to publish. That is well-recognized evidence of actual malice.[4]

### IV.    The Article Falsely Claims That Mr. Vedeneev and GNM Spy on Telegram Users for the Russian Government.

Although the Article correctly states that "[t]here is no evidence that [GNM] has worked with the Russian government or provided any data," it repeatedly contradicts that correct statement and implies that Mr. Vedeneev and GNM have actually worked with or provided data to the Russian government.  Indeed, the entire theme of the Article is that Mr. Vedeneev and GNM are working with or providing data to the Russian government.  That is yet more evidence of actual malice.[5]

That is evident from the very beginning of the article: its headline falsely casts Mr. Vedeneev (and GNM) as "the man in the middle" between Telegram and the FSB.  OCCRP and iStories repeatedly claim to have uncovered "a critical vulnerability" in Telegram's privacy linked to Mr. Vedeneev and GNM.  They further frame the issue as espionage, asserting that "the Russian military has used 'man-in-the-middle' type surveillance in [its] country after capturing network infrastructure."  This allegation—that Mr. Vedeneev and GNM spy on Telegram users for the FSB— is not only false, but also highly damaging and defamatory *per se*.[6]

The Article suggests that such surveillance would require Mr. Vedeneev and GNM to have "'physical access to the data transmission channel and install[ ] equipment there,'" and it elaborates that "'[i]n such an attack, the hackers aren't even interested so much in the user's correspondence. They get metadata to analyze.  And that means IP addresses, user locations, who exchanges data packets with whom, the kind of data it is... really, all possible information.'"  The unmistakable implication is that Mr. Vedeneev and GNM are engaged in "'man-in-the-middle' type surveillance" to intercept Telegram traffic and spy on users for the Russian government.

Once again, those claims are false.  **Mr. Vedeneev and GNM have never engaged in espionage for the Russian government.  And, as explained above, Mr. Vedeneev and GNM cannot access Telegram data or track its users.**  As explained above, such access is simply not possible given the minimal access Mr. Vedeneev and GNM have to the Telegram system.  OCCRP and iStories knew that these claims were false.  They rely on alleged 'specialists' to make up hypotheticals without any facts to support them.  Indeed, the Article makes it clear that they have no evidence.  That is not merely irresponsible journalism; it is textbook actual malice.[7]

---

[4] *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth is "unmistakably sufficient to support a finding of actual malice"); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 510 (E.D. Pa. 2010) (Jury question created where defendant did not provide an opportunity to comment to avoid receiving contradictory information).

[5] *E.g.*, *Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544, 548 (6th Cir. 2013) ("A newspaper cannot publish an accusation that it knows has no evidence behind it as a fact to fit its desired storyline and then cloak itself in the First Amendment.").

[6] *E.g.*, *DeMartini v. DeMartini*, 833 F. App'x 128, 132 (9th Cir. 2020) ("Perhaps the clearest example of defamation per se is an accusation of a crime.")

[7] *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice."); *see also Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981) (A journalist's failure to comply "with the standards of [the] profession in



### V.    The Article Falsely Claims That Mr. Vedeneev Has "A History of Collaborating with Russia's Defense Sector, the FSB Security Service, and Other Highly Sensitive Agencies."

The Article falsely characterizes Mr. Vedeneev as a shadowy intermediary working for the Russian government. That could not be further from the truth, especially as it relates to Telegram. To build this false narrative, the Article claims that Mr. Vedeneev has no public profile. In reality, Mr. Vedeneev's public LinkedIn profile directly disproves that claim, and OCCRP and iStories' choice to ignore such easily verifiable information is further evidence of actual malice.

The Article attempts to substantiate its false claim by asserting that Russian companies formerly owned by Mr. Vedeneev maintain business ties with both Telegram and the Russian government. This, too, is false. Neither ElectronTelecom nor GlobalNet has ever performed any work for Telegram. The Article notably cites no evidence to the contrary—because none exists.

The Article further claims that "[u]ntil 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet." That is also false. GlobalNet has never been a recognized LIR and has never allocated IP addresses to Telegram or anyone else. The Article then makes unjustifiable inferential leaps by pairing this falsehood with the unrelated fact that GlobalNet has provided services to some Russian government entities, such as GlavNIVTS and the Kurchatov Institute. It also notes that Roman Venediktov, a former Russian space forces officer, is a minority co-owner. The Article conveniently omits that Mr. Venediktov does not sit on the company's board, does not participate in management, and has no operational involvement. From there, the Article leaps to the baseless conclusion that GlobalNet is surveilling Russian citizens on behalf of the government. That is pure fabrication. GlobalNet is a network provider subject to Russian legal requirements, including the obligation to provide service when technically feasible, but fulfilling legal obligations does not constitute surveillance. The Article presents no evidence to suggest otherwise.

The Article makes similarly false and misleading statements about Mr. Vedeneev's former company ElectronTelecom. It claims that ElectronTelecom is "related to Telegram's infrastructure" and "assigned more than five thousand of the messenger's IP addresses." That is false. ElectronTelecom has never been a recognized LIR and has never had the authority to assign IP addresses to Telegram or any other entity. In reality, GNM, as a recognized LIR, once allocated a block of IP addresses to ElectronTelecom. When ElectronTelecom no longer needed them, those addresses were reallocated to Telegram. Public registry data and routing records confirm that, like GlobalNet, ElectronTelecom never allocated or controlled Telegram's IP addresses.

The Article further states that "Electro[n]telecom installs and manages equipment for a system used by the FSB offices in St. Petersburg and the Leningrad region for surveillance." That is false and intentionally misleading. ElectronTelecom holds the lowest level of Russian government security clearance (Level 1), which allows participation in certain commercial tenders involving infrastructure with classified elements only to the extent necessary to perform civil works. One such contract, won in open competition, involved laying fiber-optic cable and measuring network parameters for a project whose completed infrastructure was delivered to Rostelecom. These

---

information gathering and dissemination" constitutes circumstantial evidence of actual malice.); *Connaughton*, 491 U.S. at 693.



contracts were purely commercial in nature and had no relation to surveillance or operational cooperation with the FSB.

To perform any work involving SORM (the Russian lawful interception system) or similar surveillance systems, an operator must obtain special government licenses issued by the FSB and the Ministry of Digital Development. Public licensing registries confirm that ElectronTelecom has never held such licenses. This conclusively shows that proving ElectronTelecom could not and did not work with such equipment or systems.

As explained above, neither ElectronTelecom nor GlobalNet has ever had any connection to Telegram. The Article's effort to link Mr. Vedeneev and his former companies to government surveillance of Telegram users is unsupported, speculative, and false. More importantly, these allegations are irrelevant to the legality or ethics of GNM's operations or Mr. Vedeneev's work with Telegram. The Article's attempt to conflate these issues is both misleading and unsupported.

The Article concludes with the statement: "'If someone has access to Telegram traffic and cooperates with Russian intelligence services, this means that the device identifier becomes a really big problem – a tool for global surveillance of messenger users, regardless of where they are and what server they connect to.'" The false, clear, and plainly intended implication is that the "someone" is Mr. Vedeneev (and GNM). But as explained above, Mr. Vedeneev and GNM have never had access to Telegram traffic, they do not cooperate with Russian intelligence services, and even if they did (which they do not), Telegram's device identifier changes every 24 hours, rendering such tracking technically useless. The Article's accusation is baseless.

As previously explained, Mr. Vedeneev once owned two companies operating in Russia, ElectronTelecom and GlobalNet. But that is where the facts end and the Article's fiction begins. Those companies do not "have a history of collaborating with Russia's defense sector, the FSB security service, and other highly sensitive agencies," and they do not have "multiple highly sensitive clients tied to the security services." Founding companies that have, at times, performed commercial work for government clients (as is common in the telecommunications industry worldwide) does not mean that the founder intends to hack another company or engage in espionage. Such a leap in logic is unfounded and inherently implausible. At most, ElectronTelecom performs construction work, such as cable laying, network design, and resale of non-restricted equipment. for government clients. Similarly, GlobalNet is among the top three backbone operators in Russia and serves many clients, including some government entities. Neither fact indicates cooperation with intelligence agencies.

Lastly, contrary to the Article's portrayal, Mr. Vedeneev is not a significant figure in Russian telecommunications—he is not involved in them at all. He sold his stakes in both ElectronTelecom and GlobalNet in 2024, and even before that, he had not been involved in their daily operations since 2017. Mr. Vedeneev has not lived in Russia since 2017, and since 2022, he has had no immediate family there. OCCRP and iStories knew their claims of Mr. Vedeneev's supposed role in Russian telecommunications were false when they published them. Indeed, the Article acknowledges that Mr. Vedeneev no longer owns ElectronTelecom and GlobalNet and that GNM



has no ties to Russia, but it buries these admissions, further demonstrating OCCRP's and iStories' actual malice.[8]

### VI.    Mr. Anin's Pre- and Post-Publication Actions Provide Further Evidence of Actual Malice.

Despite sending a purported fact-check and engaging in a lengthy prepublication interview with Mr. Vedeneev, Mr. Anin never revealed that he intended to accuse Mr. Vedeneev or GNM of espionage and acting as a "man-in-the-middle" for the FSB.  In fact, the only questions Mr. Anin asked about GNM were whether it is true that Mr. Vedeneev has "authorized access to Telegram's infrastructure in Miami" and whether GNM "has contractual obligations regarding this infrastructure."  Mr. Anin thereby deliberately deprived Mr. Vedeneev of a meaningful opportunity to comment on the accusations he then proceeded to publish.  That is strong evidence of actual malice.[9]

What's worse, the Article states that "Vedeneev spoke with reporters but declined to make any of his comments public," but then Mr. Anin reversed course and published video clips of his call with Mr. Vedeneev on YouTube.  As an initial matter, Mr. Vedeneev did not consent to the call being recorded.  Such nonconsensual recording of another person is not just unethical but illegal in many places.  Indeed, a Swiss court has ordered one of the videos to be removed for violating the law.[10]

Moreover, in one of the YouTube videos, Mr. Anin claimed he was posting the clips because Mr. Vedeneev had complained about the reporting.  But that claim is contradicted by the fact that the call was recorded from two different angles—this was not just a simple recording for posterity; there was a cameraman in the room during the call.  This strongly implies that Mr. Anin always planned to release the footage in violation of journalistic ethics—and the law.

The Article also relies on inherently unreliable sources for the false and defamatory claims in the Article, which is further evidence of actual malice.[11]  The Article cites a source who spoke on the condition of anonymity but provides no explanation for why this is necessary.  This contradicts the Society of Professional Journalists Code of Ethics, which provides that publishers should "[r]eserve anonymity for sources who may face danger, retribution or other harm, and have information that cannot be obtained elsewhere," and when anonymity is granted, "[e]xplain why ...."[12]  The use of anonymous sources without explanation is indicative of actual malice.[13]

---

[8] *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969) (ignoring contradictory evidence in pursuit of a preconceived storyline constitutes evidence of actual malice).

[9] *Morsette v. "The Final Call,"* 309 A.D.2d 249, 258-59 (N.Y. App. Div. 2003) (gross departure from standards of responsible journalism supports a finding of liability and punitive damages).

[10] District Court of Baden, Civil Court Presidium, Order of 24 July 2025, SZ.2025.169 / hu, Vladimir Vedeneev v. Roman Anin and Google Inc.

[11] *Biro v. Condé Nast*, 807 F.3d 541, 545 (2d Cir. 2015); *see also Stern v. Cosby*, 654 F. Supp. 2d 258, 281 (S.D.N.Y. 2009) (defendant's awareness of source's "possible bias and/or unreliability" was evidence of actual malice).

[12] Society of Professional Journalists, *Code of Ethics*, https://www.spj.org/spj-code-of-ethics.

[13] *Biro*, 807 F.3d at 546 ("[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice.").



In addition to the use of anonymous and biased sources, OCCRP and iStories rely on Elies Campo, who claims to have worked at Telegram. Telegram makes it difficult to verify its employees, but it has repeatedly refuted that Mr. Campo was an employee.[14] And Mr. Campo has a history of making false claims about his employment.[15] Additionally, Mr. Campo is a political activist who claims to be a victim of spyware, and therefore is obviously not an impartial source.[16] The Article fails to disclose to readers about Mr. Campo's controversial public profile. Given these facts, what steps did OCCRP and iStories take to confirm Mr. Campo's employment?

These facts, along with those described above, show that OCCRP and iStories violated journalistic standards and demonstrated actual malice.[17]

## VII.    Necessary Steps to Mitigate the Harm You Have Caused Mr. Vedeneev and GNM.

With this letter, OCCRP and iStories are on formal, written notice that—as they knew before they published the Article—their accusations against Mr. Vedeneev and GNM discussed herein are categorially and demonstrably false and defamatory. And, as OCCRP and iStories already know, they are incredibly and irreparably damaging.

Accordingly, to begin to mitigate at least some of the devastating harm that OCCRP's and iStories' defamatory accusations have caused—and are continuing to cause—Mr. Vedeneev and GNM, we require that OCCRP and iStories immediately:

1. Retract the Article in full;

2. Issue a clear, written, and prominently published apology to Mr. Vedeneev and GNM for the reputational and economic harm that the Article has caused him;

3. Cease and desist from repeating or republishing any of the accusations against Mr. Vedeneev and GNM identified in this letter; and

4. Pay money damages to Mr. Vedeneev in the amount of $2 million. This amount reflects a small portion of the damages that OCCRP's and iStories' false and defamatory accusations have caused Mr. Vedeneev and GMN to date—an amount that will continue to increase the longer the Article remains unretracted.

---

[14] Staff, *Elies Campo Has Deceived 'Citizenlab' and 'The New Yorker,'* elTriangle (May 6, 2022), https://www.eltriangle.eu/es/2022/05/06/elies-campo-ha-enganado-a-citizenlab-y-a-the-new-yorker; Staff, *Elies Campo, the Mastermind Behind Catalangate: Neither Hired by Telegram nor a Graduate in Engineering*, Cronica (Apr. 10, 2023), https://cronicaglobal.elespanol.com/politica/20230410/elies-campo-catalangate-ni-contratado-telegram-licenciado/755174507_0.html; Staff, *The CV of the Architect of the 'Catalangate' Is Under Suspicion*, Cronica (May 7, 2022), https://cronicaglobal.elespanol.com/politica/20220507/el-curriculum-del-artifice-catalangate-bajo-sospecha/670682946_0.html.

[15] Jose Javier Olivas Osuma, *The Pegasus Spyware Scandal A Critical Review Of Citizen Lab's 'CatalaGgate' Report*, Department of Political Science and Administration, Universidad Nacional de Educación a Distancia, 75 (2023), https://eprints.lse.ac.uk/118492/5/ThePegasusspywarescandal_AcriticalreviewCatalanGate_OlivasOsunaJJ2023.pdf.

[16] *Id.* at 46.

[17] *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (denying defendant's motion for summary judgment and finding "[a]lthough failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact.").



*This constitutes Mr. Vedeneev's and GNM's formal demand for a retraction pursuant to any applicable statutory or common law. Failure to take the essential remedial steps listed above will constitute additional evidence of actual malice.[18]*

\* \* \*

We trust you appreciate and understand the seriousness of this letter, and that you will review it carefully and with the level of attention our clients deserve. Mr. Vedeneev has worked tirelessly his entire career to earn a reputation as an ethical and forthright businessman and entrepreneur, and it is reckless for OCCRP and iStories to ruin that reputation with demonstrably false and sensational accusations like those discussed in this letter.

Finally, until the issues discussed in this letter are resolved, OCCRP and iStories should reasonably anticipate litigation relating to the Article. Accordingly, we require that OCCRP, iStories, Mr. Anin, Ms. Kondratyev, Mr. Lozovsky, and anyone who has performed any work relating to the Article preserve and retain all documents, data, and electronically stored information relating in any way to the Article, Mr. Vedeneev, GNM, ElectronTelecom, GlobalNet, Global Network Management Ltd., Telegram, Pavel Durov, or Vladimir Vedeneev. These items must be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails, text messages, voicemail messages, social media posts, or in any other form. *Failure to adhere to this request could subject you to significant penalties, including claims and sanctions for spoliation. Please let us know if this request is in any way unclear.*

This is not a complete statement of Mr. Vedeneev's and GNM's rights, all of which are expressly reserved. We look forward to your prompt response. Please confirm receipt of this letter.

Very truly yours,

Joseph R. Oliveri

Kathryn G. Humphrey

cc:    Roman Anin (aninroman@gmail.com)
       Nikita Kondratyev (kondratyev@istories.med)
       Ilya Lozovsky (ilya@occrp.org)

---

[18] *E.g., Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013) (failure to retract may tend to support a finding of actual malice); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("Refusal to retract an exposed error tends to support a finding of actual malice."); *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (a defamation defendant's post-publication actions can constitute circumstantial evidence of actual malice); *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1043 (Del. Super. Ct. 2023) ("[A] refusal to retract the statement and continuing to repeat statements that have been proven false."); *Eramo*, 209 F. Supp. 3d at 874 (post-publication conduct can be probative of state of mind at publication).

# Exhibit E

**Weil, Gotshal & Manges LLP**

BY E-MAIL

2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: +1 202 682 7000
Fax: +1 202 857 0940

**Mark A. Perry**
202-682-7511
Mark.Perry@weil.com

September 23, 2025

Joseph R. Oliveri
Kathryn G. Humphrey
Clare Locke
10 Prince Street
Alexandria, VA 22314

**Re: Telegram Article (OCCRP and iStories)**

Counsel:

Together with the Cyrus R. Vance Center for International Justice, we represent the Organized Crime and Corruption Reporting Project ("OCCRP") and Important Stories ("iStories") in connection with the Article titled "*Telegram, the FSB, and the Man in the Middle*" published by OCCRP in English on June 10, 2025 (and earlier by iStories in Russian) (Exhibit A). On behalf of OCCRP and iStories, we are responding to your August 8, 2025, letter. For the reasons set forth below, our clients disagree that a retraction or any other action is warranted. OCCRP and iStories stand by the Article as published.

Your letter mischaracterizes the Article as "reckless" and "false." That is empty rhetoric with no factual basis. The Article exemplifies the kind of carefully researched, accurately reported and constitutionally protected speech on matters of public concern that is a hallmark of American democracy. Indeed, the Article was the result of nearly a year of investigation, including the review of public court filings, extensive interviews and research, and, notably, admissions by Mr. Vedeneev himself. Given the huge number of people who use the Telegram app, the Article is addressed to matters of considerable importance and widespread public interest.

If Mr. Vedeneev disagrees with anything in the Article, he is of course free to make his views public. After all, the remedy for speech is more speech. *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). In fact, it appears that Mr. Vedeneev has taken advantage of that opportunity, including by giving interviews to other media outlets and by posting extensive commentaries and critiques on LinkedIn. *See* Exhibit B (sampling of Mr. Vedeneev's LinkedIn posts). Mr. Vedeneev has gone so far as to (falsely) accuse Mr. Anin, the lead reporter on the Article, of violating journalistic ethics.

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 2

What Mr. Vedeneev may not do is attempt to stifle the speech of others. While we will not endeavor a point-by-point response to your lengthy and repetitive letter, it suffices at this stage to note that your letter does not accurately reflect either the content of the Article or the process that led to its publication. It may be that you have not yet conducted a complete investigation, or that Mr. Vedeneev has not provided you with the requisite information. Regardless, nothing in your letter warrants a retraction, correction, apology, or any other action on the part of OCCRP and iStories. To reiterate, our clients stand by the story as published.

The real point of your letter appears to be to convey the threat of a defamation suit in the District of Columbia. While our clients will respond in the appropriate forum to any action that is properly filed and served, we set forth below five overarching reasons why a lawsuit would be a waste of judicial resources.

*First,* **the factual statements contained in the Article are true.**

The Supreme Court has made clear that in defamation actions involving public figures, "where the protected interest is personal reputation, the prevailing view is that truth is a defense." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 489 (1975). *See also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (in cases involving speech on matters of public concern, the plaintiff bears the burden of proving falsity); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (recognizing that "truth may not be the subject of either civil or criminal sanctions" in defamation cases); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (minor inaccuracies do not amount to defamation where the "gist" of the statement is substantially true).

Your letter uses the word "false" or its cognates many times, but does not actually identify any *facts* that are untrue. This is critical because truth is not merely a defense in defamation law—it is a complete bar to liability. Because the Article is factually (and verifiably) accurate, this consideration alone defeats Mr. Vedeneev's claims, independent of any other protections.

*Second,* **the Article reflects Mr. Anin's robust investigation.**

Courts routinely consider whether a publication adhered to professional standards of journalism, and here, Mr. Anin's work easily meets that benchmark. Far from being reckless, the Article was subjected to intensive review, with internal deliberation reflecting a consistent focus on fairness and accuracy. This stands in stark contrast to cases like *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989), where liability was predicated on ignoring obvious sources.

By way of example only, we outline below some of the allegations raised in your letter and respond with reference to the numerous credible sources Mr. Anin reasonably relied upon during the course of his investigation and in drafting the ultimate Article.

- **Claim #1:** Mr. Vedeneev never worked for Telegram.

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 3

Contrary to your letter, the Article only states that according to court documents, "Durov had empowered Vedeneev to sign documents as Telegram's CFO." These court documents and testimony connect Mr. Vedeneev, GNM, and Telegram and include (1) novation agreements between Telegram and GNM, in which Telegram assigned all the rights and responsibilities under its contracts with data centers to GNM, and (2) Mr. Vedeneev's deposition testimony regarding his relationship with Telegram. Additionally, Mr. Vedeneev confirmed the connection during his interview with Mr. Anin.

- **Claim #2:** Mr. Vedeneev and GNM do not control Telegram IP addresses.

Mr. Anin relied on the Regional Internet Registry (RIR) for Europe, the Middle East, and parts of Central Asia. This organization is responsible for allocating and registering Internet number resources like IPv4 and IPv6 addresses and Autonomous System Numbers (ASNs). The RIPE database (IP address registry) shows that GNM is the responsible organization for 1024 addresses used by Telegram. This means that GNM sub-assigned these addresses to Telegram, but GNM remains the legal holder of these addresses and the accountable party in RIPE's eyes. Mr. Anin also checked other IP ranges used by Telegram and found that GNM controls more than 10,000 IP addresses used by the messenger.

- **Claim #3:** Mr. Vedeneev and GNM cannot access Telegram data just because they have physical access to their servers.

This statement contradicts what Mr. Vedeneev said during his interview with Mr. Anin. Mr. Vedeneev stated, "[w]hether you trust me or not, you are right: it doesn't matter whether I control the router or not. As of today, I provide Telegram with all channels of communication. Not somebody else, but me. I can even not have access to their router, which I really don't have access to, **but if I really want, of course I can intercept this traffic**. What am I going to do with this encrypted traffic, or those unencrypted headers, which you mention—analyze them, or use some big data tools and so on—only God knows. **Theoretically I can do this**. Do I do that? No, I don't!"

- **Claim #4:** Mr. Vedeneev does not have a history of collaborating with the FSB.

Mr. Vedeneev stated in numerous interviews that he is obligated to cooperate with the FSB in Russia. For example, he told Mr. Anin that "[i]n Russia, every single broadband provider—absolutely all of them, without exception—is legally required under the Law on Communications to cooperate with the police and the FSB…We've been in touch with the SORM guys for ages—let's say, on friendly terms. And they basically tell us: 'Look, we don't care about anything else. What matters is that you respond to our requests really fast. If we ask about one of your subscribers—who used a particular IP address at a certain time—we expect an answer.' **We don't know what the request is really about, but we can't ignore it. So we reply right away. We have authorized email addresses they use for sending these requests. We answer quickly: 'This was Ivan Ivanovich Ivanov, apartment 7, such-and-such.' And they say: 'Okay, perfect.' In practice, we're 'supervised' by an FSB officer—the one responsible for SORM**—who's probably trying to earn promotion. He tells everyone: 'Any access to Vladimir goes only through me.' So he filters all the communication. He'll call me and say: 'Listen, Volodya, you need

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 4

to deal with them about this or that.'" Additionally, in interviews with other media outlets, Mr. Vedeneev talked about his cooperation with Russian secret services.

Moreover, as confirmed by government documents and Mr. Vedeneev himself, Mr. Vedeneev previously owned a company with connections to the Russia government. Until June 17, 2024, Mr. Vedeneev owned 99.5% in a company from Saint Petersburg called ET-Group, which, as confirmed by Mr. Vedeneev during his interview with Mr. Anin, he later transferred to the husband of his sister, Vladimir Gulyukin. This information is also substantiated by the Russian commercial register.

ET-Group in its turn owns 100% in Electrontelekom from Saint Petersburg and 96% in GlobalNet from Moscow. Both companies have contracts with numerous Russian state agencies, including with the FSB. For instance, Electrontelekom has a contract with the FSB, under which it mounts and serves complexes used by the secret service for surveillance. This information was provided in a contract that Mr. Vedeneev sent to iStories.

GlobalNet in its turn had a large contract from 2016 to 2025 with Voentelecom, a Russian state-owned telecommunications company that provides communications infrastructure and IT services to the Russian Ministry of Defense and other security agencies. Additionally, in April 2025, GlobalNet signed a state contract with The Kurchatov Institute, Russia's leading state research center in nuclear physics and energy that is now active in nuclear technology, fusion research, and defense-related science. This information was substantiated via the Russian procurement database.

In conclusion, the truth of Mr. Anin's reporting is confirmed not only by the evidence itself, but also by the rigor of the process that produced it.

Your letter asserts that Mr. Anin's interview of Mr. Vedeneev was "off the record". That is not correct. Mr. Vedeneev requested only that certain specific information not be reported publicly, and Mr. Anin respected those requests and did not report that information (either in the Article or in the subsequent YouTube excerpts). If this matter were to go to litigation, however, that information would also be at issue.

***Third***, **Mr. Vedeneev is a limited public figure.**

Limited-purpose public figures are those who voluntarily enter specific public controversies to influence their resolution. *See Gertz v. Welch, Inc.*, 418 U.S. 323, 345 (1974); *Moss v. Stockard*, 580 A.2d 1011, 1030 (D.C. 1990). Whether an individual is a limited public figure is a fact-intensive inquiry, but the final determination is a question of law. *See Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504–05 (D.C. 2020). D.C. courts apply a three-step test to determine limited-purpose public figure status: (1) existence of a public controversy, (2) plaintiff's role in the controversy, and (3) relevance of the alleged defamation.

Applying this framework here, Mr. Vedeneev plainly qualifies as a limited-purpose public figure. Mr. Vedeneev has not only participated in the controversy regarding the security of Telegram—he has

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 5

actively sought to shape public perception and influence its outcome. The challenged statements are directly tied to that involvement and fall squarely within the scope of the public debate he helped generate. Mr. Vedeneev has continued this debate following publication of the Article through, among other things, his LinkedIn posts challenging the Article.

As such, Mr. Vedeneev is subject to the heightened "actual malice" standard, which requires him to prove that the statements were made with knowledge of their falsity or with reckless disregard for the truth. This is an exacting constitutional threshold—one that, as discussed further below, he cannot come close to meeting.

***Fourth,* the statements in the Article are protected speech under the First Amendment.**

As you know, there are broad constitutional protections of the press enshrined in the First Amendment. For more than sixty years, the Supreme Court's landmark decision in *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), and the cases that followed have secured strong First Amendment protections for the press and for others who speak on matters of public concern. *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988); *Gertz v. Welch, Inc.*, 418 U.S. 323, 345 (1974). The Court has repeatedly emphasized that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

Courts have also made clear that a person's status as a limited-purpose public figure does not transform every aspect of his life into a matter of public concern. *See Gertz v. Welch, Inc.*, 418 U.S. 323, 345 (1974). Rather, the question is whether the statements at issue relate to a "public controversy"—that is, one with "foreseeable and substantial ramifications for nonparticipants"—into which the plaintiff voluntarily injected himself. *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir. 1980); *Tavoulareas v. Piro*, 817 F.2d 762, 772–73 (D.C. Cir. 1987) (en banc).

As stated previously, that standard is easily satisfied here. The controversy at issue plainly extends beyond the immediate participants, implicating matters of broad public interest, and Mr. Vedeneev has actively sought to influence the outcome. Accordingly, Mr. Vedeneev is a limited-purpose public figure for purposes of this litigation, and the First Amendment requires him to prove "actual malice"—that the challenged statements were published with knowledge of falsity or with reckless disregard for the truth. *See NYT v. Sullivan*, 376 U.S. at 279–80. Under this standard, Mr. Vedeneev must prove by clear and convincing evidence that the challenged statements were published either with knowledge of falsity or with reckless disregard for the truth.

Courts have repeatedly emphasized that this is an extraordinarily high bar, requiring proof of the defendant's subjective state of mind rather than mere negligence or imperfect reporting. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (failure to verify alone does not establish actual malice; reckless disregard requires reliance on wholly unverified or dubious sources); *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989) (ignoring obvious sources or red flags may support malice, but careful editorial review undercuts such a finding); *Edwards v. Nat'l Audubon Soc'y*, 556 F.2d 113, 120 (2d Cir. 1977) (recognizing the "neutral reportage" doctrine; balanced reporting that includes denials

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 6

demonstrates fairness and negates malice). Courts ask whether the reporter knew the statement was false at the time of publication and whether the reporter published while entertaining serious doubts as to the truth. *N.Y. Times Co. v. Sullivan*, 376 U.S. at 279–80; *St. Amant*, 390 U.S. at 731.

Here, Mr. Anin rigorously researched and reported the Article. Far from acting with knowledge of falsity or reckless disregard, he relied on multiple independent sources, subjected the piece to editorial review, and offered Mr. Vedeneev a meaningful right of reply. These steps reflect diligence and professional care—the very opposite of actual malice. Courts have made clear that honest, good-faith reporting, even if later shown to contain minor inaccuracies, is constitutionally protected. *See, e.g., Garrison v. Louisiana*, 379 U.S. 64, 73–74 (1964) ("[E]rroneous statement is inevitable in free debate, and…it must be protected if the freedoms of expression are to have the 'breathing space' they need to survive.").

***Fifth*, Mr. Vedeneev's claims would also be barred by the D.C. Anti-SLAPP Act.**

In addition to the considerations outlined above, any claims arising from the Article would be barred at the threshold by the District of Columbia's Anti-SLAPP Act.

D.C.'s Anti-SLAPP Act applies to lawsuits based on acts "in furtherance of the right of advocacy on issues of public interest." D.C. Code Ann. § 16-5501(1) (2019). Such an act is defined as a statement made in connection with an issue under consideration by a government body or one made "in a place open to the public or a public forum in connection with an issue of public interest." § 16-5501(1)(A)(i)-(ii).

The law also applies to lawsuits arising from "expressive conduct" involving "petitioning the government or communicating views to members of the public in connection with an issue of public interest." § 16-5501(1)(B). The law defines an "issue of public interest" as "an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product or service in the market place." § 16-5501(3). The Article clearly fits within this definition, and thus the D.C. Anti-SLAPP Act would provide an independent basis for prompt dismissal of any suit challenging the Article.

\* \* \*

In closing, OCCRP and iStories stand by the Article. It was carefully researched, accurately reported, and contains verified (and verifiable) facts regarding Telegram's operations and Mr. Vedeneev's role. Your threats of litigation ring hollow for the reasons outlined herein. Mr. Vedeneev is of course free to make his own views known however he wishes, but the appropriate recourse is not a defamation suit.

OCCRP and iStories reserve all rights.

**Weil, Gotshal & Manges LLP**

September 23, 2025
Page 7

Sincerely,

Mark A. Perry

CC: Alexander Papachristou

# Exhibit A

  

**EN**

# Telegram, the FSB, and the Man in the Middle

**INVESTIGATION**

**The technical infrastructure that underpins Telegram is controlled by a man whose companies have collaborated with Russian intelligence services.**



Banner: Kos

**Key Findings**

- A company owned by a Russian network engineer named Vladimir Vedeneev controls thousands of Telegram IP addresses and maintains its servers.

9/16/25, 8:57 PM
Case 1:26-cv-01527    Document 1    Filed 05/04/26    Page 148 of 184
Telegram, the FSB, and the Man-in-the Middle | OCCRP





EN

- Because of the way Telegram's encryption protocols work, even users who use its "end-to-end" encryption features are vulnerable to being tracked by anyone who can monitor its network traffic.

Reported by

**Roman Anin**_Important Stories_, **Nikita Kondratyev**_Important Stories_

Also published by our partner [Important Stories (Russia, in Russian)](#)

June 10, 2025

    

Telegram, the wildly popular chat and messaging app, is the pride of the Russian IT industry. According to Pavel Durov, the enigmatic entrepreneur who created the service twelve years ago, it now has over a billion monthly active users around the world.

Among the reasons for this success is Telegram's reputation for security, coupled with Durov's image as a free speech champion who has defied multiple governments.

"Unlike some of our competitors, we don't trade privacy for market share," he [wrote this April](#). "In its 12-year history, Telegram has never disclosed a single byte of private messages."

  



Credit: Steve Jennings/Getty Images for TechCrunch/Flickr

Telegram founder Pavel Durov.

But a new investigation by OCCRP's Russian partner, Important Stories, reveals a critical vulnerability.

When reporters investigated who controls the infrastructure that keeps Telegram's billions of messages flowing, they found a man with no public profile but unparalleled access: Vladimir Vedeneev, a 45-year-old network engineer.

Vedeneev owns the company that maintains Telegram's networking equipment and assigns thousands of its IP addresses. Court documents show that he was granted exclusive access to some of Telegram's servers and was even empowered to sign contracts on Telegram's behalf.

There is no evidence that this company has worked with the Russian government or provided any data. But two other closely linked Vedeneev companies — one of which also assigns Telegram IP addresses, and another which did so until 2020 — have had multiple highly sensitive clients tied to the security services. Among their clients is the FSB

 

EN

Credit: Alexander Kazakov/Kremlin Pool/Russian Government / Alamy Stock Photo

Russian President Vladimir Putin speaks at the annual meeting of the FSB Board, with FSB Director Alexander Bortnikov, on February 27, 2025, in Moscow.

"If true, this reporting highlights the dangerous disconnect between what many believe about Telegram's security and privacy features, and the reality," said John Scott-Railton, a Senior Researcher at The Citizen Lab. "When people don't know what is actually going on, but assume they have metadata privacy, they can unknowingly make risky choices, bringing danger to themselves and the people they're communicating with. This is doubly true if the Russian government sees them as a threat."

A Ukrainian IT specialist who spoke with reporters on condition of anonymity said that the Russian military has used "man-in-the-middle" type surveillance in his country after capturing network infrastructure.

"You get physical access to the data transmission channel and install your equipment there," he said. "In such an attack, the hackers aren't even interested so much in the user's correspondence. They get

 

Durov is currently under investigation in France after being arrested last August on charges related to the circulation of illegal content on Telegram. The company has since implemented a number of measures to crack down and step up its collaboration with the authorities. Durov has been released under judicial supervision and is allowed to travel.

He did not reply to requests for comment. Vedeneev spoke with reporters but declined to make any of his comments public.

## Leaving Russia

The story of Telegram begins with another social networking site that is less well-known outside of Russia: VKontakte.

Created by Durov in 2006, when he was just 21 years old, the site quickly earned a large userbase because it duplicated many of Facebook's popular features and provided free access to vast troves of pirated music and videos.

But VKontakte's rise ran up against Russian President Vladimir Putin's growing authoritarianism. When opposition groups used the site to help organize mass anti-government protests in 2012, the authorities demanded that Durov ban them.

"Armed policemen [came] to my house, tried to break in because I refused," he told right-wing commentator Tucker Carlson in an interview last year, explaining that this episode gave him the idea of creating a new, more secure messaging service.

  



Credit: Bogomolov.PL/Wikimedia Commons

An anti-government rally on Moscow's Sakharov Avenue in December 2011.

Facing further pressure from the authorities, who now demanded that he disclose the personal data of Ukrainians protesting the Kremlin-aligned government in Kyiv, Durov left Russia in 2014. He sold his stake in VKontakte — which was taken over by people close to the Kremlin — and even published a manifesto: "Seven Reasons Not to Return to Russia."

Then, along with his brother, a talented mathematician named Nikolai, Durov created Telegram — a new messenger service with an emphasis on privacy. From the beginning, he claimed that his product was "safer" than its competitors and that "messages sent through Telegram cannot be bugged by third parties."

He has denied that Telegram had any infrastructure in Russia, and even claims never to have visited his home country since he left in 2014. "I don't go to any of the big geopolitical powers, countries like China or Russia or even the U.S.," he told Carlson. (Last year, reporters from Important Stories revealed that this was untrue. A leaked database of border crossings showed that Durov had traveled to Russia more than 50 times between 2015 and 2021.)

 

propagandists and security services, but also for independent media outlets and opposition figures. Millions from other countries also joined after WhatsApp made clear that it could share certain data with its parent company, Facebook.

Telegram's official FAQ stresses its security features and emphasizes transparency: "Anyone can check Telegram's open source code and confirm that the app is not doing anything behind their back," it reads.

But the reality is more nuanced. Unlike other apps like WhatsApp or Signal, Telegram chats do not use end-to-end encryption by default. The option is available for users who enable it, but as Durov's former colleague Anton Rosenberg pointed out as far back as 2018, the vast majority do not do so, instead corresponding through regular "cloud" chats, which are stored on the company's servers.

Telegram assures users that their data is safe: "Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions," the company's FAQ reads. "The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. ... Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression."

But network security experts warn that even Telegram's end-to-end encrypted chats can leave users vulnerable to being tracked. The app's MTProto protocol, which governs how its encryption works, specifies that an unencrypted element is attached to the beginning of each encrypted message.

"The unencrypted part is called 'auth_key_id,'" said Michał "rysiek" Woźniak, a security specialist who used to work for OCCRP as head of infrastructure and information security. "This makes it possible to identify a specific user device."

"If I know your device's 'auth_key_id,' and I can listen in on the network that handles the data ... I know it is your specific device communicating with Telegram servers," he explains. "By looking at the network packets

  

able to track users, even if the messages themselves cannot be read.

Woźniak conducted several tests to confirm these claims. He has published the technical details in a blog post. Other experts have also pointed out the 'auth_key_id' issue.

## The Man in the Middle

To learn how Telegram messages travel, reporters messaged each other through the service and recorded the traffic using Wireshark, a network traffic analyzer. The results showed that the IP addresses were controlled by a company registered in Antigua and Barbuda called Global Network Management (GNM).

Analyzing additional IP ranges managed by the company, reporters found that it had leased over 10,000 IP addresses to Telegram, meaning that it plays a significant role in the messenger's infrastructure.

Documents from an otherwise unremarkable court case filed in Florida in 2018 — a dispute between GNM and a contractor — reveal much more.

GNM's owner, they show, is a Russian network engineer named Vladimir Vedeneev. He tells the court that his company "is involved in the installation of client equipment — in this case for the Telegram Messenger — and further technical support of this equipment."

According to his company's legal filings, Vedeneev was the only person authorized to access Telegram servers in a Miami data center. He also testified that his company owns a router in the Telegram server room.

"If a company controls the routers that distribute traffic passing through Telegram servers, this means that it, or anyone to whom it grants such access, can see the identifiers of messenger users," says Woźniak, the security specialist.

 

Vedeneev to sign documents as Telegram's CFO. One contract found in the case materials empowers Vedeneev's GNM to deal with a third-party contractor on Telegram's behalf. It is signed by Vedeneev twice: Once as GNM's director and once as Telegram's CFO.



Signed by for and of behalf of
**Telegram Corp.**

Signature:

Name: Vladimir Vedeneev

Title: CFO

Date: 12.02.2018

Signed by for and of behalf of
**Global Network Management Ltd.**

Signature:

Name: Vladimir Vedeneev

Title: CEO

Date: 12.02.2018

Credit: Screenshot of court document obtained by Important Stories

A contract signed by Vedeneev in two roles: As CFO of Telegram and as CEO of General Network Management.

In his testimony, Vedeneev describes the arrangement as "informal" and says he was never paid by Telegram as an employee. But he also tells the court that he "had a power of attorney to sign documents on behalf of Pavel Durov and on behalf of Telegram."

Neither Elies Campo, a former partnership development manager with Telegram who spoke with reporters, nor others familiar with Telegram's corporate structure, have ever heard of Vedeneev. Given Telegram's secretive corporate culture — not even all of its top managers are



EN

market. He is the founder of GlobalNet, a St. Petersburg backbone telecom operator that controls 18,000 kilometers of backbone infrastructure from Siberia to Western Europe in two dozen countries. (Last year, Vedeneev handed over his majority share in the company to relatives.)

Until 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet.

But GlobalNet is not just any network provider. Among its clients is the Main Research Computing Center of the Presidential Property Management Department of Russia (GlavNIVTS). Officially, this organization provides technical support for President Putin's public "direct line" question-and-answer events, summits, and other high-level meetings.

But GlavNIVTS is also perhaps the most secret and little-studied special service in Russia. The agency helped plan the invasion of Ukraine, upgraded a major bot network, developed a centralized video surveillance system, and built tools to track and deanonymize internet users.

## More About GlavNIVTS

In 2019, former GlavNIVTS employees told reporters from Meduza that the center has access to secret materials and works in the interests of a litany of security agencies, including

Show more ⌄

According to data from Russia's official state procurement portal, GlobalNet also provides communications infrastructure to the Kurchatov Institute, a flagship state-owned nuclear research laboratory led by Putin ally Mikhail Kovalchuk and sanctioned by the United States.

  EN

to [Russian internet regulator] Roskomnadzor rules.

It also has a notable minority co-owner: Roman Venediktov, a Russian space forces officer.

A graduate of the elite Mozhaisky Academy, Venediktov, who owns four percent of GlobalNet's shares, served for nearly 10 years in a defence ministry spacecraft testing center outside Moscow.

Venediktov began to cooperate with the Durov family about 15 years ago, when he became the joint co-owner of their St. Petersburg company "Peering," which owned the traffic exchange network DATAIX and handled traffic for VKontakte. He did not respond to requests for comment.



Технический директор "GlobalNet" Владимир Веденеев (слева) и генеральный директор DataIX Роман Венедиктов.

Credit: Screenshot of nag.ru website

Vladimir Vedeneev (left) and Roman Venediktov (right) featured on telecommunications supplier website Nag.ru.

  EN

not respond to requests for comment.

At the same time, he also transferred his share of another company called Electrontelecom — a telecom operator that is also related to Telegram's infrastructure: the company assigned more than five thousand of the messenger's IP addresses.

Reporters obtained the company's internal accounting documents for 2024 which show that one of its most important government clients is the FSB.

The documents show that Electrotelecom installs and manages equipment for a system that is being used by the FSB offices in St. Petersburg and the Leningrad region for surveillance.

"I am shocked, but not surprised," said Woźniak, the security expert, about reporters' findings. "If someone has access to Telegram traffic and cooperates with Russian intelligence services, this means that the device identifier becomes a really big problem — a tool for global surveillance of messenger users, regardless of where they are and what server they connect to."

*With additional reporting by Ilya Lozovsky (OCCRP).*

**UPDATE, June 12, 2025: *The year the Miami court case was filed, 2018, was added to the story.***

June 10, 2025

    



Get quality reporting directly into your inbox, every week

Case 1:26-cv-01527     Document 1     Filed 05/04/26     Page 159 of 184



Case 1:26-cv-01527    Document 1    Filed 05/04/26    Page 160 of 184

    EN

# Exhibit B

 



**Vladimir Vedeneev** in
Strategy Director @ Global Network Management Services B.V. | CEO

Message

**Follow**

## All activity

Posts    ( Comments )    ( Images )    ( Reactions )

**Vladimir Vedeneev** in · 3rd+
Strategy Director @ Global Network Management Services...
5d · Edited · 🌐

Big Tech, Privacy, and the Rule of Law

On July 24, 2025, the District Court of Baden (Switzerland) issued a superprovisional injunction against Roman Aninand Google LLC (YouTube's parent company).

The ruling was crystal clear:
     The YouTube video had to be removed immediately ("sofort von allen Plattformen zu entfernen") for violating my privacy rights — not as a YouTube user, but as a private citizen.

Yet neither Roman Anin (who secretly recorded and uploaded the video in the US) nor Google LLC (YouTube's parent company) complied with the order. The video remains online in direct defiance of the court.

     Key facts:

The video was uploaded in the United States.
The court recognized a violation of privacy under Swiss law.
Google LLC received the order but has not complied.
Instead, it hides behind a corporate shell game (Google LLC vs Google Ireland).

The irony? While my company is baselessly accused of being a "privacy risk," the real privacy violations are being protected by platforms that ignore binding court rulings.

     Privacy, ethics, and the rule of law must apply equally: to telecom operators, to journalists, and to global platforms.

(Attached below: excerpts from the official court ruling, naming Google LLC and Roman Anin, and ordering immediate removal of the video.)

#Privacy #RuleOfLaw #BigTech #MediaEthics #Telecom #Transparency



Verfügung vom 24. Juli 2025

Gesuchsteller     Vladimir Vedeneev, geboren am

Gesuchs-          Roman Anin, geboren am
gegner 1

Gesuchs-          Google inc., Anphitheatre Parkway, US-94043 Mountain View
gegnerin 2

👍 5

---

👍 Like

💬 Comment

🔁 Repost

✈ Send

---

**Vladimir Vedeneev** 🔗 · 3rd+                    **+ Follow**    ···
Strategy Director @ Global Network Management Services...
2w · 🌐

On Privacy, Ethics, and the Principle of Off-the-Record

In telecommunications, privacy and compliance are non-negotiable. Every operator is bound by strict regulations that define how user data can be handled.

Journalism also has its professional standards. One of the most important is the principle of off-the-record. It means that a source may share information for context or background, but the journalist agrees not to publish or attribute it. This principle exists to protect trust and integrity in reporting.

Unfortunately, in my case, this principle was violated. Information I explicitly shared off-the-record was later used against me — without my consent. This is not just a breach of trust. In jurisdictions like Switzerland and California, violating privacy and consent is not only a civil wrong — it can also be a criminal offense.

The irony is striking: while my company is baselessly accused of being a "privacy risk," the real privacy violations are committed by those who claim to be "investigating."

And there is a third actor here: platforms. When global platforms protect violators and refuse to enforce court rulings on privacy, it undermines the very idea of the rule of law in the digital sphere.

Transparency and ethics must apply equally: to telecom operators, to journalists, and to global platforms.

#Privacy #Ethics #Media #Telecom #Trust #Transparency

😀😍👍 7

---

👍 Like

💬 Comment

🔁 Repost

✈ Send

---

**Vladimir Vedeneev** 🔗 · 3rd+                    **+ Follow**    ···
Strategy Director @ Global Network Management Services...
4w · Edited · 🌐

On selective narratives in telecom reporting

Some recent stories try to imply that GNM is "linked to FSB" because I once owned Russian operators. Here are the facts:

GNM has never had offices, subsidiaries, or licenses in Russia — and has never operated in Russia.
My former Russian companies — GlobalNet and ElectronTelecom — were sold

in June 2024. They had offices, staff, and telecom licenses in Russia and, like every operator in that jurisdiction, complied with local law.
AS31500 has never been an upstream provider for Telegram (https://lnkd.in/dzJb5q3x , https://lnkd.in/dXXH_XKi , https://lnkd.in/dKtqZgUH )

By contrast:

Telia and Vodafone do have subsidiaries and telecom licenses in Russia and, at certain points, act as upstream providers for Telegram.
Google has infrastructure present in Russia.
Telegram itself has no presence or licenses in Russia.

    See the comparison below.

This post does not suggest any wrongdoing by Telia, Vodafone, Google, or Telegram. It simply shows why using mere presence or lawful compliance in one country to insinuate "FSB links" — while ignoring these far more direct examples — is selective and technically illiterate narrative-building.

#telecom #BGP #RIPE #criticalinfrastructure #factcheck #mediaethics



AS59930 Telegram Messenger Inc
bgpview.io

🌐 12                                1 comment



👍 Like

💬 Comment

🔁 Repost

✈ Send

---

**Vladimir Vedeneev** 🔗 · 3rd+           **+ Follow**   ...
Strategy Director @ Global Network Management Services...
1mo · 🌐

There seems to be some misunderstanding in recent media coverage about how the global telecom industry operates. Let me clarify a few points that are not a matter of opinion, but of law and practice:
 • Every telecom operator worldwide, by definition, must comply with local legislation in the country where it operates. Otherwise, it risks losing its license, being banned from operating, or even facing criminal liability. There is no "alternative scenario."
 • Telecommunications are part of critical infrastructure. Connectivity cannot simply be "turned off" for political convenience. Even under the toughest sanctions regimes, governments make exceptions to ensure that basic communication services remain available.
 • For example: the Russian state operator Rostelecom is sanctioned by the U.S., yet the U.S. Office of Foreign Assets Control (OFAC) explicitly issued a license to allow Western operators to continue providing communications services. This is not about politics — it's about maintaining critical global infrastructure.
 • Local interaction with authorities is inevitable and lawful. Any operator providing services in a given jurisdiction must coordinate with regulators, emergency services, and other state bodies. This is true in the U.S., the EU, Switzerland, Russia, Iran, or anywhere else.

    I honestly don't understand why some journalists present this basic operational reality as if it were a scandal. The global internet only works because operators across all jurisdictions interconnect and follow the rules.

🌐 12                                1 comment



👍 Like

💬 Comment

🔁 Repost

Case 1:26-cv-01527    Document 1    Filed 05/04/26    Page 165 of 184

◀ Send



Vladimir Vedeneev 🔗 · 3rd+                    + Follow    ···
Strategy Director @ Global Network Management Services...
1mo · 🌐

**Why I'm Speaking Out: Setting the Record Straight**

Hello everyone,

My name is Vladimir Vedeneev. Until recently, I never anticipated having to speak publicly on this matter. However, due to recent events, I feel compelled to address an important issue concerning a misleading and unauthorized publication by OCCRP.

Yesterday, my legal counsel at Clare Locke LLP submitted a demand letter to OCCRP regarding their recent article(s), which violated an off-the-record agreement and misrepresented facts about me and my company, Global Network Management Inc. (GNM). I have always valued transparency and ethical conduct, and I had never intended to engage in public discussions. Unfortunately, I now find it necessary to set the record straight.

In the coming days, I will share factual details and documents to clarify the situation. For now, I simply want to state that my goal is to correct the record and ensure that the truth is understood.

Thank you for your support and understanding.

Best regards,
Vladimir Vedeneev

#MediaEthics #Defamation #Telecommunications #Legal #Transparency #Technology

👍😊 17                                        1 repost

👍 Like

💬 Comment

🔄 Repost

◀ Send



Vladimir Vedeneev 🔗 · 3rd+                    + Follow    ···
Strategy Director @ Global Network Management Services...
2mo · 🌐

Main building of Ciena (Ottawa)





Show more results

About    Accessibility    Help Center    Privacy & Terms ▾    Ad Choices    Advertising
Business Services ▾    Get the LinkedIn app    More

Linked in  LinkedIn Corporation © 2025

# Exhibit F



# C L A R E   L O C K E
## L L P

**JOSEPH R. OLIVERI**
joe@clarelocke.com
(202) 628-7405

10 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

**KATHRYN HUMPHREY**
kathryn@clarelocke.com
(202) 899-3877

October 30, 2025

*Via Email*                                           *Confidential – Not for Publication or Attribution*

Mark A. Perry
Weil, Gotshall & Manges LLP
Mark.Perry@weil.com

> **Re:** *False and Defamatory Statements About Vladimir Vedeneev and Global Network Management, Inc.*

Dear Mark:

We write again on behalf of our client, Vladimir Vedeneev, owner of Global Network Management, Inc. ("GNM"), in response to your September 23, 2025 letter and to follow up on our September 8, 2025 letter to Miranda Patrucic, Alesya Marohovskaya, and Alex Papachristou about the article published by OCCRP and iStores headlined "Telegram, the FSB, and the Man in the Middle" (the "Article") and published by OCCRP and iStories.[1]  In our September 8 letter, we identified numerous false and defamatory accusations about Mr. Vedeneev in the Article and explained their falsity in substantial detail.

We are surprised that OCCRP and iStories are standing by the Article and the accompanying videos (which we refer to herein collectively with the Article) despite being aware of the numerous falsehoods in them—and despite Roman Anin's ethical and legal violations in his reporting for the Article.  Your September 23 letter glaringly fails to engage with the detailed facts explained in our September 8 letter—and it speaks volumes that you "will not endeavor a point-by-point response" to the explanations in our letter.  If anything, your letter highlights your clients' and your disinterest in accurately reporting on Mr. Vedeneev.

---

[1] Roman Anin, Nikita Kondratyev & Ilya Lozovsky, Telegram, the FSB, and the Man in the Middle, OCCRP (June 10, 2025),                    https://istories.media/en/stories/2025/06/10/telegram-fsb,                    and https://www.occrp.org/en/investigation/telegram-the-fsb-and-the-man-in-the-middle.



**I.    The Article Is Rife with False and Defamatory Claims and Implications About Mr. Vedeneev—Many of Which Your September 23 Letter Does Not Even Attempt to Rebut.**

You write in your September 23 letter that our September 8 letter does not identify any falsehoods in the Article. Not so. We identified numerous false assertions and implications in the Article *and* explained *how and why* they are false. You just choose not to address them in your letter. For example, your September 23 letter does not attempt to address the demonstrably false statements of fact that:

- "Until 2020, the Telegram IP addresses now assigned by GNM were controlled by GlobalNet." *That is false. As we explained, GlobalNet has never been a recognized LIR and has never allocated IP addresses to Telegram or anyone else.*

- ElectronTelecom is "related to Telegram's infrastructure" and "assigned more than five thousand of the messenger's IP addresses." *That is false. As we explained, ElectronTelecom has never been a recognized LIR and has never had the authority to assign IP addresses to Telegram or any other entity, and it has thus never been able to do so and has never done so.*

- "Electro[nT]elecom installs and manages equipment for a system used by the FSB offices in St. Petersburg and the Leningrad region for surveillance." *That is false and deliberately misleading. As we explained, ElectronTelecom holds the lowest Russian government clearance, which permits participation in some commercial tenders involving infrastructure with classified elements, but only to the extent necessary for civil works. These contracts were purely commercial, unrelated to any surveillance or cooperation with the FSB.*

- "'If someone has access to Telegram traffic and cooperates with Russian intelligence services, this means that the device identifier becomes a really big problem – a tool for global surveillance of messenger users, regardless of where they are and what server they connect to.'" *That is false and deliberately misleading. As we explained, Mr. Vedeneev and GNM have never accessed Telegram traffic, do not cooperate with Russian intelligence agencies, and Telegram's device identifier changes every 24 hours, making such tracking impossible.*

Those falsehoods and the many others like them that we identified in our September 8 letter further demonstrate the falsity of the Article's entire premise—that Mr. Vedeneev and GNM have accessed, hacked, or otherwise monitored Telegram communications to engage in espionage for the Russian government. Notably, your letter does not attempt to defend that false premise. Instead, you cherry-pick a handful of subsidiary assertions that OCCRP and iStories made about Mr. Vedeneev in the Article and attempt to defend them. But even those defenses fall flat.

*First*, you assert in your September 23 letter that Mr. Vedeneev worked for Telegram. But that is irrelevant, and we never said that Mr. Vedeneev did not perform work for Telegram. Rather, we explained that while Mr. Vedeneev performed some limited work for Telegram in 2015 when it was a small start-up, that work involved only "the selection of telecom service providers," and Mr. Vedeneev had only "narrowly tailored authorization to sign provider contracts on Telegram's behalf" to streamline the contracting process. Moreover, we explained that Mr. Vedeneev never



held a formal position at Telegram and was never paid by Telegram for any services." The point we made—that you attempt to sidestep—is that "[t]hese limited rights did not include any authority over Telegram's internal systems, infrastructure, or data," such that they did not enable him to access or otherwise monitor Telegram communications.

***Second***, you assert in your September 23 letter that Mr. Vedeneev and GNM control Telegram IP addresses because GNM subassigned IP addresses to Telegram. But, as Mr. Vedeneev explained to Mr. Anin before publication of the article, subassignment of IP addresses does not indicate or provide control over them. And as we told you in our September 8 letter, "allocating IP addresses does not equate to routing authority or network control, that routing was exclusively managed by Telegram, and that routing determines actual operational control over network traffic." We even explained the point at length:

> GNM is a recognized Local Internet Registry (LIR) under the authority of RIPE NCC—an independent, not-for-profit organization that functions as the Regional Internet Registry (RIR) responsible for allocating and administering Internet number resources (including IP addresses and Autonomous System Numbers) in Europe, the Middle East, and Central Asia. As an LIR, GNM receives IP addresses from RIPE and allocates them to its clients—including Telegram—on a wholesale basis. Once allocated, Telegram independently configures and routes these IP addresses within its infrastructure. *This routing process is entirely managed and controlled by Telegram, not GNM. While GNM has allocated thousands of IP addresses to Telegram over time, all routing decisions, usage policies, and operational control over those IP addresses remain solely with Telegram. These facts are verifiable through public records, including the RIPE WHOIS database and global BGP routing tables, which show that Telegram's prefixes are not originated, announced, or routed through GNM.*

Your September 23 letter completely ignores that explanation and the material distinction between allocation and control. Instead, your September 23 response simply cites back to the RIPE NCC database. The RIPE NCC database indeed designates GNM as an LIR and "responsible organization" for certain IP allocations. But, as we explained, that role is purely administrative: GNM pays registry fees, maintains contact records, and may sponsor sub-allocations under RIPE policies. *It does not confer operational authority, such as routing decisions, prefix announcements, or access to Telegram's systems.*

***Third***, you assert in your September 23 letter that because Mr. Vedeneev and GNM had physical access to Telegram's servers, they could access Telegram data. And in support of that assertion, you quote (out of context) a statement that Mr. Vedeneev made during an interview with Mr. Anin. As an initial matter, as we explain below, Mr. Amin's surreptitious recording of that interview was illegal, as a Swiss court has already found. But more fundamentally, you fail to recognize—apparently willfully, because we explained this point in our September 8 letter—that Mr. Vedeneev and GNM n*ever possessed the administrative credentials, cryptographic keys, or any other means to manage Telegram's traffic engineering or encryption protocols.* As detailed in Telegram's official data center documentation, data centers operate independently with end-to-end encryption,



rendering external interception infeasible without access to internal keys—which Mr. Vedeneev and GNM do not have. And, as we explained: "Like any LIR, infrastructure operator, or data center, GNM cannot directly or indirectly access, intercept, alter, or observe Telegram's communications. GNM cannot access or decrypt Telegram traffic. Decryption is technically impossible without private encryption keys, which GNM has never possessed."

*Lastly*, you assert in your September 23 letter that Mr. Vedeneev has a history of collaborating with the FSB. You base that assertion on the fact that Mr. Vedeneev has complied with laws applicable to Russian entities he previously owned. But you intentionally obscure the facts. It is clear that the "collaboration" discussed in the Article is espionage, not lawful compliance with the law. Indeed, a widely accepted definition of "collaborate" is "to cooperate with or willingly assist an enemy of one's country and especially an occupying force."[2] The meaning and intention are clear. And we explained in our September 8 letter in no uncertain terms that **Mr. Vedeneev and GNM have never been involved in espionage on behalf of the Russian government. And, again, Mr. Vedeneev and GNM cannot access Telegram data or track its users.** There is no evidence supporting the inherently improbable claim that Mr. Vedeneev is engaged in espionage. Indeed, the Article itself states that "[t]here is no evidence that [GNM] has worked with the Russian government or provided any data." Considering the Article's entire premise is that Mr. Vedeneev has accessed, hacked, or otherwise monitored Telegram communications to engage in espionage for the Russian government, that admission is confirmatory, not exculpatory, of OCCRP's and iStories' actual malice.

You attempt to bolster the Article's false claim of espionage by contending that ElectronTelecom and GlobalNet had contracts to build and service infrastructure, citing a contract that Mr. Vedeneev provided to OCCRP and iStories. But your assertion turns the facts on their head. Mr. Vedeneev shared that contract because it demonstrates that the Russian entities had contracts *related to infrastructure, not agreements to conduct espionage* as the Article claims. Furthermore, ElectronTelecom and GlobalNet have no relationship with Telegram, and GNM has no relationship whatsoever with the Russian government. Simply put, ElectronTelecom and GlobalNet's businesses are wholly unrelated and irrelevant to Telegram.

## II.    The Purported Defenses to Defamation That You Cite in Your Letter Cannot Save OCCRP and iStories from Liability to Mr. Vedeneev.

Perhaps recognizing that the Article is rife with defamatory falsehoods, you focus the majority of your September 23 letter (other than your brief attempts to defend the four supposed facts discussed above), on the constitutional protections that you assert apply to insulate OCCRP and iStories from liability. Again, this is a telling pivot: one would think that organizations that boast about their investigative reporting would defend the truth of that reporting—not focus on purported

---

[2] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/collaborate; see also Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/collaborate ("to work with an enemy who has taken control of your own country"); Dictionary.com, https://www.dictionary.com/browse/collaborate ("to cooperate with an enemy nation, especially with an enemy occupying one's country").

4



defenses to the publication of defamatory falsehoods.  But the defenses you cite cannot save OCCRP and iStories from defamation liability.

### A.    Mr. Vedeneev Is Not a Limited-Purpose Public Figure.

Contrary to your assertion, Mr. Vedeneev is not a limited-purpose public figure.  Indeed, even the Article describes Mr. Vedeneev as "a man with no public profile."  And before OCCRP and iStories published the Article, there was no public controversy in which Mr. Vedeneev was involved.  That is fatal to your assertion that Mr. Vedeneev is a limited-purpose public figure.  Even if the Article has generated public controversy, that is irrelevant to the inquiry, as it is axiomatic that OCCRP and iStories cannot transform Mr. Vedeneev into a public figure through their Article.  As the U.S. Supreme Court has unequivocally explained, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *E.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979); *see also, e.g.*, *Porter v. Sanchez*, 2017 WL 5157898, at *3 (M.D. Fla. Nov. 7. 2017) ("[The defendant] cannot foist the status of public figure on [the plaintiff] by ginning up media coverage concerning [the object of the alleged public controversy].").

Your citation to posts that Mr. Vedeneev made on LinkedIn (attached as Exhibit B to your letter) does not change that.  Mr. Vedeneev only posted on LinkedIn about GNM's security occur ***after and in response to*** the Article.  Needless to say, those posts are irrelevant to the questions of whether a public controversy existed before OCCRP and iStories published the Article and whether Mr. Vedeneev thrust himself into that pre-existing public controversy.

In a similar vein, you assert that Mr. Vedeneev has "participated in the controversy regarding the security of Telegram," but you notably provide no evidence—not even any non-conclusory factual allegations—to support that assertion.  Because there is no such evidence.  First, your citation of a general "controversy regarding the security of Telegram" is insufficient.  The limited-purpose public figure analysis requires a court to "isolate" and "identif[y] [] a particular controversy"; a "general" or broad concern that "is shared by most [people] … is not sufficient." *Waldbaum v. Fairchild Publ's*, 627 F.2d 1287, 1297 (D.C. Cir. 1980).  A general concern about an application's security does not suffice.  Second, even if that were a sufficiently specific public controversy, Mr. Vedeneev simply has not played any role in it.  "To prove that the plaintiff is a central figure in the controversy, the defendant must put forth evidence that the plaintiff has been the regular focus of media reports on the controversy." *Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999).  Even a quick Google search shows that there was no news reporting on Mr. Vedeneev before OCCRP and iStories published their Article—let alone reporting on Mr. Vedeneev supposedly being involved in any controversy relating to Telegram.

### B.    The First Amendment Does Not Protect OCCRP's and iStories' Defamatory Falsehoods.

Next, you assert that "the statements in the Article are protected speech under the First Amendment."  But that assertion just assumes its conclusion.  And, in any event, a generic invocation of the First Amendment cannot save OCCRP and iStories from liability because, as you



surely know, the First Amendment does not protect defamatory speech: "The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-46 (2002); *accord United States v. Stevens*, 559 U.S. 460, 468 (2010) ("From 1791 to the present ... the First Amendment has permitted restrictions upon the content of speech in a few limited areas, ... including ... defamation."); *Felton v. Griffin*, 185 F. App'x 700, 701 (9th Cir. 2006) ("The First Amendment does not protect slander."). Indeed, the Supreme Court has "regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22-23 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)).

> **C.    There Is Substantial Evidence That OCCRP and iStories Published Their Defamatory Statements and Implications About Mr. Vedeneev with Actual Malice.**

Nor can the actual malice requirement of *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), save OCCRP and iStories from liability to Mr. Vedeneev. First and foremost, because Mr. Vedeneev is a private figure (see above), he need only plead and prove negligence to prevail on defamation claims against OCCRP and iStories relating to the Article. But even if Mr. Vedeneev needed to plead and prove actual malice, he would be more than able to do so here. And although you assert that actual malice presents "an extraordinarily high bar," as you well know, it is not "insurmountable." *E.g.*, *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). Mr. Vedeneev has met that bar.

OCCRP and iStories had actual knowledge that their false and defamatory claims were false when they published them. Mr. Vedeneev explained to Mr. Anin that GNM allocated IP address blocks to Telegram pursuant to its role as a Local Internet Registry (LIR) and performed routine physical maintenance on server equipment during his 3.5-hour interview. Mr. Vedeneev clearly explained that allocating IP addresses does not equate to routing authority or network control, that routing was exclusively managed by Telegram, and that routing determines actual operational control over network traffic. Mr. Vedeneev told Mr. Anin that he and GNM did not access Telegram's data. But Mr. Anin ignored that information and instead published his preconceived narrative that Mr. Vedeneev and GNM were stealing Telegram users' data to give it to Russia. This is clear evidence of actual malice. *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 873 (W.D. Va. 2016) (actual malice may be demonstrated where a reporter was aware of facts contradicting the published claims).

Moreover, as the Supreme Court has recognized, because defamation-defendants, unsurprisingly, "are prone to assert their good-faith belief in the truth of their publications," *Herbert v. Lando*, 441 U.S. 153, 170 (1979), "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("'Malice may be proved inferentially[.]'"). Here, there is substantial circumstantial evidence giving rise to a strong inference



that OCCRP and iStories published their defamatory falsehoods about Mr. Vedeneev and GNM with actual malice.

**First**, OCCRP and iStories knew there was no evidence to support their allegation that Mr. Vedeneev and GNM are providing Telegram users' data to the Russian government. As we explained above, it is not technologically feasible, and OCCRP and iStories admitted "[t]here is no evidence that [GNM] has worked with the Russian government or provided any data." Yet, they published an article stating the opposite. This is incontrovertible evidence of actual malice. *Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544, 548 (6th Cir. 2013) ("A newspaper cannot publish an accusation that it knows has no evidence behind it as a fact to fit its desired storyline and then cloak itself in the First Amendment.").

**Second**, your clients do not attempt to justify their use of inherently unreliable sources for the false and defamatory claims in the Article, which is further evidence of actual malice. *Biro v. Condé Nast*, 807 F.3d 541, 545 (2d Cir. 2015); *see also Stern v. Cosby*, 654 F. Supp. 2d 258, 281 (S.D.N.Y. 2009) (defendant's awareness of source's "possible bias and/or unreliability" was evidence of actual malice). Mr. Anin's use of anonymous sources without explanation contradicts the Society of Professional Journalists' Code of Ethics.[3] Similarly, your September 23 response does not address OCCRP and iStories' use of Elies Campo as a source. Again, Telegram has repeatedly denied that Mr. Campo was an employee.[4] And Mr. Campo has a history of making false claims about his employment.[5] Additionally, Mr. Campo is a political activist who claims to be a victim of spyware and, therefore, is obviously not an impartial source.[6] The Article fails to disclose to readers Mr. Campo's controversial public profile. Your clients refused to explain the steps they took to confirm his employment in light of these facts or to justify excluding the bias and controversy surrounding his claims.

**Third**, OCCRP and iStories recklessly published inherently improbable claims of espionage without any evidence. Publishing "inherently improbable" statements can support a finding of actual malice in a defamation lawsuit. *See, e.g., US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 60 (D.D.C. 2021), *appeal dismissed sub nom.*, US Dominion, Inc. v. My Pillow, Inc., 21-7103, 2022 WL

---

[3] Society of Professional Journalists, *Code of Ethics*, https://www.spj.org/spj-code-of-ethics; *Biro*, 807 F.3d at 546 ("[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice.").

[4] Staff, *Elies Campo Has Deceived 'Citizenlab' and 'The New Yorker,'* elTriangle (May 6, 2022), https://www.eltriangle.eu/es/2022/05/06/elies-campo-ha-enganado-a-citizenlab-y-a-the-new-yorker; Staff, *Elies Campo, the Mastermind Behind Catalangate: Neither Hired by Telegram nor a Graduate in Engineering*, Cronica (Apr. 10, 2023), https://cronicaglobal.elespanol.com/politica/20230410/elies-campo-catalangate-ni-contratado-telegram-licenciado/755174507_0.html; Staff, *The CV of the Architect of the 'Catalangate' Is Under Suspicion*, Cronica (May 7, 2022), https://cronicaglobal.elespanol.com/politica/20220507/el-curriculum-del-artifice-catalangate-bajo-sospecha/670682946_0.html.

[5] Jose Javier Olivas Osuma, *The Pegasus Spyware Scandal A Critical Review Of Citizen Lab's 'CatalaGgate' Report*, Department of Political Science and Administration, Universidad Nacional de Educación a Distancia, 75 (2023), https://eprints.lse.ac.uk/118492/5/ThePegasusspywarescandal_AcriticalreviewCatalanGate_OlivasOsunaJJ2023.pdf.

[6] *Id.* at 46.



774080 (D.C. Cir. Jan. 20, 2022), *cert. denied sub nom. MyPillow, Inc. v. US Dominion, Inc.*, 214 L. Ed. 2d 120, 143 S. Ct. 294 (2022) (plaintiffs sufficiently pled actual malice where statements were so "inherently improbable that only a reckless person could have believed them"); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003).  The evidence overwhelmingly demonstrates that Mr. Vedeneev and GNM were not involved in espionage or data theft.  Nevertheless, OCCRP and iStories persist in publishing the opposite claim—even after conceding that they have no factual basis to support it.

*Fourth*, OCCRP and iStories intentionally disregarded key sources and failed to investigate their inherently improbable claims.  *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("[C]ourts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contradictory information").  Mr. Anin never revealed in the "fact-check" or during the interview that he intended to accuse Mr. Vedeneev or GNM of espionage or of acting as a "man-in-the-middle" for the FSB.  Mr. Anin never provided Mr. Vedeneev a meaningful opportunity to comment on that allegation.  Furthermore, Mr. Anin ignored Telegram's public statements in which the company has explained that it operates all servers internally, that "no unauthorized access is possible," and that it has "never shared personal messages" or "encryption keys" with any third party.[7]

OCCRP and iStories reported on Telegram and GNM's denial of its claims but continued to distort the facts, claiming that GNM admitted to "complying with Russia's SORM surveillance regulations."[8]  As Mr. Vedeneev explained prepublication and we repeated post-publication, GNM has never operated in Russia and therefore has never been controlled by or complied with any Russian law or regulation.  Yet another example of your clients disregarding information within their possession.

*Lastly,* Mr. Vedeneev informed you prepublication that your claims that he controlled Telegram or accessed its data were false, and we reiterated this post-publication.  Your clients' persistent refusal to retract these demonstrably false claims, despite actual knowledge of their falsity, is evidence of actual malice.  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013) (failure to retract may tend to support a finding of actual malice); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) (same); *Beneficient v. Gladstone*, No. 6:23-cv-00376, 2024 WL 2338256, at *1 (E.D. Tex. May 22, 2024) ("Plaintiffs have adequately alleged actual malice by stating, among other things, that they 'repeatedly notified Gladstone of specific factual errors' in the article and that Gladstone nevertheless rejected or ignored their corrections to 'serve his preconceived agenda'"); Restatement (Second) of Torts Section 580A, cmt. D ("Under certain circumstances evidence" of a "refusal to retract a statement after it has been demonstrated to him to be both false and defamatory...might be relevant in showing recklessness at the time the statement was published").

---

[7] BBC Russia, Telegram, (Jun. 10, 2025), https://t.me/bbcrussian/81393.

[8] Alena Koroleva, Telegram Responds to Investigation that Links Its Infrastructure to Russian Security Services, OCCRP (Jun. 12, 2025), https://www.occrp.org/en/news/telegram-responds-to-investigation-that-links-its-infrastructure-to-russian-security-services



Taken together, Mr. Anin's violation of journalistic standards, plainly illegal conduct, and biased sourcing, along with OCCRP and iStories' refusal to retract, provide ample evidence of reckless disregard of the truth in favor of Mr. Anin's preconceived narrative.[9] We are confident that discovery will yield even more evidence of your clients' reckless disregard for the truth.

### D.    The D.C. Anti-SLAPP Statute Cannot Save OCCRP and iStories from Defamation Liability.

Finally, you assert in your September 23 letter that "any claims arising from the Article would be barred at the threshold by the District of Columbia's Anti-SLAPP Act. It will not.

As explained above, there is more than sufficient evidence to which Mr. Vedeneev will be able to point to plead and prove that not only did OCCRP and iStories publish defamatory falsehoods about him, but that it did so with the requisite fault. That fault is negligence, but even if Mr. Vedeneev needs to plead and prove actual malice, he will be able to do so. Indeed, as explained above, Mr. Vedeneev will plead and ultimately prove actual malice as necessary to support a claim for punitive damages. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346 (1974). Thus, the D.C. Anti-SLAPP Act will pose no obstacle.

Additionally, to the extent Mr. Vedeneev sues OCCRP and/or iStories in federal court in the District of Columbia, the D.C. Anti-SLAPP Act will not apply. *See, e.g.*, *Akhmetshin v. Browder*, 761 F. Supp. 3d 1, 15-16 (D.D.C. 2024) (citing *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1333, 1334 (D.C. Cir. 2015) (Kavanagh, J.)).

### III.    Mr. Anin Engaged in Unethical and Illegal Actions in His Reporting for the Article—A Fact That You Do Not Dispute—And Immediate Corrective Action Is Required.

OCCRP's and iStories' knowing defamation of Mr. Vedeneev is bad enough—and bad enough to sustain substantial punitive damages. But even more egregiously, Mr. Amin violated the law in his reporting for the defamatory Article—as a Swiss Court has already found.

Mr. Vedeneev spoke with Mr. Anin prepublication, off the record, and with the understanding that the Article would not mention him or his companies. Mr. Vedeneev understood that their conversation was private and would not be recorded or publicized in any way. Despite that understanding, Mr. Anin recorded the conversation from multiple angles, such that it appears there was a camera crew in the room during the call. During the recorded conversation, Mr. Vedeneev was in Switzerland and Mr. Anin was in California. Recording without the

---

[9] *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (denying defendant's motion for summary judgment and finding "[a]lthough failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact.").



permission of both parties is illegal in both places.[10]  Nevertheless, Mr. Anin publicized cherry-picked portions of that illegal recording in YouTube videos published on June 10, 2025 and July 10, 2025.[11]

Upon learning of the video, Mr. Vedeneev asked a Swiss court to order Mr. Anin and YouTube to remove the June 10 and July 10 video.[12]  The court found that Mr. Anin violated Mr. Vedeneev's personality rights under Article 28(1) of the Swiss Civil Code.  The court noted that during the interview (between minutes 1:10 and 1:41), Mr. Anin asked for permission to publish excerpts, and Mr. Vedeneev never consented.  Therefore, the disclosure was unlawful.  The court ruled that Mr. Anin must remove the interview from publication and refrain from sharing it with any third parties.  Mr. Anin has yet to comply with this court order.  Because it was illegally made, OCCRP and iStories will not be able to use this illegal recording in any litigation in this matter or any other.[13]

Notably, in your September 23 letter, you do not dispute the illegality of Mr. Amin's surreptitious and unauthorized recording of Mr. Vedeneev.  Mr. Amin's callous disregard for the law is even further evidence of his disregard for journalistic ethics and his actual malice.  *Morsette v. "The Final Call,"* 309 A.D.2d 249, 258-59 (N.Y. App. Div. 2003) (gross departure from standards of responsible journalism supports a finding of liability and punitive damages).

***Accordingly, and in light of the judicial determination that Mr. Amin's recording of Mr. Vedeneev was unlawful, we demand that Mr. Anin, OCCRP, and iStories immediately (1) segregate and sequester any and all copies of that recording, whether electronic o on physical media, and refrain from playing, distributing, or sharing it; and (2) send us a complete, unedited copy of that recording.***

## IV.     OCCRP and iStories Must Immediately Retract the Article and Take Concrete Actions to Mitigate the Harm They Have Caused Mr. Vedeneev.

As explained in our September 8 letter and reiterated above, OCCRP and iStories must take immediate and concrete actions to mitigate the harm that their false and defamatory accusations have caused—and continue to cause—Mr. Vedeneev.

At a minimum, in addition to the corrective action relating to Mr. Anin's unlawful recording of Mr. Vedeneev (see above), OCCRP and iStories must do the following:

---

[10] Cal. Penal Code § 632(a); Swiss Civil Code Art. 28(1); Swiss Criminal Code Art. 179bis and 179 ter.

[11] iStories, *How is Telegram connected to the FSB? And what does this mean for you? Investigation*, YouTube (Jun. 10, 2025), https://www.youtube.com/watch?v=s7pnANMPigg;iStories, *"If we don't give out users, we'll be shut down." A conversation about Telegram and FSB*, YouTube (Jul. 10, 2025), https://www.youtube.com/watch?v=UmgP7jbhU7s.

[12] District Court of Baden, Civil Court Presidium, Order of 17 Oct. 2025, SZ.2025.169 / hu, Vladimir Vedeneev v. Roman Anin and Google Inc.

[13] Cal. Penal Code § 632(d) ("evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding").



1.  Retract the Article and related videos in full;

2.  Issue a clear, written, and prominently published apology to Mr. Vedeneev and GNM for the reputational and economic harm that the Article and videos have caused him;

3.  Cease and desist from repeating or republishing any of the accusations against Mr. Vedeneev and GNM identified in this letter; and

4.  Pay money damages to Mr. Vedeneev in the amount of $2 million.[14]

As you know, failure to take the essential remedial steps listed above will constitute additional evidence of actual malice.[15]

**Please understand that we do not make these demands lightly. Mr. Vedeneev is ready to take all necessary steps to enforce his rights and seek redress from OCCRP and iStories— including, if necessary, litigation. And if litigation is necessary, he intends to see it through to a final judgment.**

Now—not later—is the time to resolve this matter. Mr. Vedeneev and we are not interested in *post hoc* justifications. But if OCCRP and iStories are willing to take meaningful steps to remedy the harm they have caused Mr. Vedeneev, we would be more than happy to discuss the matter with you, whether by phone, Zoom, or even in person. Please let us know.

## V.    Litigation Hold—Document Preservation Obligations

Finally, your September 23 letter did not confirm that OCCRP, iStories, or the persons who worked on the Article are preserving their documents—or even acknowledge our document hold demand. We repeat it here

> Finally, until the issues discussed in this letter are resolved, OCCRP and iStories should reasonably anticipate litigation relating to the Article. Accordingly, we require that OCCRP, iStories, Mr. Anin, Ms. Kondratyev, Mr. Lozovsky, and anyone who has performed any work relating to the Article preserve and retain all documents, data, and electronically stored information relating in any way to the Article, Mr. Vedeneev, GNM, ElectronTelecom, GlobalNet, Global Network Management Ltd., Telegram, Pavel Durov, or Vladimir Vedeneev. These items must

---

[14] This sum represents only a small part of the damages caused to Mr. Vedeneev and GMN by OCCRP's and iStories' false and defamatory claims so far. Mr. Vedeneev and GMN will continue to incur increasing damages so long as the Article and videos are not retracted.

[15] *E.g.*, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013) (failure to retract may tend to support a finding of actual malice); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("Refusal to retract an exposed error tends to support a finding of actual malice."); *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (a defamation defendant's post-publication actions can constitute circumstantial evidence of actual malice); *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1043 (Del. Super. Ct. 2023) ("[A] refusal to retract the statement and continuing to repeat statements that have been proven false."); *Eramo*, 209 F. Supp. 3d at 874 (post-publication conduct can be probative of state of mind at publication).



be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails, text messages, voicemail messages, social media posts, or in any other form. ***Failure to adhere to this request could subject you to significant penalties, including claims and sanctions for spoliation. Please let us know if this request is in any way unclear.***

Please confirm that OCCRP, iStories, Mr. Anin, Ms. Kondratyev, Mr. Lozovsky, and anyone who has performed any work relating to the Article are preserving and retaining all documents as demanded.

\*        \*        \*

This is not a complete statement of Mr. Vedeneev's and GNM's rights, all of which are expressly reserved. We look forward to your prompt response. Please confirm receipt of this letter.

Very truly yours,

Joseph R. Oliveri

Kathryn G. Humphrey

cc:     Alexander Papachristou (apapachristou@nycbar.org)
         Josephine Herman (jherman@nycbar.org)

12

# Exhibit G

**Weil, Gotshal & Manges LLP**

BY E-MAIL

2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: +1 202 682 7000
Fax: +1 202 857 0940

**Mark A. Perry**
202-682-7511
Mark.Perry@weil.com

November 19, 2025

Joseph R. Oliveri
Kathryn G. Humphrey
Clare Locke
10 Prince Street
Alexandria, VA 22314

**Re: Telegram Article (OCCRP and iStories)**

Counsel:

On behalf of the Organized Crime and Corruption Reporting Project ("OCCRP") and Important Stories ("iStories"), we are responding to your October 30, 2025 letter. For the reasons set forth in our September 23, 2025 letter, no retraction or other action is warranted. OCCRP and iStories stand by the Article as published.

In response to your inquiry, we confirm that both OCCRP and iStories have been advised of their obligations to preserve documents and other information related to the Article in connection with threatened litigation under US law. We remind you that Mr. Vedeneev and the other entities referenced in the Article and your two letters are under the same obligations.

Without acknowledging or conceding the accuracy or relevance of anything else asserted in your October 30, 2025 letter, none of those assertions requires or warrants a further response at this time.

OCCRP and iStories reserve all rights.

Sincerely,

Mark A. Perry

CC: Alexander Papachristou